No. 25-1853

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

### IN RE: ALECTO HEALTHCARE SERVICES, LLC

*Debtor*,

### THE REED ACTION JUDGMENT CREDITORS,

*Appellants*,

v.

### ALECTO HEALTHCARE SERVICES, LLC,

*Appellee.*

---

On Appeal from the United States District Court for the District of Delaware,
Cause No. 1:24-cv-00494-GBW (lead) and 1:23-cv-1442-GBW (consolidated)
Judge: Honorable Gregory B. Williams

---

### APPELLANTS' BRIEF

---

Bren J. Pomponio, Esquire
Colten L. Fleu, Esquire
**Mountain State Justice, Inc.**
1217 Quarrier Street
Charleston, WV 25301
Tel.: (304) 326-0188
Email: colten@msjlaw.org
      bren@msjlaw.org

William D. Sullivan, Esq. (No. 2820)
William A. Hazeltine, Esq. (No. 3294)
**Sullivan Hazeltine Allinson LLC**
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel.: (302) 428-8191
Email: bsullivan@sha-llc.com
      whazeltine@sha-llc.com

and

Maureen Davidson-Welling, Esquire
PA ID No. 206751
John Stember, Esquire
PA ID No. 23643
**Stember Cohn &**
**Davidson-Welling, LLC**
The Hartley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA  15219
Tel.: (412) 338-1445
Email: mdw@stembercohn.com
jstember@stembercohn.com

*Attorneys for Appellants the Reed Action Judgment Creditors*

# **TABLE OF CONTENTS**

INTRODUCTION ....................................................................................1

STATEMENT OF JURISDICTION........................................................3

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................4

    A.    Designation Appeal ..............................................................4

    B.    Confirmation Appeal ...........................................................4

STATEMENT REGARDING RELATED CASES ..................................5

STATEMENT OF THE CASE.................................................................6

    A.    Alecto Health Services, LLC ..............................................6

    B.    The *Reed* Action in Federal Court in West Virginia............7

    C.    Alecto Swiftly Hides Assets................................................8

    D.    Alecto Funnels Resources to Insolvent Subsidiaries Despite Its Duties to Its Creditors..................................................................8

    E.    Alecto Files for Bankruptcy Under Subchapter V Seeking Debtor Protections Intended for Smaller Businesses...........................9

    F.    Alecto's Schedules Understated Liabilities and Exposed Conflicts Between the Debtor and Its Officers and Managers ..........10

    G.    Creditors Submit Claims Showing That Alecto Had Non-Contingent, Liquidated Liabilities in Excess of Subchapter V Eligibility Limits ................................................................12

    H.    The LHP Claim .................................................................13

    I.    Reed Creditors Move to Revoke Alecto's Subchapter V Designation...................................................................156

J.      Alecto's Inadequate and Tainted Investigation of Potential Claims Against Insiders ....................................................................................17

K.      The Plan .............................................................................................19

L.      The Reed Creditors' Plan Objection ................................................21

M.    Confirmation Hearing Establishes Insolvency and Conflicts ............21

N.     Confirmation Ruling .........................................................................25

O.     The District Court Affirms ................................................................26

STANDARD OF REVIEW ....................................................................................28

SUMMARY OF THE ARGUMENT .....................................................................28

ARGUMENT ..........................................................................................................33

I.       THIS COURT SHOULD REVERSE THE DESIGNATION ORDER BECAUSE THE BANKRUPTCY COURT ERRED IN RULING THAT ALECTO WAS ELIGIBLE TO BE A SUBCHAPTER V DEBTOR ..........33

A.     The LHP Claim Was Not Contingent .................................................33

B.     The LHP Claim Was Liquidated .......................................................37

1.     Alecto's principal's lack of knowledge is not relevant in determining whether the LHP Debt was liquidated .................39

2.     The plain language of the Lease Agreements expressly provides that the common area maintenance charges were due and payable monthly .......................................................................41

3.     Whether Alecto retains a right to dispute its obligation to LHP does not make the LHP Claim unliquidated ...................42

4.     The 2022 Settlement Agreement between Alecto and LHP has no impact on the liquidated status of the LHP obligation .................................................................................43

II.    THE CONFIRMATION ORDER SHOULD BE REVERSED BECAUSE
       THE COURT ERRED IN APPROVING THE RELEASE OF CLAIMS
       AGAINST THE RELEASED PARTIES .......................................................44

       A.    The Applicable Legal Standard for Evaluating Fraudulent
             Transfer Actions ...................................................................................46

       B.    The Bankruptcy Court's Misplacement of the Burden of Proof
             on the Reed Creditors on the Solvency Issue Was Not Harmless
             Error.......................................................................................................47

       C.    The Bankruptcy Court Erred By Accepting the Testimony of
             Mr. Balasiano That There Were No Viable Causes of Action
             Against the Debtor's Insiders  ..........................................................50

       D.    The Bankruptcy Court Erred By Relying on Alecto's Evidence
             In its Conclusion that Alecto Was Solvent at the Time of the
             Sunrise REH Transfer .........................................................................52

       E.    The Bankruptcy Court Erred in Misapplying the Factors for
             Approval of a Settlement......................................................................55

CONCLUSION ......................................................................................................57

COMBINED CERTIFICATIONS

# **TABLE OF CITATIONS**

Cases                                                                                                          Page

*Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635 (3d Cir. 1991) .............28

*Barcal v. Laughline (In re Barcal)*, 213 B.R. 1008 (B.A.P. 8th Cir. 1997) .......41, 43

*Braniff Airways, Inc. v. Exxon Co., U.S.A.,* 814 F.2d 1030 (5th Cir. 1987).............34

*In re Am.'s Ins. Ctr., Inc.*,
    No. 20-1506, 2021 U.S. App. LEXIS 24008 (3d Cir. Aug. 12, 2021)...............44

*In re Coram Healthcare, Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004)........48, 55, 56

*In re Fostvedt*, 823 F.2d 305 (9th Cir. 1987) ............................................................37

*In re Fountain*, 612 B.R. 743 (9th Cir. BAP 2020) ...................................................37

*In re Fradkov*, No. 20-18987-JKS,
    2020 Bankr. LEXIS 3182 (Bankr. D.N.J. Nov. 12, 2020) ..................................37

*In re Hall*, 650 B.R. 595 (Bankr. M.D. Fla. 2023) ............................................39, 40

*In re Heritage Highgate, Inc.*, 679 F.3d 132 (3d Cir. 2012) ...................................28

*In re Jordan*, 166 B.R. 201 (Bankr. D. Me. 1994) ...................................................38

*In re Mazzeo*, 131 F.3d 295 (2d Cir. 1997)..............................................................37

*In re McKenzie Contracting, LLC*, Case No. 8:24-bk-01255-RCT,
    2024 Bankr. LEXIS 1712 (Bankr. M.D. Fla. 2024) ...........................................39

*In re Mitchell*, 255 B.R. 246 (Bankr. D. Mass 2000) ...............................................38
38
*In re Nutraquest, Inc.*, 434 F.3d 639 (3d Cir. 2006)..........................................44, 45

*In re Pennypacker*, 115 B.R. 504 (Bankr. E.D. Pa. 1990).......................................36

*In re Pulliam*, 90 B.R. 241 (Bankr. N.D. Tex. 1988) ..............................................35

*In re Rosenberg,* 414 B.R. 826 (Bankr. S.D. Fla. 2009)..........................................34

*In re Spansion, Inc.*, No. 09–10690(KJC),
    2009 Bankr. LEXIS 1283 (Bankr. D. Del. June 2, 2009)............................48, 56

*In re Sullivan*, 245 B.R. 416 (N.D. Fla. 1999)..........................................................39

*In re Taylor*, No. 08-00526-JDP,
    2008 Bankr. LEXIS 2313 (Bankr. D. Idaho July 25, 2008)...............................35

*In re Trans World Airlines, Inc.*, 134 F.3d 188 (3d Cir. 1998) ...............................47

*In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) ....................48

*In re Wilson*, 9 B.R. 723 (Bankr. E.D.N.Y. 1981)....................................................36

*In re Zhang Medical P.C.*, 655 B.R. 403 (Bankr. S.D.N.Y. 2023) .........................39

*Mellon Bank, N.A. v. Metro Communications, Inc.*,
    945 F.2d 635 (1991)..........................................................................................47

*Myers v. Martin (In re Martin)*, 91 F.3d 389 (3d Cir. 1996)..................................45

*Nicholes v. Johnny Appleseed (In re Nicholes)*,
    184 B.R. 82 (B.A.P. 9th Cir. 1995) .................................................................43

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414, 424 (1968)..................................................................................45

*Reed v. Alecto Healthcare Servs., LLC*,
    No. 5:19-CV-263, 2022 WL 4119367 (N.D.W. Va. Aug. 2, 2022)....................7

*United States v. May*, 211 B.R. 991 (M.D. Fla. 1997) ............................................40

**Statutes**

11 U.S.C. § 1182(1) ..................................................................................................33

**Other Authorities**

2 L. King *Collier on Bankruptcy* ¶ 109.06[2][c] (15th ed. rev. 1997))............38, 40

v

## INTRODUCTION

Alecto Healthcare Services, LLC ("Alecto") formed in 2012, rapidly expanded by acquiring five distressed hospitals throughout the U.S, but could not operate them profitably. It soon closed four, leaving behind a trail of lawsuits. The Reed Creditors ("Appellants"), are several hundred employees who lost their jobs when Alecto closed its Wheeling, WV hospital. On August 2, 2022, the federal district court entered judgment for them for $3,169,745.72 against Alecto under the WARN ACT.

Alecto did a number of things to shield itself from ever having to pay these workers. It quickly rearranged its balance sheet to make certain assets look like debts. It funneled resources to insolvent subsidiaries despite its obligations to creditors, despite knowing its interest in these subsidiaries was worthless and the sums could not be repaid. Then Alecto filed for bankruptcy, seeking advantageous protections under Subchapter V of Chapter 11 – even though it had too much non-contingent, liquidated debt to fit within eligibility limits. This was significant since allowing Alecto access to Subchapter V meant it could "cramdown" its plan over creditor objections, with its members still retaining their equity interests.

When Appellants raised conflict issues and potential claims against insiders, Alecto handpicked an independent director, Balasiano, to investigate claims and bring any actions he believed were valid. Balasiano did not independently

investigate and did not obtain a solvency analysis (necessary for fraudulent transfer claims) from his financial expert.  Instead, Balasiano relied on inadequate information spoon-fed by Alecto insiders (themselves likely targets of any investigation), to determine that Plan was reasonable, although it offered only paltry sums to release insiders from millions in liability.  The fox was not only guarding the henhouse, it was advising the hens.

Appellants appeal the Subchapter V eligibility and Plan confirmation decisions.

## <u>STATEMENT OF JURISDICTION</u>

The Bankruptcy Court had jurisdiction to enter the Designation Order and the Confirmation Order pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* entered by the Court on February 29, 2012. The District Court had jurisdiction over the Reed Creditors' appeal pursuant to 28 U.S.C. § 158(a). This Court has jurisdiction to review the appeal of the District Court's order affirming the Bankruptcy Court pursuant to 28 U.S.C. § 158(d)(1).

On April 30, 2025, Appellants filed a timely notice of appeal of the District Court's March 31, 2025 opinion and order. Joint Appendix ("JA") 1. The order from which this appeal is taken is a final decision of the District Court, disposing of all issues before it, within the meaning of 28 U.S.C. § 158(d)(1).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

**A.    Designation Appeal**

**1.**    Whether the District Court erred in affirming the Bankruptcy Court's ruling that the Debtor was eligible to proceed under Subchapter V of the Bankruptcy Code based on the lower court's determination that the claim of LHP Hospital Group, Inc. was both contingent and unliquidated as of the Petition Date solely because LHP had not demanded payment on the claim. This issue was raised before the District Court in Appellant's Opening Brief, pp. 26-37.  JA2801-2812.  The District Court ruled on this issue in its Mem. Op. & Order at pp. 16-23.)  JA55-62.

**B.    Confirmation Appeal**

1.    Whether the District Court erred in determining the Bankruptcy Court's conclusion that the Reed Creditors bore the burden of proof on the issue of insolvency was harmless error. This issue was raised before the District Court in Appellant's Opening Brief, pp. 39-41. JA2814-2816. The District Court ruled on this issue in its Mem. Op. & Order at pp. 26-28. JA65-67.

2.    Whether the Bankruptcy Court's reliance on the testimony of Mr. Balasiano that there were no viable causes of action against the Debtor's insiders was clearly erroneous.  This issue was raised before the District Court in Appellant's Opening Brief, pp. 41-44. JA2816-2819.  The District Court ruled on this issue in its Mem. Op. & Order at pp. 25-28.  JA 64-67.

3.    Whether the Bankruptcy Court erred in relying on the Debtor's evidence in ruling that the Debtor was solvent at the time of the Sunrise REH Transfer. This issue was raised before the District Court in Appellant's Opening Brief, pp. 44-47. JA2819-2822. The District Court ruled on this issue in its Mem. Op. & Order at pp. 25-28. JA64-67.

4.    Whether the Bankruptcy Court erred in misapplying the factors for approval of a settlement under Section 1123(b)(3)(A) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure. This issue was raised before the District Court in Appellant's Opening Brief, pp. 47-49. JA2822-2824. The District Court ruled on this issue in its Mem. Op. & Order at pp. 29-30. JA68-69.

## STATEMENT REGARDING RELATED CASES

This case has not been before this Court previously. Appellants are aware of the bankruptcy case of one of the Debtor's affiliates in *In re Sherman/Grayson Hospital, LLC*, 23-10810 (Del. Bankr.). Appellants are not aware of any other case or proceeding that is related, completed, pending or about to be presented before this Court or any other court or agency.

## STATEMENT OF THE CASE

### A.   Alecto Health Services, LLC

Alecto is a Delaware limited liability company owned by a handful of member interest-holders, *see* JA1448-1449, including trusts for Lexman Reddy, Alecto's Chief Executive Officer, and Michael Sarrao, Alecto's Executive Vice President, General Counsel, and Secretary since January 1, 2013, JA1447. Alecto is managed by a Board of Managers, JA2731-2732 (¶¶7.2-7.3), consisting of Reddy and Sarrao. JA1577, JA1808, JA2047.

Alecto was formed in 2012 to be a holding company for healthcare related entities. JA1448. It rapidly expanded by forming subsidiaries that Alecto used in sale leaseback transactions to acquire and operate distressed acute care hospitals. JA1448-1449, JA1450-1451. Alecto controlled the funds flowing to and from its subsidiaries, *see* JA1721-1722 (48:18–49:5); JA1913 (14:3), and guaranteed many of its subsidiaries' obligations. *See, e.g.*, JA1450-1451.

Within 5-6 years, Alecto had five (5) acute care hospitals across the country, JA1452, but could not successfully operate them or pay debts as they came due. Alecto reported **$49,100,099 in losses** on its 2019 federal tax return, JA1582, and its 2019 balance sheet reflected that Alecto had virtually no assets other than purported "other receivables" arising from intercompany transfers to Alecto subsidiaries that Alecto knew would never be repaid.  JA1622, JA2761–2762.

Alecto closed two hospitals in 2019 and one in March 2020, JA1452, and later shuttered a fourth. Alecto did not pay subsidiaries' debts (sometimes despite Alecto guarantees), *see, e.g.*, JA1450–1451 (¶19), JA1115 (¶3), and LHP transaction *infra*; and Alecto left behind a trail of lawsuits by unpaid creditors. *See* JA1451–1452 (listing six lawsuits pending against Alecto in 2022 alone).

**B.     The *Reed* Action in Federal Court in West Virginia**

On September 9, 2019, the Reed Creditors sued Alecto and its subsidiary Alecto Healthcare Services Wheeling, LLC (which operated the Ohio Valley Medical Center in Wheeling, WV) ("AHSW") to recover unpaid wages due under the WARN Act, 29 U.S.C.§ 21.01, *et seq.*, to employees fired without 60-days' notice when Alecto unexpectedly closed that medical center. *Reed v. Alecto Healthcare Servs., LLC*, No. 5:19-CV-263, 2022 WL 4119367, at *1 (N.D.W. Va. Aug. 2, 2022) ("Reed Action").

On August 2, 2022, the district court entered summary judgment on liability under the WARN Act in favor of the Reed Creditor class and scheduled a hearing on damages. *See Reed*, 2022 WL 4119367, at *16. Summary judgment was entered against both defendants, which the court ruled were a "single employer" under the WARN Act. *Id.* at *7 (citing 20 C.F.R. § 639.3(a)(ii)(2)).

On November 28, 2022 (the "Judgment Date"), the district court in the <u>Reed</u>

Action entered a Judgment Order in favor of the Reed Creditors and against Alecto

and AHSW for $3,169,745.72 (the "Judgment Amount"). JA455; JA1640–1641.

### C.    <u>Alecto Swiftly Hides Assets</u>

The ink was hardly dry on the Judgment Order when Sarrao, in consultation

with Reddy and CFO Jeremy Redin, ordered changes to the balance sheet that would

shield millions of dollars from collection. JA1965–1966. Specifically, Sarrao

directed that over $8 million in cash—that could have been distributed to Alecto as

profit as the subsidiary nominally holding it (Plaza Medical Office Building, LLC

("PMOB")) had no operations and no creditors—be reclassified as a loan ("long term

liability") owed by AHS to PMOB. *Id.*

### D.    <u>Alecto Funnels Resources to Insolvent Subsidiaries Despite Its Duties to Its Creditors</u>

After the Judgment Order, Alecto paid over $5M to Alecto affiliate

Sherman/Grayson Hospital, LLC ("Sherman/Grayson") (JA1436), despite planning

bankruptcy (JA1471, ¶9), and having already advanced over $50M to

Sherman/Grayson that Alecto knew had not been, and was "unable to be, paid back."

*See* JA1476 (showing **$60,041,067.02** claim as of Petition Date). Instead of paying

its creditors, Alecto advanced more funds to Sherman/Grayson and other

subsidiaries despite valuing its interest in those entities as "$0.00," JA1448, and

knowing its claims for later repayment were "worthless."  JA1470 (¶3).

8

**E.    Alecto Files For Bankruptcy Under Subchapter V Seeking Debtor Protections Intended for Smaller Businesses**

On June 16, 2023, Alecto filed for bankruptcy in the District of Delaware under Chapter 11 Small Business Plan Subchapter V, *see* JA014, due to the Judgment Order and the Reed Creditors efforts to collect.  JA1453 (¶32).

Alecto did <u>not</u> file jointly with any of its then-insolvent subsidiaries, *see* JA0409, including AHSW, which was also subject to the judgment, and staggered the bankruptcy filing of affiliate Sherman Grayson Hospital, LLC ("Sherman/Grayson").[1]  This ensured Alecto would have no affiliate in bankruptcy when it filed.

Under Subchapter V in 2022, an eligible "debtor":

> **(A)**…**means a person** engaged in commercial or business activities **(including any affiliate of such person that is also a debtor under this title …) that has aggregate noncontingent liquidated secured and unsecured debts as of the date of the filing of the petition or the date of the order for relief in an amount not more than $7,500,000** (excluding debts owed to 1 or more affiliates or insiders) not less than 50 percent of which arose from the commercial or business activities of the debtor; and

11 U.S.C.A. § 1182 (2022) (emph. supp.).[2]

---

[1] Sherman/Grayson filed for Chapter 11 bankruptcy in the same court, represented by the same counsel, **on June 23, 2023**. *See In re Sherman/Grayson Hospital, LLC* (Case no. 23-10810-JKS); JA1468, JA1473.    Alecto owned 80% of Sherman/Grayson. JA1612.

[2] As enacted in 2019,  debtors *with less than about $2.75 million in debts* were eligible to proceed under Subchapter V.  Pub. L. No. 116-54 (2019).  This debt limit

Alecto passed itself off as eligible for Subchapter V, as it is *far* more favorable for debtors than Chapter 11. Unlike Chapter 11, Subchapter V permits debtors to "cram down" nonconsensual bankruptcy plans over creditors' objections and keep their business equity even if not all claims are fully paid;[3] allows debtors to provide less financial information to creditors, 11 U.S.C. § 1181(b); and, unless ordered, eliminates the official creditor committees that can retain counsel and experts to represent and protect the creditors as a whole and obtain reimbursement of professional fees through the bankruptcy.[4,5] *See id.*

### F. Alecto's Schedules Understated Liabilities and Exposed Conflicts Between the Debtor and its Officers and Managers

---

was increased to $7.5 million from March 27, 2020 until June 21, 2024. *See* Pub. L. No. 116-136 (2020), as amended by Pub. L. No. 117-5 (2021) and Pub. L. No. 117-151 (2022). Since June 21, 2024, the debt limit has returned to the original limit, as adjusted per 11 U.S.C. § 104, or $3,024,725.

[3] Subchapter V cases have their own specific cramdown criteria in 11 U.S.C. § 1191(b). Section 1191(b) permits a bankruptcy court, on debtor request, to confirm a plan that does not meet the requirements of subsections 11 U.S.C. § 1129(a)(8), (10), or (15), which in particular eliminates the requirement that at least one impaired class of claims has accepted the plan.

[4] Had Alecto proceeded (or had to proceed) under Chapter 11, it could not have crammed down the current Plan on the Reed Creditors, as it did, over their objections, while keeping control of its business equity.

[5] Reed Creditors filed a motion seeking appointment of a Creditors Committee in the bankruptcy court, JA0417 at D.I. 100 and D.I 134. The Motion was denied. JA0421 at D.I 152.

On June 30, 2023, Alecto filed its *Schedule of Assets and Liabilities* (the "Schedules"). JA0413; JA0700–0173. The Schedules include 17 scheduled creditors, not including affiliates or insiders, holding noncontingent, liquidated claims totaling $3,445,535.47, including the Reed Claim, which Alecto scheduled as noncontingent, liquidated and undisputed in the Judgment Amount. *Id.*

As later proceedings would reveal, the Schedules understated Alecto's true liabilities on the petition date. Among other things:

- The Schedules omitted millions of dollars of subsidiary-generated liabilities for which Alecto was liable as guarantor or "control group" or listed them as contingent, disputed and unliquidated, despite the fact that Alecto was paying them because those subsidiaries could not pay or were no longer in operation. *See infra* at pp. 22-25; *compare* JA0700–0713.

- The Schedules listed creditor LHP Hospital Group, Inc.'s claim as "contingent" and "unliquidated," JA0708, though it was neither, and although LHP demanded payment of the overdue amounts two days earlier. JA0650–0651.

The Schedules also misleadingly listed the reclassified PMOB assets (approx. $8,083,000) as an intercompany "liability" owed by Alecto to PMOB. JA0710.

After the U.S. Trustee objected to joint legal representation of Alecto and Sherman/Grayson (which separately filed for bankruptcy on June 23, 2023), and the Reed Creditors raised the issue of conflicts arising from intercompany payments, the Bankruptcy Court held a conference on August 16, 2023 to address the issues. *See* JA1481–1487.

By the time of the conference, however, Alecto had retained new counsel, (see

JA1489, JA0129) and its Board of Managers (*i.e.*, Reddy and Sarrao) selected Steven

Balasiano and approved a resolution for his appointment as an independent director

to "evaluate the Alecto Claim including the proper treatment of the Alecto Claim"

(JA1575) in the Sherman/Grayson bankruptcy.  When Reed Creditors continued to

press for appointment of a creditors committee based on conflicts between the Alecto

debtor and its officers and directors (*i.e.*, Board of Managers), Alecto headed off that

effort by expanding the role of their handpicked independent director to include

"authority to investigate potential claims against the Company's affiliates and

insiders, and to bring any such actions as he believes in his sole discretion are

valid…" JA1578–1579.

## G.    Creditors Submit Claims Showing that Alecto Had Non-Contingent, Liquidated Liabilities in Excess of Subchapter V Eligibility Limits

The *Notice of Filing of Chapter 11 Bankruptcy Case* (JA0413 at D.I. 35) set

August 15, 2023 as the deadline to file claims. Seven creditors (not including

affiliates or insiders of Alecto) timely filed non-contingent, liquidated claims

totaling $7,615,746.29.  JA0467.

These claims included: (i) the Reed Creditors, whose filed claim increased

their scheduled claim to $3,275,382.64, based on accrued interest and collection fees

(Claim No. 19 at JA714-720); (ii) Cardinal Health 110, LLC ("Cardinal 110"),

whose claim was scheduled as an unliquidated claim, filed a non-contingent and

liquidated claim in the amount of $419,842.62; [Claim No. 4-1]; (iii) Cardinal Health 200, LLC ("Cardinal 200"), whose claim was scheduled as an unliquidated claim of $81,318.11, filed a non-contingent, liquidated claim of $119,695.80 [Claim No. 5-1]; and (iv) LHP Hospital Group, Inc. ("LHP"), whose claim was scheduled as contingent and unliquidated, filed a non-contingent, liquidated claim of $3,739,653.77 (the "LHP Claim"). [Claim No. 15-1].  *See* JA0467; *compare* JA0700–0713.

## H.    The LHP Claim

The LHP Claim attached documents confirming the non-contingent, liquidated nature of the claimed debt.  *See* JA0722–0808. The documents revealed that in 2014, an Alecto affiliate ("Alecto Sherman") purchased certain hospital assets from Sherman/Grayson Health System, LLC (the "Health System"), which were transferred to Alecto affiliate Sherman/Grayson and, as part of the transaction, it assumed five long-term leases between landlord Alterra Highlands, LLC and the Health System that LHP had guaranteed.[6] The Landlord would not release LHP from its guarantee, so Alecto and Alecto Sherman executed guarantees in LHP's favor, in

---

[6] As part of the Assignment, Altera, the Health System and Sherman/Grayson entered into a Consent Agreement, pursuant to which LHP agreed that its obligations under the LHP Guarantees applied to Sherman Grayson's obligations under the Lease Agreements. JA0674–0679; JA0683–0688.

the event that LHP was ever required to pay the Landlord on its own guarantee due to any Sherman/Grayson default on the rents. JA0801–0808.

In the guarantee, Alecto (the "Guarantor") agreed:

> …the Guarantor hereby absolutely, unconditionally and irrevocably guarantees to the Guaranteed Parties the due and punctual payment, performance and discharge of each and every of Purchaser's obligations under the Purchase Agreement...

JA0801 at ¶1 (Guarantee).  This was an "unconditional guarantee of payment and performance" (JA0801 at ¶2(a)) and not subject to the defense of "demand for payment," (JA0802 at ¶2(b) among others).  The Guarantee further stated that no amendment or modification "of any provision of this Guarantee will be valid and binding *unless it is in writing and signed…by the Guarantor, Seller and LHP…*" JA0806 (emph. supp.).

In 2020 LHP sued Alecto and Alecto Sherman for breach of contract as Sherman/Grayson had defaulted on rent and Alecto had refused to honor its guarantee. JA0075.  In 2021, the Alecto entities settled with LHP, agreeing to a cash payment to resolve past unpaid rent and further agreeing that LHP was entitled to a confession of judgment in any future lawsuit so long as it gave Alecto fifteen days' notice.  *See* JA0622–0630.  The settlement agreement between the parties did <u>not</u> state that it was terminating the Guarantee. *See id.* Instead, under the settlement agreement, Alecto <u>could not dispute the guarantee or its liability for payment in future litigation</u>; it could only dispute computational errors in rent/interest

14

calculations.  *Id.* The settlement agreement was not signed by the Health System (Seller), *see* JA0630, as would have been required to modify the guarantee. JA0806.

Thereafter, Sherman/Grayson further defaulted on rents, as Alecto knew. *See* JA2034, JA2041, JA2047; JA1468 (reflecting Sarrao was EVP for both entities).  As a result, on June 28, 2022, LHP wrote demanding payment of overdue amounts of $3,708,475.62. JA0648.  Despite this, Alecto still listed the LHP debt amount as "unknown," "contingent," "unliquidated," and "disputed" in its Schedules filed two days later.  JA0708.

## I.  Reed Creditors Move to Revoke Alecto's Subchapter V Designation.

On November 2, 2023, the Reed Creditors moved to revoke Alecto's Subchapter V designation as the total of its scheduled and filed non-contingent and liquidated claims exceeded the statutory limit of $7,500,000 under 11 U.S.C. § 1182(1) (the "Designation Motion").

On November 28, the bankruptcy court held an evidentiary hearing, at which it was provided with evidence regarding LHP's Claim against Alecto, including:

- On January 20, 2021, LHP sued Alecto Sherman (as indemnitor) and Alecto (as guarantor) for unpaid obligations of Sherman/Grayson under the Lease Agreements which it had paid to the Landlord under its guarantee.  *See* JA1114–1121 (LHP Complaint at ¶¶1, 15, 21).

- The parties settled the LHP litigation on February 16, 2022, resolving all amounts owed by Alecto and Alecto Sherman to LHP through February 28, 2022. *See* JA0621–0630 (settlement agreement).

15

- From March 1, 2022 through June 1, 2023, LHP made 16 monthly payments to the Landlord in the amount specified by the Lease Agreements (the 'Payment Confirmations"). *See* JA1113.

- On June 28, 2023, LHP made a demand on Alecto Sherman, a non-Debtor entity, for payment of the $3,708,475.62. Demand pursuant to Confidential Settlement Agreement. JA0648.

- The amount asserted in LHP's claim, filed on August 14, 2023, which includes interest, is $3,739,635.77, is $31,160.15 higher than the amount sought in the June 28, 2023 Demand Letter. *See* JA0721–0722 (LHP Claim).

On December 1, 2023, the Bankruptcy Court issued an oral ruling denying the Designation Motion. The court acknowledged that "the LHP debt is the fulcrum and whether that debt is unliquidated or contingent controls the eligibility determination." JA0074 (3:2-4). Further, **"**[if] [the Reed Creditors] were correct [that the LHP Debt was non-contingent and liquidated] the debtor would exceed the statutory cap and be ineligible to proceed under Subchapter V." JA0073 (12/1/23 Tr. 2:22-24).

Nonetheless, the Bankruptcy Court erroneously ruled that the LHP claim was not "liquidated" – even though the amount due could be readily calculated from past monthly invoices or the leases – because Alecto claimed to have been "unaware" of the exact sum owed on the petition date. JA0078.

On December 4, 2023, the Bankruptcy Court entered the Designation Order, denying the Reed Creditors' objection and motion to revoke Subpart V designation

16

for the reasons "stated on the record" at the December 1, 2023 hearing.  JA0070-0071.  The Reed Creditors timely appealed. JA0694

**J.    Alecto's Inadequate and Tainted Investigation of Potential Claims <u>Against Insiders</u>**.

Effective August 19, 2023, independent director Steven Balasiano was charged with determining whether Alecto had any potential claims against its affiliates and insiders and bringing any such claims he believed were valid.  JA1578-1579.

Effective August 25, 2023, Alecto retained Gould Consulting Services ("GCS") as its Forensic Accounting Investigation Consultant to the Debtor. JA0130.  Alecto asked GCS to "conduct a forensic analysis of cash transactions into and out of the Debtor's bank accounts to identify: (a) cash payments and loans to, or for the benefit of, officers, directors, shareholders, and related-parties [...]; and (b) potentially voidable transfers to Insiders, if any."  JA0132.[7]

Although fraudulent transfer claims require proof of insolvency, Alecto <u>did not</u> ask GCS to provide any opinion on insolvency, *see id.*, and GSC's report <u>does not</u> contain a solvency analysis.  JA1766 (93:11-13). Instead, Balasiano – who was "not a financial expert," (JA1765) – relied on information and documents curated by

---

[7] GCS submitted the Report of Gould Consulting Services (the "GCS Report") to Alecto on or about September 28, 2023. A copy of the GCS Report is attached to the Plan as Exhibit D. *See* JA0217–0408.

Sarrao to determine solvency and whether to pursue claims against Alecto's

members (owners) or officers and directors (D&O claims), including Sarrao. Among

other things, Balasiano testified:

- He spoke with his own counsel, Sarrao (debtor's general counsel), Jeff Waxman (debtor's outside counsel), and Leanne Gould of GCS in investigating claims. JA1748–1749 (75:23–77:9).

- He "knew" Alecto was solvent in 2019 because "because it was represented to me when we knew that we had a bad transaction... I said, hey, guys, were we solvent at this time, because that's the next question you would ask if you're a practicing lawyer in a bankruptcy context.... So that was the question I said, were we solvent? The answer was, yes, we were solvent." JA1762 (89:11-21).

- He could not say for sure if he'd looked at Alecto's balance sheets before deciding there was no fraudulent transfer claim and the original plan with that conclusion being filed on October 16, 2023. *See* JA1762 (89:21-24).

- Balasiano had his own counsel, yet relied on a purportedly "privileged" memo prepared by debtor's counsel applying law to facts and analyzing whether Alecto had fraudulent transfer claims. JA1779.[8]

Sarrao's heavy involvement tainted the decision-making process. Sarrao was

a member/owner of Alecto, a corporate officer, and one of the two Managers

(directors) on Alecto's Board of Managers. Sarrao was highly conflicted in giving

---

[8] *See* JA1779 ("Q:..And with respect to the questions about breach of fiduciary duty, I'm going to read to you from page 55 of your deposition. And you say, "Again, that counsel, debtor's counsel did a thorough analysis and review, and issued a report and findings to me in determining that there was no breach of fiduciary duty or loyalty. And I can't discuss more than that without breaching attorney client privilege." Do you recall that testimony? A Yes."

any advice to Balasiano related to whether he (Sarrao) or the trust holding his (Sarrao's) money should be sued by Alecto.[9]

Balasiano relied on his discussions with Sarrao, and decided Alecto had no claims worth pursuing. Both the original plan filed on October 16, 2024 and the Plan filed on December 18, 2024 report Balasiano's tainted conclusions, stating that GCS presented its report to Mr. Balasiano and "[a]t the conclusion of the conference, Mr. Balasiano determined that the estate does not have any valid claims against the Insiders for avoidable transfers." JA0134.

## K.    **The Plan**.

Alecto filed the Plan on December 19, 2023, which provides that Class 3 Allowed General Unsecured Claims:

> will be paid the Debtor's projected disposable income on a pro rata basis. Pro rata Distributions will be made to Holders of Allowed General Unsecured Claims on an annual basis with the first Distribution to be made twelve months after the Effective Date.

JA0138–0139 (Plan § IV.2.d). The Confirmation Order later modified the timing of distributions. JA97-98. (Confirmation Order ¶ 53).

In the Plan, Alecto estimated that: (i) the total amount of allowed general unsecured claims will be approximately $11,000,000; and (ii) holders of allowed

---

[9] The Bankruptcy Court denied production of the Debtor's memo purporting to provide legal advice to Balasiano as privileged. *See* JA1779–1791.

general unsecured claims will receive a distribution of from 3% to 10% on account of their general unsecured claims. JA0139 (Plan § IV.2.d).  Section IV.5 of the Plan provides in pertinent part that:

> The Plan will be funded by: (1) the Debtor's projected disposable income ($848,049) generated by the Debtor's post-confirmation operations, and (2) *$25,000 provided by certain of the Released Parties.* The Debtor expects to have approximately $170,000 in combined cash on hand and accounts receivable on the Effective Date ….

JA0143 (Plan Section IV.5) (emph. supp.). On May 4, 2024, Alecto filed its Notice of Filing of Amended Exhibits C and G to the Plan ("Exhibit Notice") (Bankr. Ct. DI 316), attaching a revised Income Statement projecting an increased projected disposable income amount of $1,916,510 during the three-year distribution period. *Id.*, Ex.1.

Pursuant to Plan Section VII.2, Alecto proposed to release certain "Released Parties" from all claims Alecto may have against them in exchange for payment of $25,000. JA0148 (Plan §VII.2). The Released Parties include: "(a) the officers and managers of the Debtor; (b) the Debtor's Professionals, and (c) [sic] with respect to each of the foregoing Persons in clauses (a) through (b), such Entities' respective predecessors, successors and assigns, provided, however, that notwithstanding the foregoing, and for the avoidance of doubt, nothing herein shall release any Causes of Action of the Debtor or the Estate against any of the Debtor's representatives that did not serve in such capacity on or after the Petition Date." JA0122 (Plan § I.44).

**L.**      **The Reed Creditors' Plan Objection**.

The Reed Creditors filed their Plan Objection on February 22, 2024, contending that the Plan provided paltry compensation ($25,000) for the proposed release of all claims against the Released Parties. In particular, they pointed to the release of a potential fraudulent transfer claim against Alecto's members (the "Alecto Members") *of approximately $22,000,000.*[10] JA1420–1421 (¶3). They also identified a fiduciary breach claim against Alecto's officers and directors ("D&O claims) arising from Alecto's advancement of funds to affiliates while insolvent instead of paying creditors.  JA1421 (¶4).

On March 4, 2024, the Reed Creditors filed a Supplement to their Plan Objection, pointing out that Alecto never asked GSC for a solvency opinion, did not present evidence of "fair valuation," was improperly raising a solvency defense at the "eleventh hour," and using Sarrao's "incompetent and conflicted" testimony do to it. (JA1441–1444).

**M.**      **Confirmation Hearing Establishes Insolvency and Conflicts**.

---

[10] On June 19, 2019, Alecto transferred its 100% equity interest in Sunrise Real Estate Holdings, LLC ("Sunrise REH") to the Alecto Members, who formed a new entity named Sunrise MOB Holdings, LLC ("Sunrise MPB") to receive the Sunrise REH equity (the "Sunrise Transfer").   JA0222. The Sunrise REH equity was valuable because Sunrise REH was 100% owner of PMOB, which owned a medical office building appraised at $50,700,000.   JA0223. Alecto received approximately $28 million in value in exchange for its transfer of ultimate ownership interest in the building, which is $22,700,000 less than the appraised value of the PMOB's building.  JA0219.  The GCS Report confirms that Alecto did not receive reasonably equivalent value in the transaction. *Id.*

The Bankruptcy Court held a two-day evidentiary hearing on Plan confirmation on March 4–5, 2024.  See JA1674–1995. There, Alecto did not dispute GCS's finding that Alecto did not receive reasonably equivalent value from the Sunrise Transfer. Instead, Alecto attempted to prove that Alecto was solvent before and after the Sunrise Transfer.

The Debtor offered testimony through Sarrao, but Sarrao is not a solvency expert, as the Bankruptcy Court recognized. JA1846 (3/5/24 Tr. 47:15-17) (" He's not an expert on solvency.").

Sarrao nevertheless testified factually regarding Alecto's positive equity positions of $18.5 million, $19.9 million, and $19.9 million as reflected on Alecto's (unaudited) balance sheets for 2019-2021.  JA1834–1835, JA1839–1840, JA1842–1843; see JA1622–1629 (balance sheets). Sarrao also reviewed Alecto's 2019 tax return, which on schedule L confirmed Alecto's positive equity (based on the value of its partners' capital accounts) of $18.671 million.  JA1844–1845; JA1589 (Schedule L).  Based on this scant evidence, Sarrao testified that the Debtor was not insolvent in this period and that the Sunrise transfer did not cause Alecto to be insolvent. JA1845–1846 (46:19–47:24).

On cross examination, Sarrao acknowledged that the $18.6 million in Alecto's equity on 2019's Schedule L (the balance sheet in Alecto's 2019 tax return) depended on a $25.5 million intercompany receivable, and if that receivable had no

value, Alecto's equity would be negative. JA1937–1938 (138:13–139:19). Sarrao also acknowledged that the 2019–2021 balance sheets included receivables that may have been uncollectible, JA1895 (96:4–96:20) and did not include Alecto's liabilities for any subsidiaries which Alecto had guaranteed. JA1899 (100:4–10); JA1908 (109:22–110:8).

The Reed Creditors introduced evidence of substantial liabilities paid by, guaranteed by, or asserted against Alecto that <u>not</u> shown on the balance sheets. Sarrao confirmed, for example, that in January 2021, Alecto paid $9.4 million in unpaid federal and state payroll taxes that its Olympia subsidiary and other affiliates had accrued, (JA1637) and in August 2021, it paid an additional $10.5 million in federal and state payroll obligations its affiliates had accrued. JA1639. Sarrao confirmed that Alecto had also received a demand in September 2020 from its union pension fund for $10.8 million in withdrawal liability relating to obligations of Alecto Healthcare Services Fairmont, for former employees of the Fairmont General Hospital. JA1639. Sarro confirmed that these obligations were being paid quarterly with funding from Alecto. *See* JA1899–1900 (100:15–101:22); JA1639 (reflecting payment of $707,803 booked to Alecto re Alecto Ohio Valley Pension Plan). Sarrao confirmed that Alecto had also been sued by the Centers for Medicare & Medicaid Services ("CMS"), of the U.S. Depart. of Health and Human Services, for

reimbursement of more than $12 million in Medicare advance payments made to its Olympia affiliate. JA1897–1899 (98:20–100:3).

Sarrao stated that none of these liabilities was listed on Alecto's balance sheet because Alecto did not book obligations that originated from an affiliate or subsidiary, despite the fact that it regularly paid them. JA1899 (100:4-10); JA1906 (107:8-25).

As for intercompany accounting, Sarrao acknowledged that all intercompany advances were booked through Alecto. JA1908 (109:4-17). Intercompany transactions shown on the balance sheets related to five different Alecto affiliates that operated hospitals. Sarrao acknowledged that Alecto had financially supported Sherman/Grayson since 2014, which amounts Sherman/ Grayson was unable to repay, resulting in unpaid advances of over $60 million when Alecto filed bankruptcy. JA1476 (¶27). Three other hospitals are designated on some of the balance sheets as discontinued entities, having been closed in 2019 (Alecto Ohio Wheeling and Alecto Martins Ferry) (JA1452, ¶25) and March 2020 (Alecto Fairmont). JA1900 (101:14-15).

24

N.    **Confirmation Ruling**

On March 20, 2024, the Bankruptcy Court issued its Confirmation Ruling, approving the Plan and overruling the Reed Creditors' objections to confirmation. JA2010–2011.

The Bankruptcy Court's key finding in approving the release of the Released Parties was that Alecto was solvent at the time of the Sunrise Transfer, *see* JA2005, and, therefore, no fraudulent transfer claim existed. In so finding, the Bankruptcy Court relied exclusively on Balasiano's testimony:

> [Mr. Balasiano] reviewed the GCS Report, P&L balance sheet, cash flow, and tax returns. Mr. Balasiano relied upon the Debtor's 2019 balance sheet, which reflects the Debtor had an equity value of at least $9.4 million; and the Debtor's 2019 tax returns, which show assets in excess of $18 million. He concluded the Debtor had a positive balance sheet for 2019 (and 2020) and was able to pay its debts as they became due.
>
> *********

JA2004. By contrast, the Bankruptcy Court did not consider the Reed Creditors' evidence that: (i) Alecto was hemorrhaging money in 2019 (with reported tax return losses of over $48M); (ii) Alecto's financial situation was so bad that Alecto had to close two hospitals that year; (iii) Alecto artificially inflated its equity by not booking *millions of dollars* of liabilities that Alecto was on the hook for and was paying; and (iv) Alecto treated intercompany receivables as assets when many were uncollectable, which also resulted in overstating Alecto's equity. *See* JA1996–2013,

*generally.*  Nor did the Bankruptcy Court address the conflicts raised by the Reed Creditors. *See id.*

The Bankruptcy Court entered the Confirmation Order on April 4, 2024. JA0084. The Reed Creditors timely appealed on April 18, 2024.  JA2014–2017.

**O.    The District Court Affirms**

After the Reed Creditors separately appealed the Designation Order (Subchapter V eligibility) and the Confirmation order, the district court consolidated the cases.  On March 31, 2025, the District Court ruled on the consolidated appeals, JA0039, but clearly erred.

The District Court affirmed the Designation Order, based on its erroneous conclusion that the Settlement Agreement between Alecto and LHP modified and superseded the 2014 Guarantee between Alecto, LHP, and the seller.  JA0057.   It ruled that "the LHP claim was contingent as of the Petition Date" as the Settlement Agreement created a requirement that LHP demand payment and the "contingency-the demand requirement-had not yet occurred 'as of the Petition Date.'"  JA0057. The District Court acknowledged the Reed Creditors' authorities showing the LHP claim was not "contingent," but still affirmed, stating "even assuming that the debt was non-contingent, …the Bankruptcy Court correctly concluded that debt was unliquidated, which, in and of itself, was dispositive of Alecto's eligibility for Subchapter V."  JA0060.  Though the amounts due were calculable from prior

invoices and/or by consulting the Lease Agreements, the District Court ruled the LHP claim as "unliquidated," based on supposed "uncertainty of when a demand might be made, and what expenses might be included in the demand" on the petition date.  JA0062.

The District Court also affirmed the Confirmation Order.

The District Court dismissed the Bankruptcy Court's analysis – which placed the burden of proving insolvency on Reed Creditors – as harmless error, reasoning that the Bankruptcy Court was not required to hold a "mini-trial" on the merits, and "[r]ather than deciding "questions of law or fact raised by litigation," the court below merely needed to "canvas the issues to determine whether the settlement falls above the lowest point in the range of reasonableness."    JA0063.   Based on this, the District Court then completely ignored compelling evidence of conflicts and insolvency developed at the evidentiary hearing in the Bankruptcy Court, and affirmed the Plan despite its release of *over $20 million dollars in claims against insiders* for less than a single week of CEO Reddy's salary.  JA0062–0069.

The Reed Creditors timely appealed.  JA0001.

## STANDARD OF REVIEW

In reviewing the Bankruptcy Court's determinations, the Court of Appeals exercises "the same standard of review as did the District Court." *In re Heritage Highgate, Inc.*, 679 F.3d 132, 139 (3d Cir. 2012). The Bankruptcy Court's findings of fact are reviewed for clear error, while legal determinations are reviewed de novo. *Id.* For mixed questions of law and fact, the Court accepts the trial court's finding of historical or narrative facts unless clearly erroneous, but exercise "plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts." *Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 642 (3d Cir. 1991).

## SUMMARY OF THE ARGUMENT

This appeal seeks the reversal of two orders of the Bankruptcy Court in Alecto's bankruptcy case. The first, the Designation Order entered by the Bankruptcy Court on December 4, 2023, permitted Alecto's bankruptcy case to proceed under subchapter V of the Bankruptcy Code, despite clear evidence that Alecto's non-contingent and liquidated claims exceeded the subchapter V eligibility limit of $7,500,000. The second, the Confirmation Order entered by the Bankruptcy Court on April 30, 2025, approved the settlement and release of fraudulent transfer and fiduciary duty claims against insiders of the Debtor for payment by the insiders of $25,000, which did not meet the standards established in the *Coram Healthcare*

28

decision applicable to such settlements. In a Memorandum Opinion and Order entered on April 25, 2025, the District court affirmed the Bankruptcy Court's findings and conclusions on both issues. This appeal technically challenges the District Court's Memorandum Opinion and Order but substantively is primarily focused on the errors of the Bankruptcy Court.

The Bankruptcy Court's ruling that Alecto was eligible to proceed as a subchapter V debtor hinged on its determination that the claim filed by LHP in the amount of $3.74 million, for obligations of an Alecto affiliate that Alecto had guaranteed, was unliquidated and did not count toward the $7.5 million eligibility debt limit. The Bankruptcy Court cited two primary reasons for its determination that the LHP claim was unliquidated: (1) it included pro-rated amounts for operating expenses which were subject to reconciliation; and (2) because LHP had not made a demand for the precise amount due prior to the filing of Alecto's bankruptcy petition. The District Court affirmed the Bankruptcy Court confirmation and found that evidence below established that the LHP claim was both contingent and unliquidated solely because: (i) certain amounts had to be reconciled despite the fact that the amounts due could be readily calculated from the leases; and (ii) LHP failed to make a demand for payment.

In fact, the LHP claim for reimbursement of sixteen monthly rental payments it made on the five leases falls squarely within the accepted definition of a liquidated

claim because the amount due was readily determinable from the applicable lease documents. These documents were easily accessible to the Debtor, since a Debtor affiliate was the tenant by assignment of the leases. In addition, the reconciliation process could only affect amounts due for future rent payments; it would not alter the precise amounts due monthly as operating expenses under the leases through the petition date. The fact that LHP had not made a demand for the precise amount due as of the petition date did not impact its claim, which had fully accrued as of the petition date. In ignoring this evidence, the Bankruptcy Court erred in its determination that the LHP claim was unliquidated and the District Court erred in determining that the LHP claim was contingent and unliquidated solely because LHP had not made a demand for payment.

With respect to the Confirmation Order, Alecto's own forensic accountant issued a report documenting that the June 23, 2019, Sunrise Transfer was not made for reasonably equivalent value and that the Debtor's equity holders, including insiders, received a $22 million benefit from the transaction. At the confirmation hearing, Alecto only argued that the Sunrise Transfer could not constitute a fraudulent transfer because Alecto was not insolvent at the time of or as a result of the transfer. In accepting the conclusions of Steven Balasiano, the Debtor's purported independent director, that no fraudulent transfer claim could be brought and that settlement of the potential claim against insiders for $25,000 was

appropriate based on the Debtor's solvency at the time of the transaction, the Bankruptcy Court committed multiple errors.

First, the Court erroneously held that the Reed Creditors, the Appellants herein, bore the burden of proof on the issue of solvency, even though it was the Debtor that had purported to investigate and settle the claim and had the burden of demonstrating that the $25,000 settlement was appropriate. The District Court subsequently concluded this clear error was harmless. It was not.

Second, the Court accepted Mr. Balasiano's testimony regarding Alecto's solvency despite his failure to conduct *any* independent investigation of it. Third, the Bankruptcy Court relied on factual testimony from Mr. Sarrao, Alecto's vice-president and general counsel – and a target of the potential fraudulent transfer claims – regarding the equity figures listed on the Debtor's balance sheets and tax returns, despite recognizing that Mr. Sarrao was not qualified to render an opinion on solvency.

The Bankruptcy Court ignored the evidence that Alecto's balance sheets relied on the value of its intercompany claims to retain a positive equity value and those intercompany claims had no value given Alecto's long history of advancing funds to its struggling hospitals. The Bankruptcy Court also ignored the evidence that the balance sheets did not account for the substantial obligations Alecto paid, guaranteed or was liable for, simply because the obligations were booked as

obligations of a subsidiary.  These errors regarding the inadequacy of the Debtor's solvency analysis resulted in the Bankruptcy Court misapplication of the *Coram Healthcare* factors used to approve the Plan settlement that released insider claims, which the District Court simply ratified.

For the reasons set forth more fully herein, this Court should reverse the District Court's Memorandum Opinion and Order and remand to the Bankruptcy Court for further proceedings in accordance with its order.

## ARGUMENT

## I.    THIS COURT SHOULD REVERSE THE DESIGNATION ORDER BECAUSE THE BANKRUPTCY COURT ERRED IN RULING THAT ALECTO WAS ELIGIBLE TO BE A SUBCHAPTER V DEBTOR.

Bankruptcy Code Section 1182(1)(A) defined a Subchapter V "debtor" as one who had:

> …***aggregate non-contingent liquidated secured and unsecured debts*** as of the date of the filing of the petition or the date of the order for relief in an amount ***not more than $7,500,000***….

11 U.S.C. § 1182(1)(a) (emph.supp.).   As explained herein, the LHP claim for $3,739,653.77   was a non-contingent, liquidated debt.   Therefore, the filed and scheduled claims against Alecto totaled $7,890,536.14, *see* JA721-808, and Alecto was not eligible to proceed under Subchapter V.

### A.    The LHP Claim Was Not Contingent.

The Bankruptcy Court designation decision rested on its finding that the LHP Claim was unliquidated, JA79 (8:14-22), but the District Court affirmed on multiple grounds, including that the LHP claim was contingent as a result of the Settlement Agreement between LHP and Alecto.[11] JA55-60.  This was error.

The fact that the Settlement Agreement provides for a demand before payment is due does not render the underlying debt contingent until a demand is made. The

---

[11] The District Court determined the Bankruptcy Court had made an "[i]mplicit" ruling that the LHP claim was contingent.  JA55.

Settlement Agreement did not eliminate or otherwise modify the underlying guarantee, *see* JA622- 647, JA806. it merely provided a *procedure* for payment:

> Accordingly, the Alecto Defendants agree to the following procedure for payment of Future Expenses.
>
> A. LHP shall make written demand upon the Alecto Defendants for a specified amount in accordance with the forbearance schedule set forth in Paragraph 8….

JA624. This procedure for payment did not create Alecto's liability – it only established a procedure to determine when payment must be made. The Debtor's liability to LHP arose upon Sherman/Grayson's breach of the Lease Agreements and increased monthly with each payment made by LHP on its own guarantee. There is nothing in the Settlement Agreement that conditions Alecto's obligation on a demand for payment. *See Braniff Airways, Inc. v. Exxon Co., U.S.A.,* 814 F.2d 1030, 1036 (5th Cir. 1987) ("The debt owed…does not have to be calculated prior to the filing of the bankruptcy petition[.]…The debt was absolutely owed; it just was not due until a calculation of the amount…was made.").

The facts here differ significantly from the facts from *In re Rosenberg*, the primary authority relied upon by the District Court to support its conclusion that the LHP claim was contingent without a payment demand. JA58-59.  In *In re Rosenberg*, the underlying agreement specifically conditioned the debtor's obligation on a demand for payment and an opportunity to dispute: "[A] demand for payment must be made upon Rosenberg before any liability matures under the Limited Guaranty."

414 B.R. 826, 844 (Bankr. S.D. Fla. 2009). Accordingly, the court ruled that the claimant had no liability to Rosenberg. In contrast, the LHP Settlement Agreement expressly eliminated Alecto's right to dispute the obligation as long as LHP made the payments it sought to recover and the Settlement Agreement provided a right of judgment by confession if the Debtor did not pay the amounts specified. JA624 (¶ 6).

The District Court concluded that the Settlement Agreement superseded the original guaranty and imposed this new condition of a demand for payment. JA55-60. However, the Settlement Agreement did not change the arrangement between Alecto and LHP in any substantive way. The Settlement Agreement is a subsequent guaranty incorporating the first guaranty. Typically, with a guaranty agreement, the guarantor's liability attaches at the time of default on the debt the guarantor has guaranteed:

> A guaranty of payment, which is also known as an absolute guaranty, requires the guarantor to pay immediately upon the principal obligor's default. The guarantor's liability attaches upon the primary obligor's default even if the guarantor is not given notice of the default. *United States v. Little Joe Trawlers, Inc.*, 776 F.2d 1249, 1253 (5th Cir. 1985). "[The] demand [for payment] serves solely as a request for payment as opposed to the creation of liability." *In re Wilson*, 9 Bankr. 723, 725 (Bankr. E.D.N.Y. 1981). An absolute guaranty ceases to be contingent upon the principal obligor's default.

*In re Pulliam*, 90 B.R. 241, 243 (Bankr. N.D. Tex. 1988); *see also In re Taylor*, No. 08-00526-JDP, 2008 Bankr. LEXIS 2313, at *10 (Bankr. D. Idaho July 25, 2008)

35

("An absolute guaranty is an 'unconditional undertaking on the part of the guarantor that he will pay the debt or perform the obligation immediately upon the debtor's default….'").

Moreover, a demand for payment in a guaranty agreement does not create the liability, the default of the principal obligor does.

> That the Bank did not make a demand for payment until March 28, 2008 is of no moment. As this Court recently explained, a demand for payment is not essential to the existence of liability for a guaranteed debt. Debtors were liable for the entire outstanding principal balance and accrued interest and late fees the moment Raftis defaulted on its obligation.

*Id.* at *12; *see also*, *e.g.*, *In re Wilson*, 9 B.R. 723, 725 (Bankr. E.D.N.Y. 1981) ("The demand serves solely as a request for payment as opposed to the creation of liability.").

When Sherman/Grayson ceased payments to the Landlord and vacated the office suites subject to the Lease Agreements, LHP's obligation to satisfy Sherman/Grayson's obligations under the Lease Agreement kicked in, as did Alecto's obligation to reimburse LHP for the amounts LHP paid to the landlord.

The District Court erroneously concluded that whether the Settlement Agreement was a guaranty was of no moment because a guaranty is a classic example of contingent liability. JA59. But a guarantor's liability is contingent only until such time as there is a default by the principal. *See In re Pennypacker*, 115 B.R. 504, 507 (Bankr. E.D. Pa. 1990) ("The classic example of a contingent debt is a

36

guaranty because the guarantor has no liability unless and until the principal defaults."); *In re Fradkov*, No. 20-18987-JKS, 2020 Bankr. LEXIS 3182, at *3 (Bankr. D.N.J. Nov. 12, 2020) ("In a guaranty situation, the liability of the guarantor is contingent upon the default of the principal."). After default, the liability of a guarantor is no longer contingent.

The District Court's finding that the procedure for payment by Alecto, which included a demand by LHP, created the liability on the guaranty recognized by the Settlement Agreement, was clearly erroneous.

### B. The LHP Claim Was Liquidated.

The District Court affirmed the Bankruptcy Court's ruling that the LHP claim was unliquidated, but this too was error, since the claim was readily ascertained and could be precisely computed.

As numerous cases recognize, whether a claim is liquidated depends on whether it can be readily determined and is precisely calculable. *In re Fostvedt*, 823 F.2d 305, 306 (9th Cir. 1987) ("[T]he question whether a debt is liquidated turns on whether it is subject to 'ready determination and precision in computation of the amount due.'") (citation omitted); *In re Fountain*, 612 B.R. 743, 749 (9th Cir. BAP 2020) ("A debt is liquidated if it is capable of 'ready determination and precision in computation of the amount due.'") (citation omitted); *In re Mazzeo*, 131 F.3d 295, 304 (2d Cir. 1997) ("[C]ourts have generally held that a debt is 'liquidated' ... where

the claim is determinable by reference to an agreement or by a simple computation.""") (quoting 2 L. King *Collier on Bankruptcy* ¶ 109.06[2][c] (15th ed. rev. 1997)); *In re Mitchell*, 255 B.R. 246, 360 (Bankr. D. Mass 2000); *In re Jordan*, 166 B.R. 201, 202 (Bankr. D. Me. 1994) ("A claim is liquidated 'if the amount due can be readily ascertained either by reference to an agreement or by simple mathematics.'") (citation omitted). Here it is undisputed that the LHP claim satisfies these tests.

Nonetheless, the lower courts focused primarily on Alecto's alleged lack of knowledge of the actual amount of the LHP claim on the Petition Date. The Bankruptcy Court's ruling that the LHP Claim was unliquidated is based on three factual determinations it made: (1) while the Debtor was aware of its obligations to LHP, it did not know the precise amount owed as of the Petition Date; (2) the monthly operating expenses due under the Lease Agreements, which form the basis for the LHP obligation, were estimated and subject to reconciliation, and (3) the amount payable to LHP remained subject to potential dispute. JA78-79 (7:8-8:13). None of these findings are relevant to whether the LHP Claim was liquidated, which is not dependent on the Debtor's knowledge of the claim amount. The District Court affirmed, concluding that because the LHP had not made a demand for payment, the Bankruptcy Court was correct in concluding that the claim was *both* contingent and unliquidated. JA55-62.

### 1.    Alecto's principal's lack of knowledge is not relevant in determining whether the LHP Debt was liquidated.

Because the amount of the LHP obligation was specified in the Lease Agreements and Payment Confirmations, the information necessary to precisely calculate the amount of the LHP Claim existed as of the Petition Date. This information was readily available to the Debtor because the tenant under the leases – Sherman/Grayson – is an affiliate of Alecto. Accordingly, Alecto's purported lack of knowledge of the amount due to LHP on the Petition Date is irrelevant; the standard is whether the amount is readily ascertainable, not whether Alecto knew how much is due. *See, e.g. Fostvedt*, 823 F.2d at 406.

Eligibility under Subchapter V is determined by what the debtors owe on the Petition Date, not by what the debtors think they owe. *In re Hall*, 650 B.R. 595 (Bankr. M.D. Fla. 2023); *see also In re Sullivan*, 245 B.R. 416 (N.D. Fla. 1999) (holding that eligibility for Chapter 13 relief is determined based on the total amount of unsecured debt that debtor owes on petition date, not on what a debtor in good faith thinks he owes on the petition date, and there is nothing to prevent bankruptcy court from looking past a debtor's schedules to other evidence of the correct amount of such debt as of the petition date); *In re Zhang Medical P.C.*, 655 B.R. 403, 409 (Bankr. S.D.N.Y. 2023) (in determining a debtor's total noncontingent liquidated debt, the court may look both to the debtor's schedules and to creditors' proofs of claim); *In re McKenzie Contracting, LLC*, Case No. 8:24-bk-01255-RCT, 2024

Bankr. LEXIS 1712, at *4 (Bankr. M.D. Fla. 2024) (same). Accordingly, the lower courts erred when they based Alecto's eligibility determination on the Debtor's lack of knowledge of the amount of the LHP Claim when the petition was filed.

To be clear, the Debtor had full knowledge of the ongoing basis for its debt to LHP because LHP sued the Debtor in the Delaware Superior Court for the rent obligations to the Landlord for which the Debtor had an obligation to reimburse LHP. The obligations stem from Lease Agreements assigned to Sherman/Grayson for premises adjacent to a hospital it acquired in 2014. Based on these contractual relationships, Alecto was able to ascertain the amounts asserted against it by LHP simply by reviewing the monthly rent and other financial obligations specified in the leases it guaranteed.

Accordingly, the amount of the LHP Claim: (i) was subject to ready determination and precision in computation of the amount due; and (ii) the amount due is readily ascertainable by reference to the lease documents and simple mathematics. *See Hall*, 650 B.R. at 599 ("[C]ourts have generally held that a debt is liquidated if its amount is readily and precisely determinable, where the claim is determinable by reference to an agreement.") (quoting *United States v. May*, 211 B.R. 991, 996 (M.D. Fla. 1997) (citing Collier on Bankruptcy, 15th Ed. At 1109.06[2][c] (March 1997))). Ordinarily, debts of a contractual nature are "subject to ready determination and precision in computation of the amount due"

and, therefore, are considered liquidated, even if subject to substantial dispute. *Barcal v. Laughline (In re Barcal)*, 213 B.R. 1008, 1014 (B.A.P. 8th Cir. 1997).

## 2. The plain language of the Lease Agreements expressly provides that the common area maintenance charges were due and payable monthly.

In further support of its flawed conclusion that the Debtor did not know the amount of its liability to LHP, the Bankruptcy Court noted that the leases required monthly payment of estimated pro-rated operating expenses in addition to base rent. JA78-79, 12/1/2023 Tr. 7:16–8:3. The Bankruptcy Court noted that the amount of the estimated monthly operating expenses varied per suite and was subject to reconciliation annually. *Id.* This procedure for the payment of pro-rata operating expenses does not render the amount due under the lease unliquidated, however. Written notice of the amount due annually for pro-rata operating expenses is provided under the terms of each lease, and the Lease Agreements required that that specific amount be paid in monthly increments (one-twelfth of the total) at the same time as base rent is paid. To the extent that pro-rata operating expenses are revised through the reconciliation process, they result in an additional amount due or credit towards future rent due, and do not affect the prior payments made.[12]  Accordingly,

---

[12] The applicable lease provisions provide:

- …*Tenant agrees to pay Landlord each month, at the same time the Base Rent Payments are due, an amount equal to one-twelfth (1/12th) of the*

41

there is nothing unliquidated about the monthly payment obligations under the lease, and it was plainly error for the Bankruptcy Court to credit the testimony of Michael Serrao that he did not know the amount of the estimated operating expenses. His purported knowledge is not relevant to this analysis. In short, Alecto's obligation is liquidated because the amount can be ascertained by reference to the Lease Agreements and simple mathematics.

Moreover, the failure to pay the Pro Rata Share of Operating Expenses when due constitutes a default under the Lease Agreements. Accordingly, the Operating Expenses are not unliquidated because, pursuant to the Leases, they are due and payable on or before the first day of each month, when the Base Rent is due.

### 3. Whether Alecto retains a right to dispute its obligation to LHP does not make the LHP Claim unliquidated.

The Bankruptcy Court further erred when it concluded that there was no precision to LHP's debt because the Alecto purportedly retained a right to object to the computation of amounts due to LHP under the 2022 Settlement Agreement.

---

*estimated annual Pro Rata Share of Operating Expenses due.* Leases § 3.2(1)). *(emphasis supplied). Ex. 10.*, JA385**.**

- *However, if Tenant has paid more than its Pro Rata Share of the actual Operating Expenses, Landlord shall either pay the amount of such excess to Tenant within ten (10) days after delivery of the aforementioned statement, or, at Landlord's option, apply such excess to any sums due or to become due from Tenant to Landlord.* Leases § 3.2(3)). *Id.* Ex. 10, JA385.

JA79, 12/1/2023 Tr. 8:7 – 11. Under the plain language of 11 U.S.C. § 1182, disputed debts are not excluded from the $7.5 million debt limit. *Hall*, 650 B.R. at 599. "[T]he process for determining the claim" dictates whether the claim is liquidated or unliquidated, not the magnitude of the dispute or the length of the trial required to resolve the dispute. *In re Barcal,* 213 B.R. at 1014; *see also Nicholes v. Johnny Appleseed (In re Nicholes),* 184 B.R. 82, 91 (B.A.P. 9th Cir. 1995) ("So long as a debt is subject to computation of the amount due, then it is considered liquidated and included for eligibility purposes under § 109(e), regardless of any dispute.").

> ### 4.    The 2022 Settlement Agreement between Alecto and LHP has no impact on the liquidated status of the LHP obligation.

The Bankruptcy Court's ruling included an analysis of the 2022 Settlement Agreement between LHP and the Debtor, the terms of which the Court found superseded the prior guarantee that the Debtor had provided to LHP. The District Court agreed that the terms of the Settlement Agreement superseded the original guaranty. *Id*. As was explained above in the context of the contingent analysis, the guarantee the Debtor provided to LHP remained in effect. Moreover, the additional provision in the 2022 Settlement Agreement that LHP was to make a written demand for a specified amount to Alecto, and that absent the demand, Alecto had no obligation to pay, has no relevance to whether the claim is liquidated.

## II.    THE CONFIRMATION ORDER SHOULD BE REVERSED BECAUSE THE COURT ERRED IN APPROVING THE RELEASE OF CLAIMS AGAINST THE RELEASED PARTIES.

The Bankruptcy Court erred in approving the releases of the Released Parties (the "Plan Releases"): (i) when it ruled that the Reed Creditors bore the burden of proof on the insolvency issue; (ii) when it relied on the testimony of Mr. Balasiano that there were no viable causes of action against the Debtor's insiders; (iii) when it relied on the Debtor's evidence that it was solvent at the time of the Sunrise REH Transfer; and (iv) when it misapplied the factors for approval of a settlement.

This Court reviews a lower court's approval of a bankruptcy settlement, including application of the "'fair and equitable' rubric as well as the *Martin* factors to approve the settlement." *In re Nutraquest, Inc.*, 434 F.3d 639, 645 (3d Cir. 2006). The same types of errors  that meet the abuse of discretion standard (*i.e.*, clearly erroneous finding of fact, error of law, and error in application of law to fact) will *both* violate the general "standard of review" applicable to bankruptcy court orders *and* give rise to an abuse of discretion for purposes of settlements governed by Rule 9019(a). *See, e.g., In re Am.'s Ins. Ctr., Inc.*, No. 20-1506, 2021 U.S. App. LEXIS 24008 at 6-7 (3d Cir. Aug. 12, 2021) (vacating settlement where "court based its approval on a factual premise that is not supported by the record" undermining determination of fairness).

44

Indeed, "the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them." *In re Nutraquest*, 434 F.3d at 644. Under Rule 9019(a), bankruptcy courts have a duty to make an informed, independent judgment that a compromise is fair and equitable before approving it. *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). In making such a determination, a bankruptcy court must consider, "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *In re Martin*, 91 F.3d at 393

Moreover, as the Supreme Court emphasized in *TMT Trailer Ferry*,

> There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.

*TMT Trailer Ferry*, 390 U.S. at 424–25; *see also In re Martin*, 91 F.3d at 393 (bankruptcy court "must be apprised of all relevant information that will enable it to determine what course of action will be in the best interest of the estate.").

Thus, in *TMT Trailer Ferry*, the Supreme Court refused to grant approval of a compromise and remanded where the record was "devoid of facts which would have permitted a reasoned judgment that the claims of actions should be settled" or on what terms, 390 U.S. at 440-441, and where the insolvency determination was not made in accordance with applicable standards. *Id.* at 441 , Here, the Bankruptcy Court's approval of the settlement was not based on sufficient facts to support the conclusion that the settlement was reasonable and was not made with accordance with the proper standards.

### A.    The Applicable Legal Standard for Evaluating Fraudulent Transfer Actions.

The Bankruptcy Court, in its Confirmation Ruling, relied on Steven Balasiano's testimony for the standard for evaluating fraudulent transfer claims:

> Based on his investigation, Mr. Balasiano concluded that "there was no actionable cause of action that could be brought as a result of [the Sunrise Transfer] because "[t]he company was solvent." He reasoned that: "In order to bring a fraudulent conveyance action there are two factors. One is there has to be a transfer for lack of reasonably equivalent value and, number two, the company has to be insolvent at the time of that transfer. Clearly, the second fact[or] of the test was not satisfied her[e]."

********

46

The Court finds that Mr. Balasiano's determination that there is "no actionable cause of action that could be brought" for fraudulent conveyance is a reasonable basis for the settlement.

JA2004-2005.

Section 3439.02(a) of California Uniform Voidable Transfer Act provides in relevant part that "[a] debtor is insolvent if, at fair valuations, the sum of the debtor's debts is greater than all of the debtor's assets. Cal. Civ. Code § 3439.02(a). A debtor's assets and liabilities must be calculated at fair valuation to determine whether its debts exceed its assets. *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 648 (1991) "[A] fair valuation of assets contemplates a conversion of assets into cash during a reasonable period of time." *In re Trans World Airlines, Inc.*, 134 F.3d 188, 194 (3d Cir. 1998). Courts should consider contingent liabilities when evaluating the solvency of a debtor. *Trans World Airlines*, 134 F.3d. at 197.

### B. The Bankruptcy Court's Misplacement of the Burden of Proof on the Reed Creditors on the Solvency Issue Was Not Harmless Error.

In its Confirmation Ruling, the Bankruptcy Court held that "the Reed Creditors did not carry their burden to prove by a preponderance of the evidence that the Debtor was insolvent at the time of the Sunrise Transfer." JA2005. The District Court concluded that the Reed Judgment Creditors misinterpreted this improper shifting of burdens, and in any event, the error was harmless. JA66.

To begin, the Bankruptcy Court and the District Court erred to the extent that it placed the burden of proof on the viability of the fraudulent transfer claim on the Reed Judgment Creditors. The burden is on the Debtor to prove that the settlement regarding the Plan Releases falls above the lowest range of reasonableness. *See*, *e.g.*, *In re Spansion, Inc.*, No. 09–10690(KJC), 2009 Bankr. LEXIS 1283, at *13 (Bankr. D. Del. June 2, 2009); *In re Washington Mutual, Inc.*, 442 B.R. 314, 328 (Bankr. D. Del. 2011).

One of the factors courts consider in determining whether to approve a settlement is the probability of success in the litigation. *In re Coram Healthcare, Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004). In considering the probability of success on the merits, the Debtor, as a fiduciary, was required to carefully consider each of the elements of the possible fraudulent transfer claim against the Released Parties. The record demonstrates that the Debtor did not do that.

Steven Balasiano was appointed as an independent director to evaluate and bring valid causes of action against the Debtor's affiliates and insiders.  GCS, a forensic accounting firm, was retained to examine whether the Debtor had any avoidance actions against the Debtor's Insiders and provide its findings to Mr. Balasiano. JA_, Plan § III.9. p. 15. Despite their charges, the Debtor never asked GCS to perform a solvency analysis, and GCS did not perform one. JA1766 (93:11-13).

Instead, the Debtor relied on the testimony of Balasiano and Michael Sarrao, the Debtor's executive vice president and general counsel – and himself a beneficiary of the Plan Releases – to testify factually on Alecto's solvency based exclusively on balance sheets and tax returns. Neither Mr. Balasiano nor Mr. Sarrao is a financial expert nor qualified to render an opinion on solvency. *See* JA1765 3/4/24 Tr. 3:19-21. In particular, no testimony was presented that either Balasiano or Sarrao considered anything other than the facial numbers on the Alecto's balance sheets.

As a result, no competent testimony was submitted to the Bankruptcy Court through which Alecto could meet its burden of demonstrating that it was solvent, which proof is necessary to prevent the acknowledged transfer to its members for less than equivalent value ($22 million less) from being a fraudulent transfer. And the Bankruptcy Court's assignment of the burden on the Reed Judgment Creditors was not harmless. The cause of action was purportedly investigated and resolved by Alecto, without input from its creditors, when actually Alecto failed to meet its burden on the solvency issue. As a result, the Bankruptcy Court could not have concluded – and the District court could not have affirmed – that the settlement was within a reasonable range.

**C.      The Bankruptcy Court Erred By Accepting the Testimony of Mr. Balasiano That There Were No Viable Causes of Action Against the Debtor's Insiders.**

The Bankruptcy Court further erred in accepting Mr. Balasiano's conclusion that there were no viable causes of action against its insiders, [JA2004-2005], as Mr. Balasiano's testimony was unreliable.

At the Confirmation hearing, Mr. Balasiano testified that he concluded that the Debtor had no viable causes of action against its insiders by October 9, 2023:

> Q All right. And so, between the time that you received the report and the time that the plan was filed, a period of about ten days, that's when the decision – that's when you reached the determination that there was [sic] no viable causes of action, correct?
>
> *********
>
> A It was an iterative process. It did not happen on [a] particular date, it was a process that happened from the time that I was engaged at the end of August through the time that we receive [sic] Leanne Gould's report. Once I had time to speak to all of the respective professionals in this case, the decision was formulated, correct.
>
> Q But that conclusion was reached by October 9th?
>
> A Correct.

JA1175. But Mr. Balasiano testified earlier during cross-examination that he could not recall: (i) when he first determined that the Debtor was solvent at the time of the Sunrise REH transfer (ii) whether he made that determination on his own or simply

accepted what the Debtor told him; or (iii) whether he even saw the Debtor's financial statement before he made his determination.

> Q But it's fair to say that you didn't perform your own analysis to reach your own opinion on solvency up and through October 9th of 2023?
>
> A Well, [……..] you're [sic] cutting hairs here. *The question is where – my opinion is formulated based on the information that I received from the professionals that I hired, retained in this case. So to say when my opinion was formed as opposed to receiving the information and the data and the backup and the conversations, it's very hard to be able to dissect that the way you're asking me to.*
>
> Q Okay.
>
> A I'm sorry.
>
> Q Well, do you recall – let's put aside –
>
> A *At all time – let me explain something. At all times in 2019, this company was solvent. I knew that this company was solvent in 2019 because it was represented to me when we knew that we had a bad transaction – or not a bad transaction – a transaction that was made for less than reasonable value. I said, hey, guys, were we solvent at this time, because that's the next question you would ask if you're a practicing lawyer in a bankruptcy context, or an independent director or a liquidating trustee. So that was the question I said, were we solvent? The answer was, yes, we were solvent. And when in fact I saw that financial statement, whether it was October 9th, October 7th, October 17th, I can't sit here today and tell you exactly the date.*

*Id.* 88:9–89:24. JA1761. (emphasis added).

Balasiano's testimony plainly states that rather than make his own determination on solvency based on a review of Alecto's financials, he relied on representations made to him by Alecto that Alecto was solvent. Relying on Alecto's

representation on solvency is antithetical to Mr. Balasiano's role as an independent director. His charge was to determine whether the Debtor had any potential claims against its insiders, especially because members of Alecto's management are themselves beneficiaries of the Plan Releases. Mr. Balasiano abdicated his role as an independent director and a fiduciary in the determination of whether Alecto was insolvent at the time of the Sunrise REH Transfer. He simply let the Debtor decide.

### D.    The Bankruptcy Court Erred By Relying on Alecto's Evidence In its Conclusion that Alecto Was Solvent at the Time of the Sunrise REH Transfer.

Lacking a solvency expert, Alecto relied on a simplistic solvency analysis based on the positive equity values shown on its balance sheets and tax returns, as summarized by the Court:

> [Balasiano] relied upon the Debtor's 2019 balance sheet, which reflects the Debtor had an equity value of at least $9.4 million; and the Debtor's 2019 tax returns, which show assets in excess of $18 million. He concluded the Debtor had a positive balance sheet for 2019 (and 2020) and was able to pay its debts as they became due.

JA2004.   While the Bankruptcy Court notes Balasiano's reliance on the balance sheets and tax returns, this evidence was actually introduced at the Confirmation Hearing by  Sarrao. The Bankruptcy Court's Confirmation Ruling fails to mention any of the evidence presented to Sarrao of liabilities of Alecto not included in its balance sheets, or limitations on the value of intercompany receivables which provided the positive equity value noted on the face of the balance sheets.

The balance sheet numbers in a vacuum do nothing to establish the fair value of Alecto's assets and liabilities and Alecto made no attempt to otherwise establish the fair valuation of Alecto's assets and liabilities as of June 19, 2019. By relying on the face of the balance sheets to prove its solvency, Alecto ignores the very nature of a solvency analysis. At the outset of the case, Sarrao acknowledged that "advancing funds to its subsidiaries was Alecto's general business practice." JA1476. Between 2014 and the Petition Date, Alecto loaned Sherman Grayson in excess of $60 million that it acknowledged could not be paid back. *Id.* Two of the four other hospitals were closed in 2019 and a third was closed in 2020. These struggling entities were not in a position to pay back receivables owed to affiliates in the months before they were closed. In fact, Alecto faced significant liabilities arising from its subsidiaries, and these liabilities were acknowledged by Mr. Sarrao. JA2279 – 2280 (¶¶12-15).

In 2021, Alecto paid more than $19 million in state and federal payroll taxes for its subsidiaries, all of which was booked as a loan to them, entitling Alecto to an intercompany receivable for the loan amount. JA1639. Alecto received a payment demand of more than $10 million for withdrawal liability caused by the closing of the hospital operated by Alecto Fairmont; payments toward this liability were also made by Alecto. JA1681 – 1682 (l. 62:21-63:24). Obligations owed pursuant to any guarantee Alecto issued with respect to an obligation of an affiliate were never

booked on its balance sheet, even after claims against Alecto were made – and even after judgments were obtained. JA1931 (132:11 – 16).  Mr. Sarrao also confirmed that Alecto had been sued by CMS, of the U.S. Department of Health and Human Services, for reimbursement of more than $12 million in Medicare advance payments made to its Olympia affiliate.  CMS filed a claim in the Alecto bankruptcy case on December 13, 2023, for $29,126,600.[13]  JA1898 (99:7-18).  Mr. Sarrao acknowledged that none of these liabilities were listed on the Alecto balance sheet because the obligations originated with an affiliate or subsidiary.  JA1899 (3/5/2024 Tr. 100:4-10) and JA1906 (*Id.*, 107:8-25).

Setting aside the value that the Debtor should have attributed to these liabilities, solvency based on the 2019 balance sheet is rebuttable simply by the lack of value of its intercompany receivable. As testified by Sarrao at the confirmation hearing, the Partner's capital account figure on line 21 of Schedule L of the 2019 tax return ("Balance Sheets per Books") shows $18,671,358, which is the Debtor's equity.  JA 1838 (3/5/24 Tr. 39:13–40:4); JA.2662-2884.    But Sarrao also acknowledged that this equity calculation relies on the intercompany receivable amount of $25,489,819 in line 8 ("other investments", which references Statement 14 ) ("Intercompany Receivables"). Sarrao further acknowledged that a reduction in

---

[13]  Because the liability for this claim was not adjudicated, it was not liquidated for the purposes of subchapter V eligibility.

the value of the intercompany receivables results in a reduction of the partner's (Alecto's) equity because "it's a sum of numbers. So, just from a mathematical proposition, it would be different." JA1937-38 (3/5/24 Tr. 138:16–139:19).   As noted, evidence in the record, including Mr. Sarrao's own testimony, indicate that the substantial sums loaned to Alecto's affiliates' operating hospitals will never be repaid, rendering the intercompany receivable worthless.

Balasiano ignored all this evidence when he drew his conclusion straight from the face of the 2019 balance sheet and tax return Sarrao provided him.  All of this evidence was ignored by the Bankruptcy Court when it accepted Balasiano's conclusion without further comment. The District Court simply affirmed the clearly erroneous reliance on Mr. Balasianio's testimony. The ultimate conclusion – based on this faulty solvency analysis – that there were no viable claims for a fraudulent transfer, and accordingly that the settlement was within a reasonable range – was plain error.

### E.     The Bankruptcy Court Erred in Misapplying the Factors for Approval of a Settlement.

Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for the "settlement or adjustment of any claim or interest belonging to the debtor or to the estate." *In re Coram Healthcare Corp.*, 315 B.R. 321, 334-35 (Bankr. D. Del. 2004). Further, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the

debtor's business judgment, is fair, reasonable, and in the best interests of the estate." *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010).

As the Bankruptcy Court noted in the Confirmation Ruling, "[t]he Court determines if the released claims fall into the lowest point of reasonableness for a settlement." JA2002, citing *Coram Healthcare, Corp.*, 315 B.R. at 330. The Bankruptcy Court further stated that "Where a compromise is part of a plan of reorganization, however, the court has the duty "to determine that a proposed compromise forming part of a reorganization plan is fair and equitable." The standards for approval of a settlement under section 1123 are generally the same as those under Rule 9019, though the court should consider all factors relevant to a "full and fair assessment of the wisdom of the proposed compromise." (citing *Id.* at 334-335).

The Bankruptcy Court erred as a matter of law in ruling that the Reed Judgment Creditors bore the burden of proof on insolvency. Having erroneously concluded there was not a probability of success for the fraudulent conveyance claim, the Bankruptcy Court then failed to consider the other factors including the cost of the litigation, the likelihood of collection and the paramount interest of the creditors. Accordingly, the Bankruptcy Court misapplied the factors for approval of the settlement. The District Court, likewise, erred in affirming the Bankruptcy Court's confirmation of the Plan.

## <u>CONCLUSION</u>

WHEREFORE, the Reed Creditors respectfully request that this Court reverse the Designation Order and the Confirmation Order and remand this matter to the Bankruptcy Court with instructions that the Bankruptcy Court make further proceedings consistent with this Court's ruling.

Dated: September 22, 2025　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　**SULLIVAN · HAZELTINE · ALLINSON LLC**

　　　　　　　　　　　　　　　　*/s/William D. Sullivan*
　　　　　　　　　　　　　　　　William D. Sullivan, Esq. (No. 2820)
　　　　　　　　　　　　　　　　William A. Hazeltine, Esq. (No. 3294)
　　　　　　　　　　　　　　　　919 North Market Street, Suite 420
　　　　　　　　　　　　　　　　Wilmington, DE 19801
　　　　　　　　　　　　　　　　Tel.: (302) 428-8191
　　　　　　　　　　　　　　　　Email: bsullivan@sha-llc.com
　　　　　　　　　　　　　　　　　　　whazeltine@sha-llc.com

　　　　　　　　　　　　　　　　Bren J. Pomponio, Esquire
　　　　　　　　　　　　　　　　Colten L. Fleu, Esquire
　　　　　　　　　　　　　　　　**Mountain State Justice, Inc.**
　　　　　　　　　　　　　　　　1217 Quarrier Street
　　　　　　　　　　　　　　　　Charleston, WV 25301
　　　　　　　　　　　　　　　　Tel.: (304) 326-0188
　　　　　　　　　　　　　　　　Email: colten@msjlaw.org
　　　　　　　　　　　　　　　　　　　bren@msjlaw.org

　　　　　　　　　　　　　　　　and

Maureen Davidson-Welling, Esquire
PA ID No. 206751
John Stember, Esquire
PA ID No. 23643
**Stember Cohn &**
**Davidson-Welling, LLC**
The Hartley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA  15219
Tel.: (412) 338-1445
Email: mdw@stembercohn.com
jstember@stembercohn.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this date, a copy of the foregoing **APPELLANTS' BRIEF** was filed electronically with the Clerk of Court using the ECF system which will send notification to the parties of record. In addition, seven (7) paper copies of this brief will be delivered to the Clerk within five (5) days of the electronic mailing:

Respectfully submitted,

Dated: September 22, 2025

**SULLIVAN · HAZELTINE · ALLINSON LLC**

*/s/William D. Sullivan*
William D. Sullivan, Esq. (No. 2820)
William A. Hazeltine, Esq. (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel.: (302) 428-8191
Email: bsullivan@sha-llc.com
          whazeltine@sha-llc.com

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

The Reed Action Judgment Creditors,

*Appellants*,

v.

Alecto Healthcare Services, LLC,

*Appellee.*

No. 25-1853

## <u>COMBINED CERTIFICATIONS</u>

I hereby certify that:

1.      Undersigned counsel is admitted to the bar of the United States Court of Appeals for the Third Circuit.

2.      The text of the PDF version of the Appellants' Brief, as electronically filed, is identical in every response to the hard copies of Appellants' Brief that have been sent to the Court.

3.      A virus check was performed on the PDF copy of Appellants' Brief using WebRoot Endpoint Protection CE 24.3.

4.      Pursuant to Federal Rules of Appellate Procedure 32(a)(7)(B), Appellants' Brief contains 12,906 words.

Date: September 22, 2025

**SULLIVAN · HAZELTINE · ALLINSON LLC**

*/s/William D. Sullivan*
William D. Sullivan, Esq. (No. 2820)
William A. Hazeltine, Esq. (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel.: (302) 428-8191
Email: bsullivan@sha-llc.com
        whazeltine@sha-llc.com

*Attorneys for Appellants*