Case No. 25-1853

IN THE
## UNITED STATES COURT OF APPEALS
FOR THE
## THIRD CIRCUIT

*IN RE:* **ALECTO HEALTHCARE SERVICES LLC,**
*Debtor*

**THE REED ACTION JUDGMENT CREDITORS,**
*Appellants,*

v.

**ALECTO HEALTHCARE SERVICES LLC,**
*Appellee.*

On bankruptcy appeal from the United States District Court
for the District of Delaware,
Gregory B. Williams, District Judge
Case Nos.: 1:24-cv-0494-GBW and 1:23-cv-1442-GBW

## APPELLEE'S BRIEF

Carl N. Kunz, III (DE Bar No. 3201)
Jeffrey R. Waxman (DE Bar No. 4159)
Douglas N. Candeub (DE Bar No. 4211)
**MORRIS JAMES LLP**
3205 Avenue North Blvd., Suite 100
Wilmington, DE 19803
Telephone: (302) 888-6800
Email:     ckunz@morrisjames.com
           jwaxman@morrisjames.com
           dcandeub@morrisjames.com

*Attorneys for Alecto Healthcare Services LLC*
Debtor and Appellee

## CORPORATE DISCLOSURE

Pursuant to Fed. R. Bankr. P. 8012(a) and 8014(a)(1), Alecto Healthcare Services LLC, the Reorganized Debtor and Appellee herein, hereby discloses and states that it is a Delaware limited liability company; that it has no parent corporation; and that no publicly held corporation owns any membership interests in the Appellee.

# TABLE OF CONTENTS

COUNTER-STATEMENT ON THE ISSUES AND THE
STANDARD OF REVIEW ........................................................................1

COUNTER-STATEMENT OF THE CASE ..............................................4

    A.    Alecto Healthcare Services LLC..................................................4

    B.    The *Reed* Action in West Virginia .........................................5

    C.    Alecto Applies Some Available Resources to Its
         Subsidiaries ................................................................................6

    D.    Alecto's Subchapter V Bankruptcy Filing ............................6

    E.    The Debtor's Counsel and Schedules ...................................7

    F.    The LHP Claim ..........................................................................8

    G.    The Hearing on Alecto's Subchapter V Designation.........10

         1.    The Settlement Agreement with LHP.......................10

         2.    No Prepetition Demand for Payment by LHP ..........12

         3.    No Evidence that Alecto Knew, Prepetition, What
            LHP Might Say Was Owed, or When.......................12

         4.    The Ruling on Debtor's Subchapter V Eligibility ...................14

    H.    The Debtor's Independent Director and His
         Investigation into Potential Claims Against Insiders.........15

    I.    The Plan and the Gould Report............................................16

    J.    The Reed Creditors' Objections and the Confirmation
         Hearing ......................................................................................18

    K.    On Appeal, No Stay Was Obtained.......................................21

SUMMARY OF ARGUMENT .................................................................22

ARGUMENT ........................................................................................24

I.     THE LOWER COURTS COMMITTED NO ERROR IN
       CONCLUDING THAT ALECTO WAS ELIGIBLE TO BE
       A SUBCHAPTER V DEBTOR ....................................................24

       A.     Appellants' Arguments to Show that the Debt to LHP
              Was Not Contingent Disregard the Evidence ....................27

              1.     Appellants' Minimizing of the Settlement
                     Agreement Is Counter-Factual................................28

              2.     Appellants' Alternative Argument that the
                     Settlement Agreement Is Itself a Guaranty Is a
                     Fiction ....................................................................32

       B.     Appellants' Arguments that the Debt to LHP Was Not
              Unliquidated Disregard the Evidence and Are
              Inconsistent with the Purpose of Subchapter V .................34

II.    THE BANKRUPTCY COURT DID NOT ABUSE ITS
       DISCRETION OR ERR WHEN IT APPROVED THE
       SETTLEMENT WITH THE RELEASED PARTIES AS AN
       ELEMENT OF THE PLAN ...........................................................39

       A.     Appellants Do Not Challenge the Applicable
              Standards for Deciding Whether to Approve a
              Settlement and Release Within a Plan, as Carefully
              Laid Out by the Bankruptcy Court......................................39

       B.     Appellants Have Misconstrued Both the Lower
              Court's Rulings on the Settlement of the Dubious
              Potential Claim to Void the 2019 Sunrise REH
              Transfer................................................................................42

       C.     Appellants Present No Valid Basis for Overruling, as
              Clearly Erroneous, the Bankruptcy Court's Findings
              of Fact Upon Which It Approved the Plan..........................48

       D.     Appellants Ask this Court to Assume Viable Breach
              of Fiduciary Duty Claims Exist, Though No Evidence
              of Them Was Produced in Bankruptcy Court.....................50

E.    Appellants' Contention that the Bankruptcy Court
      Misapplied the Factors for Approval of a Settlement
      Lacks Merit............................................................................51

CONCLUSION ........................................................................................53

iii

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*In re Adams*,
  373 B.R. 116 (B.A.P. 10th Cir. 2007) ...................................................36

*In re Alecto Healthcare Servs., LLC*,
  2025 WL 961482 (D. Del. Mar. 31, 2025) ............................................1

*In re Alecto Healthcare Servs., LLC*,
  No. 23-10787, 2024 WL 1208355 (Bankr. D. Del. Mar. 20,
  2024), *aff'd,* 2025 WL 961482 (D. Del. Mar. 31, 2025)......................21

*Braniff Airways, Inc. v. Exxon Co., U.S.A.*,
  814 F.2d 1030 (5th Cir. 1987) .............................................................30

*Burtch v. Opus LLC (In re Opus E. LLC)*,
  698 F. App'x 711 (3d Cir. 2017) ...........................................................3

*In re Capmark Fin. Grp. Inc.*,
  438 B.R. 471 (Bankr. D. Del. 2010)................................................4, 43

*In re Chernushin*,
  911 F.3d 1265 (10th Cir. 2018) ...........................................................27

*In re Cleary Packaging, LLC*,
  36 F.4th 509 (4th Cir. 2022) ...............................................................25

*In re Coram Healthcare Corp.*,
  315 B.R. 321 (Bankr. D. Del. 2004)....................................................41

*In re Fostvedt*,
  823 F.2d 305 (9th Cir. 1987) ...............................................................36

*In re Fradkov*,
  2020 WL 6701335 (Bankr. D.N.J. Nov. 12, 2020) .............................31

*In re Free Speech Sys., LLC*,
  649 B.R. 729 (Bankr. S.D. Tex. 2023) .................................................27

iv

*In re Fruehauf Trailer Corp.*,
   444 F.3d 203 (3d Cir. 2006) ................................................................. 3

*In re Global Tissue, L.L.C.*,
   302 B.R. 808 (D. Del. 2003), *aff'd,* 106 F. App'x 99 (3d Cir. 2004) ............ 48, 49

*In re Hall*,
   650 B.R. 595(Bankr. M.D. Fla. 2023) ................................................. 38

*In re Heart Heating & Cooling, LLC*,
   2024 WL 1228370 (Bankr. D. Colo. Mar. 21, 2024) ........................... 35

*In re Hibbard Brown & Co.*,
   217 B.R. 41 (Bankr. S.D.N.Y. 1998) .................................................... 4

*In re Ibbott*,
   637 B.R. 567 (Bankr. D. Md. 2022) ................................................... 31

*Kairys v. S. Pines Trucking, Inc.*,
   75 F.4th 153 (3d Cir. 2023) ............................................................... 49

*Matter of Knight*,
   55 F.3d 231 (7th Cir. 1995) ............................................................... 35

*In re LandSource Communities Dev., LLC*,
   612 B.R. 484 (D. Del.), *aff'd.*, 834 F. App'x 747 (3d Cir. 2020) ............. 4

*In re Lenox Healthcare, Inc.*,
   343 B.R. 96 (Bankr. D. Del. 2006) ..................................................... 45

*In re Lucky's Mkt. Parent Co.*,
   2022 WL 843763 (D. Del. Mar. 22, 2022) .......................................... 3

*In re Mazzeo*,
   131 F.3d 295 (2d Cir. 1997) ......................................................... 31, 36

*In re McKenzie Contracting, LLC*,
   2024 WL 3508375 (Bankr. M.D. Fla. July 19, 2024) ......................... 38

*In re McPhillips Flying Service, Inc.*,
   2025 WL 3030284 (Bankr. W.D. Mich. Oct. 29, 2025) ...................... 27

v

*In re Montgomery Ward Holding Corp.*,
   268 F.3d 205 (3d Cir. 2001) ...............................................................28

*Myers v. Martin (In re Martin)*,
   91 F.3d 389 (3d Cir. 1996) .............................................4, 41, 42, 52

*In re NNN 400 Capitol Ctr. 16 LLC*,
   632 B.R. 243 (D. Del. 2021), *aff'd,* 2022 WL 17831445
   (3d Cir. Dec. 21, 2022) ......................................................................49

*In re NovaPro Holdings, LLC*,
   815 F. App'x 655 (3d Cir. 2020)........................................................43

*In re Nutraquest, Inc.*,
   434 F.3d 639 (3d Cir. 2006) ..............................................................42

*In re Parking Mgmt., Inc.*,
   620 B.R. 544 (Bankr. D. Md. 2020) .............................................26, 36

*In re Rosenberg*,
   414 B.R. 826 (Bankr. S.D. Fla. 2009). *subsequently*
   *aff'd,* 472 F. App'x 890 (11th Cir. 2012) ..........................................32

*In re Slack*,
   187 F.3d 1070 (9th Cir. 1999) ...........................................................39

*In re Spansion, Inc.*,
   426 B.R. 114 (Bankr. D. Del. 2010)....................................................41

*In re Stahl*,
   2021 WL 1293853 (B.A.P. 9th Cir. Apr. 7, 2021) .............................38

*In re Summit Metals, Inc.*,
   477 F. App'x 18 (3d Cir. 2012)......................................................52, 53

*United States v. State Street Bank & Tr. Co.*,
   520 B.R. 29 (Bankr. D. Del. 2014)......................................................45

*United States v. Verdunn*,
   89 F.3d 799 (11th Cir.1996) ...............................................................35

vi

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012) ................................................................42

*In re Washington Mutual, Inc.*,
   442 B.R. 314 (Bankr. D. Del. 2011) ...................................................41

*In re Zhang Med. P.C.*,
   655 B.R. 403 (Bankr. S.D.N.Y. 2023) ................................................38

**Statutes**

11 U.S.C. § 108(a)(2) ............................................................................16

11 U.S.C. § 109(e) ...........................................................................26, 35

11 U.S.C. § 362(a) ................................................................................14

11 U.S.C. § 365(d)(3) ...........................................................................29

11 U.S.C. § 544 .........................................................................16, 43, 44

11 U.S.C. § 546(c) ................................................................................32

11 U.S.C. § 548 ....................................................................................43

11 U.S.C. § 553(a) ................................................................................30

11 U.S.C. § 1123(b)(3)(A) .....................................................................40

11 U.S.C. § 1182(1)(A) ...........................................................25, 31, 34, 35

California Uniform Voidable Transfer Act,
   Cal. Civ. Code §§ 3439 *et seq.* .....................................................16, 43

Small Business Reorganization Act of 2019, Pub. L. 116-54 .................24

**Court Rules**

Fed. R. App. P. 28(b) ..............................................................................4

Fed. R. Bankr. P. 8014(b) ........................................................................4

Fed. R. Bankr. P. 9019(a) ...............................................................40, 43

vii

## Other Authorities

*Final Report of the American Bankruptcy Institute Subchapter V Task Force* (2024) https://www.abi.org/newsroom/press-releases/abi-subchapter-v-task-force-final-report-provides-key-recommendations-to..............................................................................................7

Heidi J. Sorvino,  *et al.*, *The $7.5 Million Subchapter V Debt Limit Should Be Reinstated*, Am. Bankr. Inst. J. (February 2025) .............................7

Michelle M. Harner, *et al.*, *Streamlining Small Business Bankruptcies Under Subchapter V,* Norton Annual Survey of Bankr. Law 2 (2021).............................................................................................................25

17643769/2

## COUNTER-STATEMENT ON THE ISSUES AND
## THE STANDARD OF REVIEW[1]

### A.  The Issues

Appellee Alecto Healthcare Services LLC ("Appellee," "Alecto" or the "Debtor") disputes the premises of three of the issues in the Statement of Issues in the Opening Brief ("Appellants' Brief" or "Appellants' Br.") filed by the appellants, the Reed Action Judgment Creditors ("Appellants" or the "Reed Creditors"):

1.    The "Designation Ruling" (Subchapter V Eligibility) Appeal.

Appellants assert that the District Court affirmed the Bankruptcy Court's eligibility determination "solely because LHP had not demanded payment on the claim." Appellants' Br. at 4 (emphasis added).  That assertion is inaccurate, since (i) the District Court's affirmance was not solely on that basis [*see* District Court's 3/31/2025 Memorandum Opinion (the "Mem.Op.") at 21-23][2]; (ii) Appellants themselves say the Bankruptcy Court so ruled based on multiple reasons [Appellants' Br. at 38]; and this Court may affirm based on any of the reasons that support the ruling.

2.    The Confirmation Ruling (on the Plan's Settlement and Releases) Appeal.

Appellee takes issue with the *first* and the *third* of the Appellants' issues in

---

[1] *See* Fed. R. App. P. 28(b); Fed. R. Bankr. P. 8014(b).

[2] The District Court's opinion is reported at *In re Alecto Healthcare Servs., LLC*, 2025 WL 961482 at *7 (D. Del. Mar. 31, 2025).

their appeal from the Bankruptcy Court's Confirmation Ruling.

(i)    Appellants assert the District Court erred by treating as "harmless error" the Bankruptcy Court's *purported* conclusion that "the Reed Creditors bore the burden of proof on the issue of insolvency" with respect to that potentially challengeable transfer. Appellants' Br. at 4.  That is misleading.  The District Court concluded that to view the Bankruptcy Court as having placed the burden of proof of insolvency upon the Reed Creditors was a "misreading," since the Bankruptcy Court understood that "*no party* bore the burden of proving solvency or insolvency." Mem.Op. at 27 (emphasis added).  The District Court added, however, that *if* that were not the case, then the Bankruptcy Court's conclusion was "harmless error."  *Id*.

(iii)    Appellants assert that the Bankruptcy Court erred in relying on the Debtor's evidence "in ruling that the Debtor was solvent at the time of the Sunrise REH Transfer."   The Bankruptcy Court, however, did *not* rule that the Debtor was solvent at the time of that transfer.

### B. Standard of Appellate Review

Alecto does not disagree as to the general applicability of the principles of law cited by Appellants in their statement of the Standard of Review [Appellants' Br. at 28], but there are other review standards that are applicable here, as well.

When reviewing factual findings for clear error, the Bankruptcy Court's factual findings "may only be overturned if they are 'completely devoid of a credible

2

evidentiary basis or bear[] no rational relationship to the supporting data.'" *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 210 (3d Cir. 2006); *see also Burtch v. Opus LLC (In re Opus E. LLC)*, 698 F. App'x 711, 714 (3d Cir. 2017) ("Clear error occurs only if the court's finding is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." (citations omitted)).

"The reviewing court must give 'singular deference to a trial court's judgments about the credibility of witnesses.'" *In re Lucky's Mkt. Parent Co.*, 2022 WL 843763, at *6 (D. Del. Mar. 22, 2022) (citation omitted).

On appeal, the Court "may affirm a judgment on any ground apparent from the record, even if the [lower] court did not reach it." Mem.Op. at 18, n.7, quoting *Oss Nokalva, Inc. v. European Space Agency*, 617 F.3d 756, 761 (3d Cir. 2010).

As to a decision to approve a settlement that has been incorporated into a debtor's plan, '[a] decision to approve a settlement is reviewed for abuse of discretion." Mem.Op. at 13, citing *In re NovaPro Holdings, LLC,* 815 F. App'x 655, 657 n.6 (3d Cir. 2020) ("We apply the same standard as the District Court and review the approval of a settlement for an abuse of discretion."). To find an abuse of discretion, the lower court's decision "must rest on a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Id.*, quoting *In re Nutraquest, Inc.,* 434 F.3d 639, 645 (3d Cir. 2006). "'[A] decision

3

should not be overturned under the abuse of discretion standard, unless *no reasonable person would adopt the lower court's view.*'" *In re LandSource Communities Dev., LLC*, 612 B.R. 484, 493 (D. Del.), *aff'd.*, 834 F. App'x 747 (3d Cir. 2020).

In addition, the court should exercise its discretion "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co.,* 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998); *see also In re Martin,* 91 F.3d 389, 393 (3d Cir. 1996) ("compromises are favored in bankruptcy"); *In re Capmark Fin. Grp. Inc.,* 438 B.R. 471, 515 (Bankr. D. Del. 2010).

## COUNTER-STATEMENT OF THE CASE

Alecto includes this counter-statement of the case because Appellants' presentation of the case background in their opening brief is flawed. *See* Fed. R. App. P. 28(b); Fed. R. Bankr. P. 8014(b). Alecto notes, however, that the factual and procedural background to this case was ably set forth in the District Court's Memorandum Opinion. Alecto agrees with the Distrct Court's recitation of the background, and does not attempt to replicate it herein.

### A.    Alecto Healthcare Services LLC.

Alecto, a Delaware limited liability company that is headquartered in

4

California,[3] was formed as a holding company. JA0123. However, it also provides some direct management services to its subsidiary Alecto Hayward, under that subsidiary's contract with St. Rose Hospital in Hayward, California. JA0124. JA0124. Still, as a holding company, the upstreaming of revenue from subsidiaries or affiliates has been a principal source of its income.

In describing Alecto's business, the Reed Creditors are dismissive of a line entry in a 2019 Alecto balance sheet for "other receivables," insofar as it referred to receivables from subsidiaries or affiliates. Appellants' Br. at 6. Without factual support, Appellants state that "Alecto knew [that its transfers to the subsidiaries] would never be repaid" [*id.*], but their citations to the record are only to balance sheets; the assertion about what Alecto "knew" has no basis in the record.

## B.    The *Reed* Action in West Virginia

Appellants' WARN Act lawsuit was filed against their direct employer, Alecto Healthcare Services Wheeling, LLC, d/b/a Ohio Valley Medical Group ("AHSW") and that entity's ultimate parent, Alecto. *See* Appellants' Br. at 7. The federal court in West Virginia ruled that Alecto and AHSW constituted a "single employer" for purposes of the WARN Act. *Id.* But in its bankruptcy case, Alecto is and has been the sole debtor-entity.

---

[3] See JA013 (current); JA0668 (in 2014).

5

### C.    Alecto Applies Some Available Resources to Its Subsidiaries

As stated in the Debtor's Plan, Alecto historically had formed subsidiaries for different purposes, one of which was to acquire "distressed acute hospitals" [JA0123]. When the Covid-19 pandemic arrived, it added greater challenges for Alecto's hospital network. JA0125.

With the goal of adding value to these operating subsidiaries, and ultimately selling them for a net gain, Alecto needed to, and periodically did, provide them with capital. The Reed Creditors refer to Alecto's having advanced approximately $60 million to its subsidiary, Sherman/Grayson Hospital, LLC ("Sherman/Grayson"). Appellants' Br. at 8. That amount was advanced over a *nine-year period*, and the funds were paid out in large part to help it to "attempt a financial recovery." JA1476. *See also* JA1471 ("If Sherman/Grayson was unable to sell its assets, Sherman/Grayson would have been forced to cease operations and immediately shut down the Hospital").

### D.    Alecto's Subchapter V Bankruptcy Filing

On November 28, 2022, in the action *Reed, et al. v. Alecto Healthcare Services LLC, et. al.,* Civil Action No. 5:19-cv-263 (N.D.W.Va.), judgment was entered in the principal amount of $2,686,357.11 plus attorney's fees and costs of

$483,388.61, for a total of $3,169,745.72 (the "Reed Judgment"). JA0720.[4]

On June 1, 2023, the Reed Creditors obtained a writ of execution against the Debtor in the amount of $3,242,498.77. JA1453; JA0126. Alecto filed its bankruptcy petition on June 16, 2023 (the "Petition Date").

One week after Alecto filed its petition and Subchapter V election, Sherman/Grayson filed for Chapter 11 bankruptcy relief in the District of Delaware. Appellants' Br. at 9. The Reed Creditors describe Alecto's Subchapter V election as though Subchapter V were something nefarious. *Id*. at 10. It is not; to the contrary, it has been lauded as a very successful addition to the Bankruptcy Code.[5]

### E.    The Debtor's Counsel and Schedules

Appellants note that Alecto and Sherman/Grayson started out being "represented by the same counsel." Appellants' Br. at 9, n. 1. But that common representation did not last long. As the Reed Creditors acknowledge, any potential conflict of interest issues quickly resulted in the Debtor obtaining new, separate

---

[4] The Declaration of Michael Sarrao in Support of First Day Motions (at JA1453) and subsequently, Alecto's Plan (at JA0126) mistakenly stated that the judgment was entered on May 13, 2023.

[5] *See, e.g., Final Report of the American Bankruptcy Institute Subchapter V Task Force* (2024) https://www.abi.org/newsroom/press-releases/abi-subchapter-v-task-force-final-report-provides-key-recommendations-to ("Subchapter V is working as Congress intended, allowing smaller companies to reorganize their businesses and to make payments to their creditors"); Heidi J. Sorvino, *The $7.5 Million Subchapter V Debt Limit Should Be Reinstated*, Am. Bankr. Inst. J. (February 2025), at 8, 58.

counsel, as well as an independent director.  *Id*. at 11-12.

Appellants assert vaguely that Alecto's schedules listed millions of dollars of subsidiary-generated liabilities as contingent and unliquidated, or else omitted them. *Id.* at 11.  Nonetheless, in Bankruptcy Court, it was undisputed that it was only the debt to LHP Hospital Group, Inc. ("LHP") whose status (as contingent or unliquidated) could be challenged *and* which was of such a magnitude that it could alter Alecto's Subchapter V eligibility.  JA0074.  *See* Mem.Op. at 14.

### F.     The LHP Claim

Alecto filed its Schedules shortly after filing its bankruptcy petition.  It listed LHP as a creditor with a contingent and unliquidated claim of an unknown amount. JA0708.  The Reed Creditors' challenge to Alecto's eligibility for a Subchapter V bankruptcy turns on the conclusion – reached by Alecto, the Bankruptcy Court, and the District Court – that Alecto's debt to LHP on the Petition Date was contingent and/or unliquidated.

Several facts are notable about the Appellants' basing their challenge to Alecto's Subchapter V eligibility on the characterization of Alecto's debt to LHP. First is the very fact that Appellants' challenge to Alecto's Subchapter V eligibility "was based not on Alecto's debt to Appellants, but rather based on Alecto's debt to LHP."  Mem.Op. at 16.  Apart from their common status as creditors of Alecto, the Appellants, being former employees at an acute hospital in West Virginia, have no

8

connection whatsoever with LHP, an entity that is a guarantor of various leases and subleases in a medical office building in Texas that is owned by another entity, Altera Highland.   JA1114-JA1119.

In 2014, LHP had entered agreements with two separate affiliates of Alecto: Alecto Healthcare Services Sherman LLC ("Alecto Sherman")[6], and Sherman/Grayson.  Mem.Op. at 4; JA0622.   When LHP entered its contract with Alecto Sherman, Alecto provided LHP a guarantee of Alecto Sherman's obligations. JA0665.  In July 2020, LHP sued Sherman/Grayson in Texas for breach of contract; in January 2021, LHP sued Alecto Sherman and Alecto in Delaware state court for breach of contract; and on February 16, 2022, a Settlement Agreement was entered into, between and among LHP, Alecto and Alecto Sherman (referred to in the agreement collectively as the "Alecto Defendants"), and Sherman/Grayson (the "Settlement Agreement").  JA0622-JA0630.   A large part of the Reed Creditors' argument involves urging the Court to look to the operative documents between Alecto and LHP that preceded the Settlement Agreement, but to ignore some of the relevant operative provisions in that Settlement Agreement.

Second is the fact that LHP itself "did not take a position on the status of its debt" as contingent or unliquidated or otherwise, "[w]hile its counsel was present

---

[6] Alecto Sherman was itself a holding company, as parent to Sherman/Grayson Hospital, LLC and Sherman/Grayson Sponsor, LLC.  JA2053.

9

throughout the hearing on the Designation Motion." Mem.Op. at 4 & n. 2.

### G.    The Hearing on Alecto's Subchapter V Designation

The Bankruptcy Court held its hearing on the Reed Creditors' motion to revoke Alecto's Subchapter V Designation on November 29, 2023.    JA2018-JA2151.    Appellants list some of the documentary evidence introduced at the hearing.    Appellants' Br. at 15-16.    The Debtor called the only witness to testify at the hearing: Michael Sarrao, Alecto's Executive Vice President and General Counsel.    JA2021-JA2022.    The Reed Creditors introduced no other witnesses.    The evidence largely focused on the February 16, 2022 Settlement Agreement.

#### 1.    *The Settlement Agreement with LHP*

The most critical document offered into evidence was the Settlement Agreement.    *See* JA0621-JA0630.    Apart from providing for a payment to be made to resolve amounts claimed to have been currently owed to LHP, the agreement set terms for the handling of prospective "future expense" obligations that the landlord, Altera Highland LLC,  might hold LHP responsible to pay, as to which LHP might then seek indemnification from the Alecto Defendants.    *Id*.    Paragraph 6 of the Settlement Agreement between Alecto and LHP provides, in pertinent part, as follows:

> 6. <u>Future Expenses – Alecto Defendants</u>. The Alecto Defendants acknowledge and agree that, absent a resolution with Altera, LHP *may* continue to accrue expenses in connection with the [Medical Office

10

Building located in Sherman, Texas ("MOB")], including without limitation in connection with the Lease Agreements (as defined in the Complaint in the Delaware Action) and the Ground Lease Agreement entered effective as of August 21, 2012 between Sherman/Grayson and Altera ("Ground Lease"). Accordingly, the Alecto Defendants agree to the following procedure for payment of Future Expenses:

> a.    LHP shall make written demand upon the Alecto Defendants for a specified amount in accordance with the forbearance schedule set forth in Paragraph 8;
>
> b.    The Alecto Defendants shall make payment of the specific amount within fifteen (15) days of such demand;
>
> ….
>
> d.    The only matter that the Alecto Defendants may contest in connection with such proceeding is the computation and payment of the principal, interest, fees, and costs of the judgment; all other defenses are hereby expressly waived . . . .

JA0624 (emphasis added).[7]

Paragraph 8 of the Settlement Agreement provides:

> 8. <u>Forbearance on Demand for Future Expenses</u>. LHP agrees not to make demand for future expenses, whether against Alecto Defendants or Sherman/Grayson … until the expiration of one (1) year from the Effective Date. Thereafter, LHP may only seek payment of Future Expenses every six months from the date of the last payment ….

JA0625-JA0626.

Finally, paragraph 19 of the Settlement Agreement is a merger clause:

> 19. <u>Entire Agreement</u>. This Agreement and the Exhibits

---

[7] The Lease Agreements referred to in LHP's Complaint were between Altera Highland LLC as landlord and Sherman/Grayson Health System LLC as tenant. *See* JA0809-JA1029. Neither Alecto Defendant was a party to those Leases.

11

attached hereto set forth the entire agreement between the Parties and fully supersede any and all prior agreements or understandings, written or oral, between the Parties . …

JA0628.

### 2. No Prepetition Demand for Payment by LHP

Questioned about the original 2014 Purchase Agreement and Guarantee upon which LHP sued the Alecto Defendants in 2021, Mr. Sarrao testified repeatedly that they were "superseded by the terms of the Settlement Agreement." JA2049. *See also* JA2067-JA2068; JA2082. The Settlement Agreement, which required LHP to make a demand for payment before anything would be owed, was the operative document.

Confirming what the plain language of the Settlement Agreement provides, he testified that "a demand for payment" from LHP to Alecto was a "condition precedent" under the agreement to any payment obligation of Alecto to LHP. JA2065. Mr. Sarrao's uncontroverted testimony was that LHP had not made any payment demand upon Alecto subsequent to the parties' execution of the February 2022 Settlement Agreement, through the Petition Date. JA2072-JA2073; JA2089.

### 3. No Evidence that Alecto Knew, Prepetition, What LHP Might Say Was Owed, or When

The Reed Creditors' repeated insistence that the amount due to LHP was "calculable" [Appellants' Br. at 26] and could have been "readily calculated" [*id*. at 16] was unsupported by facts in evidence.

12

Mr. Sarrao testified that, as of the Petition Date, Alecto did not know what, if anything, Alecto owed to LHP. Alecto could not know, as a demand for payment was a condition precedent, and none had been made. JA2065; JA2073; JA2074.

Even if Alecto had wanted to calculate what LHP was going to demand as payment, it could not have done so, insofar as the amount due was based on invoices that Altera, as landlord under the various Leases, may have sent out to LHP, and Alecto did not receive those invoices. JA2063 (Sarrao: "we didn't know what, if anything, was owed to Altera Highland. LLC because we didn't receive those – any invoices"). Alecto also did not know whether or to what extent LHP had paid what Altera had invoiced them, such that they could seek indemnification from Alecto. JA2064. For that matter, Alecto Sherman and Sherman/Grayson were also obligated to LHP under the Settlement Agreement, and if either had made a payment to LHP, it would have reduced Alecto's potential obligation. JA2069-JA2070.[8]

The amount of rent being invoiced by Altera could vary depending on whether one or more of the leased suites had been re-let. JA 2062; JA2072. In addition, the amounts charged for common area maintenance (CAM) expenses were only estimates; as the bankruptcy judge noted, "CAM is not reconciled until

---

[8] Mr. Sarrao testified that either of those entities could have made a payment to LHP, and if either had done so, the effect would have been to reduce the debtor's monetary obligations. JA2069-JA2070.

13

approximately six, seven months after the conclusion of the year." JA2106. The CAM charges amounted to about 30 percent of a given monthly invoice. JA2073. In 2022, the invoices were overcharging in their estimates of CAM which, once reconciled, resulted in a credit of $32,985.80 available in 2023. JA2107. That credit information was not available to Alecto prior to the Petition Date. JA 20290.

The Reed Creditors' counsel presented his own calculation of what LHP was owed on the Petition Date, based on a set of invoices that had *not* been sent to or received by Alecto. See JA1113. That figure - $3,708,475.62[9] – differed from the $3,739,635.77 figure that LHP later asserted Alecto owed it as of the Petition Date. *See* JA0722. The LHP proof of claim does not itself set forth a calculation to explain how the total was reached.

### 4.    The Ruling on Debtor's Subchapter V Eligibility

On December 1, 2023, the Bankruptcy Court announced its ruling in court (the "Designation Ruling"), holding that Alecto was "eligible to be a Subchapter V debtor" [JA0074] and denying the Reed Creditors' motion. JA0072-JA0082. As to the LHP debt, the Bankruptcy Court expressly held that it "was unliquidated as of the Petition Date." JA0079. On December 4, 2023, the Bankruptcy Court entered

---

[9] This figure corresponds to the demand letter sent by LHP to Alecto Sherman on June 28, 2023. JA0648. Since that demand was only being made after Alecto filed for bankruptcy relief, the automatic stay of 11 U.S.C. § 362(a) barred LHP from making such a demand directly on Alecto. *See* JA2104.

its formal order (the "<u>Designation Order</u>") denying the motion.  JA0070.

In the Reed Creditors' appeal from that ruling to the District Court, the District Court affirmed, holding that the LHP debt was unliquidated as of the Petition Date. Mem.Op. at 21.  It also concluded that the Bankruptcy Court had *implicitly* ruled that the LHP debt to Alecto was contingent as of the Petition Date, and affirmed on that ground as well.  Mem.Op. at 16.

### H.     The Debtor's Independent Director and His Investigation into Potential Claims Against Insiders

Alecto retained Steven Balasiano to serve as Independent Director; the Bankruptcy Court approved his retention on August 16, 2023.  JA0419.  On August 27, 2023, the Debtor applied to the Bankruptcy Court to retain Leanne Gould of Gould Consulting Services ("<u>Gould</u>") as a forensic accounting investigation consultant.  JA0420.  No objection was raised to her retention or its scope, and the court subsequently approved her retention, *nunc pro tunc* to August 25, 2023. JA0423.

Gould was engaged to investigate and identify potentially voidable (cash payments, loans, or other transfers to insiders in the four-year period between June 17, 2019 and June 16, 2023 (*i.e.,* the Petition Date).  JA013 (Plan); JA0218 (Gould's report).  She was not asked to perform an analysis of whether Alecto was solvent or insolvent at any particular time within that period.    JA1766.

15

I.      **The Plan and the Gould Report**

Alecto filed its Plan on December 19, 2023.  JA00113-JA00114.  Gould's report – presenting the result of her investigation – was attached to the Plan. JA1231-JA1412.  The Plan provided, *inter alia*, for a $25,000 payment by an unspecified set of the insiders and affiliates (the "Released Parties"), which was understood as a settlement payment made in exchange for a release by the Debtor of any potential claims against them.  JA0143.  Attached as an exhibit to the Plan was the Gould Report, which presented the results of her investigation.  JA0217-JA0398.

Ms. Gould's report identified a single transaction, which took place on June 19, 2019 – which, considered in isolation, appeared to have been made for less than reasonably equivalent value.[10]  On that date, Alecto had transferred its ownership of its subsidiary, Sunrise Real Estate Holdings, LLC ("Sunrise REH") to a newly formed entity, Alecto Sunrise MOB Holdings, LLC ("Sunrise MOB"), owned by the holders of the membership interests in Alecto (the "Alecto Members").  JA0218-JA0219.  At the time of the June 19, 2019 transfer (the "Sunrise REH Transfer"), Sunrise REH was the sole owner of another entity, Plaza Medical Office Building, LLC ("Plaza MOB"), and Plaza MOB had been appraised at $50,700,000.  JA0220.

---

[10] Such a claim, if made, would have been pursuant to California's Uniform Voidable Transfer Act, in tandem with 11 U.S.C. § 544.  The Bankruptcy Code gives a debtor to a two-year extension to the statute of limitations, pursuant to 11 U.S.C. § 108(a)(2).  Thus, the extended limitations period expired on June 16, 2025.

16

In exchange for its transfer of interests in Sunrise REH, Alecto received $28,416,827 (comprised of (i) the payoff of $19,472,350 of the secured debt of Plaza MOB, and (ii) capital contributions from the Alecto Members totaling $8,944,477). *Id.*

Viewed in isolation, it suggested that Alecto received approximately $22 million less in value than it transferred. However, the Gould Report presented the transfer as essentially the first of an extended one and one-half year, multi-part transaction that ultimately yielded a *net* benefit to Alecto of perhaps $15 million. JA0219-JA0220.[11]

As Alecto's Plan  states, Ms. Gould, after submitting her Report, presented it to Mr. Balasiano  and conferred with him, to address any questions he might have about it. After so conferring, Mr. Balasiano concluded that "the estate does not have any valid claims against the Insiders for avoidable transfers." JA0134. As Mr.

---

[11] The Gould Report summarized this part of its findings as follows:

> [T]he June 2019 transfer of Sunrise REH and Plaza MOB was completed without receiving reasonably equivalent value in exchange (appraised value of over $50 million was greater than the loan payoff and capital contribution received of over $28 million).

> [However,] the assets were transferred back by assignment to Alecto by the Alecto Members in January 2021 for no consideration and those assets were sold later that year for over $58 million, an increase in value of approximately $8 million. No consideration was given to the Alecto Members for the transfer and Alecto received proceeds from the sale of over $15 million.

JA0219.

Balasiano testified at the confirmation hearing, he understood that Alecto was solvent in June 2019; and he knew that the transaction could not be potentially voidable without, at a minimum, a showing of insolvency.   JA1762.

### J.    The Reed Creditors' Objections and the Confirmation Hearing

The Reed Creditors objected to the Plan, initially identifying three grounds for objection. JA1419-JA1436.  They later supplemented that with objections to the Debtor's handling of the solvency issue. JA1438-1444.  Most prominently, they objected to the release of what was described as a potential fraudulent transfer action based on the Sunrise REH transfer in June 2019.  Appellants' Br. at 21.  They also objected to the Plan on the ground that the Debtor should not have released potential claims of the Debtor against various officers, directors or members for breach of fiduciary duty. *Id*.

The Bankruptcy Court conducted a two-day hearing on plan confirmation and the Reed Creditors' objections thereto.  *Id*. at 22; JA1674; JA1800.   The witnesses who testified at the confirmation hearing were: (1) Jeffrey McCutcheon, an expert on employee compensation retained by the Debtor[12]; (2) Ms. Gould, the forensic accounting consultant; (3) Mr. Balasiano, the independent director; and (4) Mr. Sarrao, Alecto's Executive Vice President and General Counsel.  JA1677, JA 1803.

---

[12] No objection to Mr. McCutcheon's testimony was raised in Appellants' appeal.

The Reed Creditors did not counter with any witness of their own, either fact or expert.

The Reed Creditors' Objections asserted that this approximate $22 million value differential in the June 19, 2019 transfer presented a valuable opportunity for a constructive fraudulent transfer (or "voidable transfer") action against the Alecto Members.  JA1421.

At the confirmation hearing, Mr. Balasiano testified that he concluded that Alecto was not insolvent in June 2019 based on his review of balance sheets of the Debtor in 2019, as well as other financial statements and documents, and background information obtained from speaking with Mr. Sarrao.  JA1774-JA1776; *see* JA2271-JA2272.  He did not see value in causing the Debtor to pursue a potentially expensive litigation in which, he had concluded, the Debtor would not succeed.   JA1780; *see* JA1688.

The Reed Creditors attempted to challenge Mr. Balasiano on cross-examination, to no great effect.  They argue that Mr. Balasiano's testimony was "tainted" because he used information he obtained from Mr. Sarrao.  Appellants' Br. at 18.   But the Reed Creditors have never provided any evidence, or even alleged, for example, that Mr. Sarrao provided him faulty information, or that someone else was an important information source to whom Mr. Balasiano should have turned instead, but did not.

Mr. Balasiano's testimony on Alecto's solvency at the time of the Sunrise transfer, in 2019, was corroborated by testimony from Mr. Sarrao, who the Reed Creditors cross-examined. JA1983-JA1984. It was uncontradicted by anyone else's testimony. As more fully stated in Mr. Sarrao's testimony, the Debtor was solvent until the significant disruption to the business of operating acute hospitals that was caused by the COVID-19 pandemic, which came after March 2020. JA1452.

The Reed Creditors also objected to the Plan on the ground that the Debtor should not have released potential claims of the Debtor against various officers, directors or members for breach of fiduciary duty. JA1421. The alleged breaches concerned the choices that Alecto had made, prepetition, when its options were either: (i) to financially support its affiliates to either enable them to return to profitability or to be sold as going concerns, or (ii) to allow the affiliates to fail, in which case, Alecto would lose the value of the affiliates while Alecto would also be financially responsible for certain affiliates' obligations – either by agreement or by operation of law. JA1851-JA1852; JA2006-JA2009. Alecto estimated those obligations (the "Springing Obligations") would have aggregated to approximately $30 million. *Id.* There was no credible evidence presented that Alecto acted improperly, or that viable breach of fiduciary claims existed or had value. *See* JA22009.

20

On March 20, 2024, the Bankruptcy Court issued its decision (the
<u>Confirmation Ruling</u>") overruling the Reed Creditors' objections and confirming the
Plan.  JA1996-JA2013.[13]  On April 4, 2024, the Bankruptcy Court issued an order
(the "<u>Confirmation Order</u>") confirming the Debtor's Plan.  JA0084-JA0111.  The
Reed Creditors appealed, and the appeal was consolidated with their appeal of the
Designation Ruling and Order.

In its Memorandum Opinion dated March 31, 2025, the District Court
affirmed both the Designation Ruling and Order and the Confirmation Ruling.

### K.   On Appeal, No Stay Was Obtained

The Reed Creditors did not seek (or obtain) a stay of the implementation of
the Debtor's Plan, pending their appeals, and the Plan became effective on April 19,
2024.  *See* JA0436.  Accordingly, Alecto has moved forward with implementation
of the Plan.  Distributions to creditors as contemplated by the Plan have commenced.
Alecto will be filing a Motion in this Court to dismiss the instant appeal on mootness
grounds.

---

[13] The Bankruptcy Court's opinion overruling the Reed Creditors' plan objections
is reported at: *In re Alecto Healthcare Servs., LLC*, No. 23-10787, 2024 WL
1208355 (Bankr. D. Del. Mar. 20, 2024), *aff'd,* 2025 WL 961482 (D. Del. Mar. 31,
2025).

## SUMMARY OF ARGUMENT

1.  <u>The appeal of the Designation Ruling</u>.  Appellants have challenged Alecto's assertion that, when it filed its bankruptcy petition, it met the then-applicable $7,500,000 limit of noncontingent, liquidated debt for electing Subchapter V status.  Alecto's debt to creditor LHP Hospital Group was scheduled as contingent and unliquidated, but post-petition, LHP asserted a claim in a fixed amount, large enough that, had it been includable on the Petition Date, would have rendered Alecto ineligible for Subchapter V.  Alecto maintains that the debt to LHP was contingent and unliquidated on the Petition Date.  Appellants tried to show it was neither.  LHP itself took no position on it.  The operative agreement between LHP, Alecto, and an Alecto affiliate is a 2022 Settlement Agreement that made a written demand for payment by LHP a condition for Alecto's obligation to pay, and did not by its terms include a means to calculate what would be owed at a given point.  The evidence presented by Alecto established that the debt to LHP was indeed contingent and unliquidated on the Petition Date.  Appellants' arguments disregard the Settlement Agreement in favor of the agreements they superseded.  The Bankruptcy Court and District Court did not err in finding that the LHP was properly excluded from the count.  This Court should affirm.

2.  <u>The appeal of the Confirmation Ruling</u>.  The Bankruptcy Court did not abuse its discretion, or otherwise err, when it approved the settlement with, and

release of, insiders and affiliates of the Debtor, as a component of the Plan of Reorganization that the court confirmed.  The Bankruptcy Court laid out the standards for deciding whether to approve a settlement and release within a Plan, and Appellants do not dispute their  applicability.  In this appeal, Appellants have focused exclusively on a June 2019 transfer by Alecto to its members of its interests in an entity that held certain real estate; the Debtor's forensic consultant concluded that the transfer was made for less than reasonably equivalent value, but Alecto's independent director, after undertaking a reasonable investigation, concluded that Alecto was solvent at the time of the 2019 transfer, and thus that the transfer would not be voidable; and he therefore supported the settlement and release in the Plan. The Bankruptcy Court found his testimony, and that of Alecto's executive officer, to be credible, and concluded that the settlement fell within the range of reasonableness.  Appellants, who themselves offered no witness to testify at the confirmation hearing, challenge the Bankruptcy Court's ruling in part based on a misreading of its decision, and in part by arguing that the court should not have found the witnesses credible.  But the Bankruptcy Court's assessment of credibility is entitled to substantial deference, and its weighing of the evidence was not an abuse of discretion.  The District Court affirmed, and this Court should as well.

# ARGUMENT

## I. THE LOWER COURTS COMMITTED NO ERROR IN CONCLUDING THAT ALECTO WAS ELIGIBLE TO BE A SUBCHAPTER V DEBTOR

<u>Standard of Review</u>: The issues in this Section present mixed questions of law and fact: plenary review as to the law; clearly erroneous as to the facts.

Appellants' challenge to Alecto's eligibility to be a Subchapter V debtor is based entirely on their contention that Alecto's debt to LHP on the Petition Date should have been treated as *both* liquidated *and* noncontingent.  They contend that the Bankruptcy Court erred when it determined the debt to LHP to have been unliquidated; and they contend that the District Court compounded the error by concluding that the evidence established that Alecto's debt to LHP on the Petition Date was *both* unliquidated and contingent.  Appellants' Br. at 33. Their arguments are inconsistent with the record and unsupported by the law.

Congress added Subchapter V[14] to the Bankruptcy Code in August 2019, in recognition that, for small businesses, reorganizing under Chapter 11 is too expensive, too time-consuming, and otherwise unsatisfactory, and that Congress's prior efforts to accommodate small businesses seeking to reorganize were

---

[14] The legislation was the Small Business Reorganization Act of 2019, Pub. L. 116-54.  It became effective in February 2020.  Subchapter V is comprised of 11 U.S.C. §§ 1181-1195.

unsuccessful.[15] "Congress enacted Subchapter V … to streamline reorganizations for small business debtors;" and to "simplify[] …[small business] reorganizations … and reduc[e] [their] administrative costs." *In re Cleary Packaging, LLC*, 36 F.4th 509, 514, 517 (4th Cir. 2022).

Congress set simple terms for determining the eligibility of a small business for Subchapter V relief. It set a fixed upper limit of the dollar amount of debt a business could have when it filed for bankruptcy relief – the limit was $7,500,000 at the time Alecto filed its bankruptcy petition -- and that debt limit was to be based on the debtor's

> aggregate noncontingent liquidated … debts as of the date of the filing of the petition … (excluding debts owed to 1 or more affiliates or insiders).

11 U.S.C. § 1182(1)(A).[16]

In other words, eligibility is based on whether the total of the debtor's fixed and certain debts to non-insiders at the time it files its bankruptcy petition falls within

---

[15] *See* Michelle M. Harner, *et al.*, *Streamlining Small Business Bankruptcies Under Subchapter V,* 2021 Norton Annual Survey of Bankr. Law 2 (2021) ("Congress first tried to address these issues in" 1994 and 2005 amendments to the Code, but "the … success rates for smaller business debtors only declined.").

[16] The definition of "debtor" that was set forth in § 1182(1)(A) had some additional factors not relevant here. Technically, one might now call it the "*former §* 1182(1)(A)" because, with the sunsetting of the 2022 Amendment to the Act that created Subchapter V, there no longer is a subsection (A) to § 1182(1). For ease of reference, however, § 1182(1)(A) will here be referred to in the present tense.

the dollar limit. Debts that are contingent on the petition date, however large; debts that are unliquidated on the petition date, however large; and any debts to affiliates or insiders, however large – they are all excluded when determining eligibility for Subchapter V.

The Reed Creditors make it very clear that they do not like the advantages that Subchapter V affords to debtors, in comparison to Chapter 11. *See, e.g.,* Appellants' Br. at 10 ("Subchapter V …is *far* more favorable for debtors than Chapter 11"). They gripe that Alecto did not file for bankruptcy relief "jointly with any of its then-insolvent subsidiaries." *Id*. at 9. Ultimately, they latched onto the LHP claim – a claim they had no pre-bankruptcy connection to, or information about – seeing in it a potential means to deny Alecto the Subchapter V relief it had elected.

Preliminarily, it may be noted, as the District Court found, that the phrase "as of the date of the filing of the petition" as used in § 11182(1)(A), is best construed to mean "*on* the Petition Date." Mem.Op. at 14-15 & n.6. Appellants did not appeal from that part of the District Court's ruling, and have not disputed that conclusion. Where a Bankruptcy Code provision sets a temporal marker such as "on the petition date" for assessing the level of a debtor's debt, it "require[s] consideration of the debts as they exist as of the petition date, irrespective of postpetition events." *In re Parking Mgmt., Inc.*, 620 B.R. 544, 554 (Bankr. D. Md. 2020) (construing comparable language in 11 U.S.C. § 109(e), the provision that sets eligibility

requirements for Chapter 13 debtors).[17] *See also In re McPhillips Flying Service, Inc.,* 2025 WL 3030284, at *13 (Bankr. W.D. Mich. Oct. 29, 2025) (Section 636(b) Penalty claim asserted against debtor, though calculable, was contingent where the conditions precedent to establishing the Debtor's liability for the violation had not yet all occurred).

### A. Appellants' Arguments to Show that the Debt to LHP Was Not Contingent Disregard the Evidence

The Settlement Agreement established the timing upon which any payment of "future expenses" would become due and payable. It provides that: "LHP shall make written demand upon the Alecto Defendants for a specified amount," after which the Alecto Defendants would become obligated to pay within 15 days. JA0624.

The Bankruptcy Court found that these Settlement Agreement provisions meant that: "Unless and until LHP made a specific demand the Debtor had no obligation to pay." JA0077. Reviewing the evidence and the Bankruptcy Court's ruling, the District Court expressly concluded that the evidence established that

---

[17] *See also In re Chernushin*, 911 F.3d 1265, 1269 (10th Cir. 2018) (concluding that the phrase "as of," as use in § 541(a)'s definition of "property of the estate," "establishes a clear-cut date after which property acquired by the debtor will normally not become property of the bankruptcy estate").

Courts have also recognized that an alternative construction would be problematic. "If postpetition affiliate filings lead to ineligibility and revocation, it means that debtors could float in and out of Subchapter V at any time. That contradicts the text and purpose of Subchapter V." *In re Free Speech Sys., LLC*, 649 B.R. 729, 734 (Bankr. S.D. Tex. 2023).

Alecto's debt to LHP was "contingent" on the Petition Date. Mem.Op. at 18.

>  1.  *Appellants' Minimizing of the Settlement Agreement*
>       *Is Counter-Factual*

The Reed Creditors dismiss those findings, though without any evident grounding. They shrug off the Settlement Agreement's pertinent language, the uncontroverted testimony confirming what Settlement Agreement's intent, and the findings of both of the lower courts. `They then write that the Settlement Agreement "merely provided a *procedure* for payment" [Appellants' Br. at 34 (emphasis in original)]; that "[t]here is nothing in the Settlement Agreement that conditions Alecto's obligation on a demand for payment" [*id.*]; and that "the Settlement Agreement did not change the arrangement between Alecto and LHP in any substantive way." *Id.* at 35.

Their dismissal of the "written demand" provision as mere "procedure" suggests they are attempting to argue that contractual provisions governing the timing of payments can be disregarded as inconsequential. *See* Appellants' Br. at 34. Among other things, that argument flies in the face of a substantial body of bankruptcy law that places immense importance on when contractual payment obligations become due. For example, under *In re Montgomery Ward Holding Corp.*, 268 F.3d 205 (3d Cir. 2001) and subsequent case law, it is well established that that if, under a real property lease, payment is due on the first day of the month,

and a company files for bankruptcy relief on, say, the third day of a given month, the debtor will *not* be obligated to "timely perform" the obligation of paying the rent for that month, pursuant to 11 U.S.C. § 365(d)(3), whereas, if the lease provided that payment was due on the *fifth* day of the month, the debtor *would* be obligated to pay it. The contractual timing for when payment becomes due may thus be determinative as between possible alternative outcomes.

In contending that the Settlement Agreement did not affect a "substantive" change, they are just denying reality. The Settlement Agreement's merger clause, both by its terms and as described by Mr. Sarrao, meant that it superseded the previous operative documents – the 2014 Purchase Agreement and the Guarantee – in regard to the obligations of Alecto and Alecto Sherman to LHP. The Bankruptcy Court applied Delaware law to construe the agreement and, held as a matter of law that the Settlement Agreement's merger clause "makes plain that it amends the operative agreements." Designation Ruling, at JA0076-JA0077, citing *CitiSteel USA, Inc. v. Connell Ltd. P'ship,* 758 A.2d 928, 931 (Del. 2000).

The Appellants make a strained attempt to dismiss the effect of the Settlement Agreement and its merger clause: they cite to "JA806" – a page in Alecto's 2014 Guarantee to LHP with a provision detailing what is required before the Guarantee can be waived. Appellants' Br. at 34. But LHP satisfies it, since it signed the Settlement Agreement. JA0630. The Reed Creditors' assertion that the Settlement

Agreement "did not … modify the underlying guarantee" is a baseless throwaway.

As Mr. Sarrao testified, the Settlement Agreement's requirement that LHP make a written demand before any payment is owed and due sets a condition precedent for a payment obligation on Alecto's part. The Bankruptcy Court reviewed the agreement and concluded that "the Debtor had no obligation to pay"… "[u]nless and until LHP made a specific demand." JA0077. In turn, the District Court viewed the Bankruptcy Court's conclusion to mean that make "a specific demand for payment" by LHP was made "a requisite *condition* before Alecto (or Alecto Sherman) had an obligation to pay." Mem.Op. at 19 (emphasis added).

Appellants base their argument that the "written demand" requirement is not conditional on *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030 (5th Cir. 1987). In *Braniff,* the debtor initiated a preference action against a vendor that had an open account with the debtor, and the vendor-defendant sought to defend in part based on setoff rights, under § 553(a). Section 553(a) provides that other provisions of the Bankruptcy Code do not affect any "right of a creditor to offset a mutual debt" that such creditor owed debtor "that arose before the commencement of the case." 11 U.S.C. § 553(a). There was no contract with a required written demand for payment; and the statutory language at issue dealt with when the setoff "right" of the creditor "arose." *See id*. at 1033. As the statutory language was not analogous, the case is not remotely pertinent.

30

In the instant case, the undisputed evidence established, and the Bankruptcy Court found, that there had been no written demand for payment made by LHP upon Alecto pursuant to the Settlement Agreement "of the exact amount due" prior to Alecto's bankruptcy filing. JA0079. As restated by the District Court, the evidence showed that:

> LHP never made a demand upon anyone for payment in connection with its claim until June 28, 2023 – twelve days *after* the Petition Date – when LHP submitted its payment demand to Alecto Sherman (but not to Alecto, to avoid violating the automatic stay).

Mem.Op. at 18. Accordingly, the District Court correctly held that "the LHP claim was *contingent* as of the Petition Date, and the contingency – the demand requirement – had not yet occurred 'as of the Petition Date.'" *Id*. (emphasis in original).

Apart from denying the relevance of the Settlement Agreement [Appellants' Br. at 34-35], the Reed Creditors have little to say about the District Court's application of the term "contingent," as used in § 1182(1)(A),[18] to the facts as

---

[18] "It is generally agreed that a debt is contingent if it does not become an obligation until the occurrence of a future event." *In re Mazzeo*, 131 F.3d 295, 303 (2d Cir. 1997). "A debt is contingent where 'the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor.'" *In re Fradkov*, 2020 WL 6701335, at *1 (Bankr. D.N.J. Nov. 12, 2020) (quoting *In re Weiss*, 251 B.R. 453, 465 (Bankr. E.D. Pa. 2000)). "[N]oncontingent debts are those where 'all events necessary to give rise to liability take place prior to filing the petition.'" *In re Ibbott*, 637 B.R. 567, 575

31

established by the evidence. The District Court appropriately held that there is no legal impediment to contract parties making a requirement of a written payment demand a *condition* to a payment obligation. Mem.Op. at 19 ("Making demand for payment a condition for the obligation to pay, as provided in the Settlement Agreement, is enforceable."). *See In re Rosenberg*, 414 B.R. 826, 844 (Bankr. S.D. Fla. 2009). *subsequently aff'd,* 472 F. App'x 890 (11th Cir. 2012) ("The claim against Rosenberg is, without dispute, contingent. … [A] demand for payment must be made upon Rosenberg before any liability matures under the Limited Guaranty.").[19]

Lacking a basis for challenging that principle, Appellants instead attempt to distinguish the *Rosenberg* case, on the ground that the guaranty in that case included some terms that were different from the terms of Alecto's guaranty to LHP. Appellants' Br. at 34-35. The distinction is insignificant; it has no impact on the applicability of the principle for which the District Court cited the *Rosenberg* case.

    2.    *Appellants' Alternative Argument that the Settlement Agreement Is Itself a Guaranty Is a Fiction*

Finally, the Reed Creditors' last line of attack on the finding and conclusion

---

(Bankr. D. Md. 2022) (quoting *In re Green,* 574 B.R. 570, 576–77 (Bankr. E.D.N.C. 2017)).

[19] There are other, familiar rights triggered by the making of a written demand. *See, e.g.,* 11 U.S.C. § 546(c) (a seller of goods to a debtor who seeks to reclaim the goods must first "demand[ ] in writing reclamation of such goods").

that the Alecto debt to LHP was contingent on the Petition Date is to engage in a fiction: they assert that "[t]he Settlement Agreement is a subsequent guaranty incorporating the first guaranty." *Id.* at 35. Their support for that assertion? None of the actual language in the Settlement Agreement; none of the testimony of Mr. Sarrao, who participated in negotiating it; nothing. Still they advance their fiction, and posit that the Settlement Agreement-qua-Guaranty has all the characteristics of a *typical* "absolute" guaranty (*i.e.,* not necessarily specific to Delaware). *Id*. at 35-36. They then explain that the key to determining when liability is triggered for the "guarantor" is "the default of the principal." *Id*. at 36.

The District Court duly rejected a similar argument the Reed Creditors made to that court, writing that it "relies on the 2014 guaranty which was superseded by the Settlement Agreement." Mem.Op. at 20.

Nonetheless, the District Court humored the Appellants by briefly contemplating the outcome if, hypothetically, there were "validity to ignoring the Settlement Agreement and treating Alecto's guaranty as though it remained in force." *Id*. The Appellants now take issue with the District Court's handling of this counter-factual scenario, on the ground that the court did not consider "default by the principal" as the trigger for the "guarantor." Appellants' Br. at 36. Had "default by the principal" been applicable to the Settlement Agreement, a "default" would likely be understood to occur if no payment was forthcoming more than 15 days after a

33

written demand for payment made by LHP.  But there is no need to persevere with Appellants' fiction.  The Settlement Agreement is not itself a guaranty; it sets a condition (a demand in writing) that had not occurred on or before the Petition Date; consequently, LHP's debt remained "contingent" on the Petition Date.

**B.    Appellants' Arguments that the Debt to LHP Was Not Unliquidated Disregard the Evidence and Are Inconsistent with the Purpose of Subchapter V**

In addressing Appellants' arguments on whether Alecto's debt to LHP was liquidated on the Petition Date, this  Court should be cognizant that the Appellants persist in their improper usage (in the instant context) of the term "claim," where the proper term to use would be "debt."  Appellants' Br. at 37-38.

Section 1182(1)(A) sets eligibility for Subchapter V based on a tally of the prospective debtor's "aggregate noncontingent liquidated secured and unsecured *debts*."  11 U.S.C. § 1182(1)(A).  The terms "debt" and "claim" are both defined in § 101 of the Bankruptcy Code.  The District Court addressed the improper usage, though evidently to no effect, writing:

> [T]he question is whether Alecto's *debt* to LHP was liquidated on the Petition Date; not LHP's *claim*.  LHP's proof of claim is of no utility in addressing the state of a debtor's liquidated, noncontingent  debt on the Petition Date in a case such as this, where there was no date upon which  the debt would be determined  and the "demand" had not yet occurred as of the Petition Date.

> In reference to Chapter 13 eligibility, it has been observed that "Congress made a conscious choice when it employed the term 'debt' instead of 'claim' in the context of Section 109(e)." *In re Lambert,* 43 B.R. 913,919 (Bankr. D. Utah 1984). "['C]laim' has a broader significance, referring to a creditor's demand for payment, regardless of the existence or validity of the underlying obligation or to the accuracy of the amount demanded, while 'debt' has a narrower significance. … " *Id.* at 918. Congress defined the term "debt" to mean "liability on a claim." 11 U.S.C. § 101(12). The term "claim" is defined far more broadly …. 11 U.S.C. § 101(5). "The term 'claim' was avoided because the Congress did not wish the … eligibility determination ... to be predicated upon the mere demands of creditors." *Lambert,* 43 B.R. at 919.

Mem.Op. at 21-22. The same applies for "debts' in eligibility for Subchapter V. *In re Heart Heating & Cooling, LLC,* 2024 WL 1228370, at *8 (Bankr. D. Colo. Mar. 21, 2024).

In determining a debt's status as liquidated or unliquidated, the Court should consider not only the criteria for what makes a debt liquidated or unliquidated, but also the process in which the determination is made.[20]

While the court plainly plays an important gatekeeper role when a debtor's

---

[20] To be clear, just as § 1182(1)(A) includes "noncontingent" and "liquidated", but *not* "undisputed," as criteria for tabulating the amount of a debtor's debt for eligibility purposes, "the existence of a dispute over … the amount of a debt does not automatically render the debt … unliquidated." *Matter of Knight*, 55 F.3d 231, 235 (7th Cir. 1995). It has been held, in the context of the analogous section 109(e), that "[t]he concept of liquidation" relates only to "the amount of liability not the existence of liability." *United States v. Verdunn,* 89 F.3d 799, 802, n. 10 (11th Cir.1996).

eligibility for Subchapter V is challenged, the Bankruptcy Court should also be cognizant that maintaining a reasonably simple process is important too:

> the means of determining eligibility must be efficient and inexpensive. *To allow an extensive inquiry in each case would do much toward defeating the very object of the statute.*

*In re Parking Mgmt., Inc.*, 620 B.R. at 550, quoting *Comprehensive Accounting Corp. v. Pearson (In re Pearson)*, 773 F.2d 751 (6th Cir. 1985) (emphasis added). If determining eligibility will require extensive time, written discovery, and depositions, in advance of a mini-trial – as this one has – that itself seems inconsistent with Subchapter V's "streamlining" purpose. *See* Argument. I, *supra*.

The criteria for whether a debt is liquidated or unliquidated includes "whether it is subject to 'ready determination and precision in computation of the amount due.'" *In re Fostvedt*, 823 F.2d 305, 306 (9th Cir. 1987) (citation omitted). Further, it has been held that the amount of a debt is subject to 'ready determination "only if the process of determining the claim is fixed, certain, or otherwise determined by a specific standard." *In re Adams*, 373 B.R. 116, 120 (B.A.P. 10th Cir. 2007), citing *In re Barcal,* 213 B.R. 1008, 1014 (8th Cir. BAP 1997). If the value of the debt depends on "a future exercise of discretion, not restricted by specific criteria," the debt is unliquidated." *In re Mazzeo*, 131 F.3d 295, 304 (2d Cir. 1997).

Absurdly, the Reed Creditors contend "it is undisputed that the LHP *claim*

satisfies these tests." Appellants' Br. at 38 (emphasis added).[21]   Not so.

Appellants say that the debt to LHP on the Petition Date was "precisely calculable". *Id*. at 37. Yet, the Reed Creditors tabulated a figure [JA1113] that differs from the figure that LHP set down in the proof of claim in the case. JA0722. Appellants' counsel admitted to the Bankruptcy Court that the figure they arrived at is based on estimates – not a precise figure.   JA2108.   The testimony established that the amounts to be charged were uncertain, due to variations in CAM charges and uncertainty about whether any of the suites in the medical office building may have been re-let.

There is no evidence that, on or by the Petition Date, the Debtor itself could have made the tabulation that Appellants' counsel made.  Appellants were relying on invoices that were not addressed to Alecto.  As the Bankruptcy Court found, there was no evidence that the invoices that Appellants tabulated were sent to or received by Alecto.    The invoices were for rent payments, and, as the evidence showed, Alecto was neither a lessee nor a tenant under the Lease Agreements in question. There was no evidence that Alecto knew to what extent there were tenants occupying any of the premises in the group of subject leases, and paying the rent for their suites.

---

[21] As explained *supra*, the issue concerns Alecto's *debt* to LHP, not LHP's *claim* against Alecto.

Most importantly, there was no basis in the evidence upon which to find that the debt to LHP was "readily determinable" on the Petition Date – precisely because LHP had not sent a written demand by that date, and by the terms of the Settlement Agreement, written demand was necessary for Alecto to be able to determine what was owed.  Written demand made by LHP constituted the "specific standard" by which Alecto's debt to LHP was to be determined, due to the Settlement Agreement.

Appellants use a misreading of some court decisions in which proofs of claim or other information were taken into account in deciding an eligibility issue. Appellants' Br. at 39-40.  None provide support for retroactively calculating what the debtor could not have calculated on the petition date.[22]  "[A] bankruptcy court

---

[22] One of them simply stated that "proofs of claim that the debtor does not challenge may be deemed valid for subchapter V eligibility purposes." *In re Zhang Med. P.C.*, 655 B.R. 403, 409 (Bankr. S.D.N.Y. 2023); *but see In re Stahl*, 2021 WL 1293853, at *1 (B.A.P. 9th Cir. Apr. 7, 2021) ("we reject EmCyte's argument that the bankruptcy court was bound to include the stated amount of its proof of claim in determining Stahl's chapter 13 eligibility because Stahl did not object to its claim."). Here, Mr. Sarrao testified that Alecto did dispute LHP's claim.  JA2064.

In another, the bankruptcy court examined the proofs of claim filed by three "merchant cash advance" (MCA) creditors, which had attached their contracts with the debtor, and concluded that the debtor had properly *excluded* them from its Subchapter V eligibility calculation.  *In re McKenzie Contracting, LLC*, 2024 WL 3508375, at *6 (Bankr. M.D. Fla. July 19, 2024).

In *In re Hall*, 650 B.R. 595(Bankr. M.D. Fla. 2023), the bankruptcy court disagreed with the ruling in *In re Stahl*, 2021 WL 1293853, at *1 (bankruptcy court did not abuse its discretion by relying exclusively on the schedules to calculate Stahl's chapter 13 eligibility), and held that the debtor's schedules are of "probative value" but not dispositive, on the matter of eligibility. *Hall*, 650 B.R. at 600.

38

cannot look to post-petition events to determine the amount of the debt" for eligibility purposes. *In re Slack*, 187 F.3d 1070, 1073 (9th Cir. 1999). Appellants' argument that the debt to LHP was liquidated on the Petition Date find no support in the evidence presented.

## II. THE BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION OR ERR WHEN IT APPROVED THE SETTLEMENT WITH THE RELEASED PARTIES AS AN ELEMENT OF THE PLAN

<u>Standard of Review</u>: The issues in this Section present mixed questions of fact, including as to witness credibility, and bankruptcy court discretion: clearly erroneous as to the facts; greater deference as to witnesses; abuse of discretion on plan approval.

### A. Appellants Do Not Challenge the Applicable Standards for Deciding Whether to Approve a Settlement and Release Within a Plan, as Carefully Laid Out by the Bankruptcy Court

The Reed Creditors have been trying to sink Alecto's Subchapter V Plan due to their dissatisfaction with the releases it gives to insiders and affiliates of Alecto (collectively, "<u>Insiders</u>") and with the modest settlement payment from Insiders that it provided for. The transactions that the Reed Creditors have targeted in their effort to reverse the Bankruptcy Court's approval of Alecto's Plan are (1) the June 2019 "Sunrise Transfer" (discussed *supra*); and (2) a disparate set of payments made by Alecto to some of its cash-strapped subsidiaries or affiliates, in the two or three years leading up to Alecto's filing of its bankruptcy petition – in particular, a $5 million payment to Sherman/Grayson made within a few months of the filing. The settlement amount, which was paid by unspecified Insiders when the Plan became

effective, was $25,000. As the testimony at the confirmation hearing reflected, the payment was ample because, as the independent director had concluded, the alleged claims to be released had no value.

To confirm a plan of a Subchapter V debtor, a bankruptcy court must examine whether the plan and all of its components meet the requirements of Bankruptcy Code Sections 1123, 1129, and 1190, as modified by Section 1181. Pursuant to Section 1123(b)(3)(A), a Subchapter V debtor (or any chapter 11 debtor), may "(3) provide for – (a) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A).

Here, the Bankruptcy Court evaluated the Releases and the Settlement Payment contained in the Plan, based on the application of Section 1123(B)(3) and the legal standards that have been spelled out in pertinent case law. The Bankruptcy Court identified the following standards, which it applied in its analysis of the settlement and releases comprised in the Plan:

- [A] debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."

- Where a compromise is part of a plan of reorganization, …, the court has the duty "to determine that a proposed compromise forming part of a reorganization plan is fair and equitable."

- The standards for approval of a settlement under section 1123 are generally the same as those under Rule 9019, though the court

40

should consider all factors relevant to a "full and fair assessment of the wisdom of the proposed compromise."

- "When determining whether to approve a settlement, the bankruptcy court should consider: (1) the probability of success in the litigation; (2) the complexity, expense, and delay of the litigation involved; (3) the possible difficulties in collection; and (4) the paramount interests of creditors."

- "The court does not have to be convinced that the settlement is the best possible compromise, but only that the settlement falls within a reasonable range of litigation possibilities."

- The Court determines if the released claims fall into the lowest point of reasonableness for a settlement.

- Courts generally defer to a trustee's business judgment when there is a legitimate business justification for the trustee's decision.

JA2002-JA 2003, citing or quoting (variously, as to the above): *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Coram Healthcare Corp.*, 315 B.R. 321, 334-35 (Bankr. D. Del. 2004); *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); and *In re Washington Mutual, Inc.*, 442 B.R. 314, 338 (Bankr. D. Del. 2011).

The Bankruptcy Court then explained that, to determine the reasonableness of the settlement, it would review the underlying potential claims raised by the Reed Creditors that had been investigated by the independent director. JA2003. That meant that the Court reviewed, first, the Sunrise REH Transfer as a potential voidable transfer action, and second, the advancement of funds by Alecto to its affiliate, Sherman/Grayson, in the months before the bankruptcy filing, as a potential

breach of fiduciary duty claim, these being the particular underlying alleged claims pressed by the Reed Creditors.

The Reed Creditors do not challenge any of the applicable standards laid out by the Bankruptcy Court.  Appellants' Br. at 44-36.  They restate some of the same considerations, principally citing the *Martin* case and *In re Nutraquest, Inc.,* 434 F.3d 639 (3d Cir. 2006).  *Id*.  Of the several that they omit, the Appellants do not dispute their applicability.

Appellants identify two broad grounds upon which they take issue with the Bankruptcy Court's approval of the settlement.  For one, they say that the approval was granted without "sufficient facts" (*i.e.*, evidence) to support it.  *Id,* at 46.  The other – which they assert despite having taken no issue with the standards spelled out by the Bankruptcy Court – is that the approval was "not made [in] accordance with the proper standards." *Id,*  From there, Appellants go on to present arguments based on standards that are definitively *not* applicable.

## B.    Appellants Have Misconstrued Both the Lower Court's Rulings on the Settlement of the Dubious Potential Claim to Void the 2019 Sunrise REH Transfer

It is a venerable axiom that a hearing to consider whether to approve a settlement is not a "mini-trial."   In analyzing the compromise or settlement agreement under the *Martin* factors, courts should not "have a 'mini-trial' on the merits."  *In re W.R. Grace & Co.*, 475 B.R. 34, 77–78 (D. Del. 2012).

42

The Bankruptcy Court need not probe the merits of all claims or conduct a "mini -trial" before approving the settlement; rather, avoiding litigating the issues is one of the main advantages of settlement. *In re Key3Media Grp., Inc.,* 336 B.R. 87, 92-93 (Bankr. D. Del. 2005); *see also Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586-87 (7th Cir. 1994); *In re Martin*, 212 B.R. 316, 319 (8th Cir. BAP 1997) (noting it is "not necessary for a bankruptcy court to conclusively determine claims subject to a compromise, nor must the court have all of the information necessary to resolve the factual dispute, for by so doing, there would be no need of settlement").

*In re NovaPro Holdings, LLC*, 815 F. App'x 655, 658 (3d Cir. 2020). "Under Bankruptcy Rule 9019(a), the Bankruptcy Court is not required to conduct a full evidentiary hearing as a prerequisite to approving a compromise." *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 515 (Bankr. D. Del. 2010).

Here, the Bankruptcy Court gave consideration to how the alleged fraudulent transfer claim might arise and be pursued.  Under § 544, a debtor-in-possession or trustee may step into the shoes of a creditor, and bring a fraudulent transfer action under applicable state law, for which only an actual creditor would otherwise have standing.  11 U.S.C. § 544(b). This enables a debtor or trustee potentially to use the four-year reach-back under, in this case, California law, and not be limited to the two-year reach-back under 11 U.S.C. § 548.

The Bankruptcy Court thus looked to sections 3439.04 and 3439.05 of California's Uniform Voidable Transactions Act.  *See* JA2003; Cal. Civ. Code §§ 3439 *et seq*.  Doing so corroborated the testimony from Mr. Balasiano that, if Alecto

43

were to pursue such a claim, it would need to be proven that Alecto was insolvent at the time of the June 19, 2019 Sunrise REH Transfer, or became insolvent as a result of it. JA2003-JA2004.   The Bankruptcy Court observed that "[b]oth the balance sheet reflecting assets in excess of liabilities and the payment of debts as they become due are acceptable methods for calculating solvency under the California fraudulent conveyance statute."  JA2004 (citation omitted).  The Bankruptcy Court further observed that, under California law, for a creditor bringing a fraudulent transfer action, "[t]he burden of proving insolvency is on the creditor by a preponderance of the evidence."  JA2005 (citations omitted).[23]  In addition, under California law, the court found that "[a]s a general rule 'solvency and not insolvency is presumed."  JA2005 (citations omitted).

The Bankruptcy Court then described the testimony given by Mr. Balasiano on this issue, including the documents he reviewed and the consultant, counsel, and company officers with whom he conferred, leading to his conclusion that Alecto was paying its debts as they came due and was not insolvent at the time, as well as through the end of 2019.    JA2004-JA2005.  *See also* Mem.Op. at 26. The Bankruptcy Court found that "Mr. Balasiano's determination that there is 'no actionable cause of action that could be brought' for fraudulent conveyance [was] a

---

[23]   In this context, the role of "creditor" would be filled by Alecto, by stepping into the shoes of a creditor, as enabled by § 544 of the Bankruptcy Code.

reasonable basis for the settlement." [JA2005] Notwithstanding the Reed Creditors' efforts to undermine his testimony through cross-examination, the Court found Mr. Balasiano's testimony to be "credible." JA2012.

In this context – in which the Court was evaluating a settlement and release of a potential action that could only be brought by the Debtor, in which the Debtor would have the burden of proving insolvency, but the Debtor's independent director has credibly testified to his conclusion that the Debtor was solvent at the time of the subject transfer, and in which the court would typically defer to the independent director's business judgment – the Bankruptcy Court had plainly concluded that the Reed Creditors would need to have come forward with sufficient evidence to overcome the great weight of evidence favoring the Debtor's conclusion on solvency, and persuade the Court of the viability of their proposed fraudulent transfer action.[24]

What the Bankruptcy Court wrote was: "[T]he Reed Creditors did not carry their burden to prove by a preponderance of the evidence that the Debtor was

---

[24] As a common evidentiary matter, once one side has satisfied its burden, the other side needs to come forward with evidence of its own. *See, e.g., In re Lenox Healthcare, Inc.*, 343 B.R. 96, 107 (Bankr. D. Del. 2006) (in a summary judgment motion, "[i]f the moving party satisfies its burden, the burden then shifts to the non-moving party 'to come forward with persuasive evidence'"); *United States v. State Street Bank & Tr. Co.*, 520 B.R. 29, 87 (Bankr. D. Del. 2014) (where a proof of claim had *prima facie* validity, the objecting party had "the burden of coming forward with evidence to rebut" it).

*insolvent at the time of the Sunrise Transfer*." JA2005 (italics added). In view of the context, as just described, it is clear what the Bankruptcy Court meant. There was no actual, pending fraudulent transfer action, in which proof of insolvency is an element. The hearing on plan confirmation was not a trial on that unasserted fraudulent transfer claim. And since a hearing on a settlement is not a mini-trial, nor was there a requirement that Alecto prove its *solvency* in June 2019 in order for the Bankruptcy Court to approve the Plan. The applicable standards were the ones the Bankruptcy Court described, discussed *supra*.

Appellants argued to the District Court that the Bankruptcy Court had made an egregious error. But the District Court understood the situation, writing:

> *The Court agrees with Alecto that [Appellants' argument is a misreading of the Bankruptcy Court's decision or is, at most, a harmless error.* As no fraudulent transfer action was initiated, no party bore the burden of proving solvency or insolvency. Rather, Alecto's burden was to prove that the independent director's judgment was reasonable in approving the settlement with the Released Parties that exceeded the lowest point in the range of reasonableness.

Mem.Op. at 27 (emphasis added).

But the Appellants are not interested in reading either the Confirmation Ruling or the District Court's Memorandum Opinion in a sensible manner. They are interested in persevering with feckless arguments. They argue, once again, that "the Bankruptcy Court's assignment of the burden [to prove insolvency] on the Reed Judgment Creditors was not harmless" [Appellants' Br. at 49], and that "the District

46

Court erred to the extent that it placed the burden of proof on the viability of the fraudulent transfer claim on the Reed Judgment Creditors." *Id.* at 48. They make the blatantly false assertion that "no testimony was presented that … Balasiano or Sarrao considered anything other than the facial numbers on the Alecto's balance sheets," in testimony about the state of Alecto's finances in 2019. *Id.* at 49. They baselessly assert that there was "no competent testimony" on Alecto's solvency in and about June 2019. *Id.* Among the multiple elements and factors for a court to consider in evaluating a settlement, they cite one: the probability of success in the litigation [*id.* at 48] – and that itself is odd, in view of Mr. Balasiano's conclusion that the potential fraudulent transfer action would be a loser – and twist it around to assert that Alecto "had the burden" on solvency, and that "proof" that Alecto was solvent (at the time of the Sunrise REH Transfer) was "necessary" before the Court could approve the settlement within the Plan. *Id.* at 49.

None of this is true. As the Distrct Court explained very well: "To the extent that the Bankruptcy Court's phrasing might be viewed as off the mark, it was harmless error; *the Bankruptcy Court knew it was evaluating a settlement, not trying a fraudulent conveyance action*." Mem.Op. at 27 (emphasis added). The issue was whether the settlement fell within the range of reasonableness, and that was amply demonstrated. The range of information that Mr. Balasiano reviewed and considered – including documents and individuals with whom he conferred – was described by

17643769/2

both the Bankruptcy Court and the District Court, and it was not exclusively balance sheets. The arguments Appellants are making are not serious ones.

### C.     Appellants Present No Valid Basis for Overruling, as Clearly Erroneous, the Bankruptcy Court's Findings of Fact Upon Which It Approved the Plan

Taking a second stab at virtually the same issue, the Reed Creditors argue that it was error for the Bankruptcy Court to have accepted the Debtor's evidence in support of the Plan's settlement and release of the arguably potential ability to sue the Insider transferees in the June 2019 Sunrise REH Transfer. Appellants' Br. at 52. Notably, they assert only that the Bankruptcy Court "erred" – although the "clearly erroneous" standard would be the correct one to apply. *Id*. And they assert that the Court erred by "relying on Alecto's evidence in its conclusion that Alecto was solvent at the time of the Sunrise REH Transfer" [*id.*] – but, in fact, the Bankruptcy Court did not render a specific finding or conclusion on solvency.

On this issue, the Appellants ignore the standard of review; but this Court must. As to factual findings, generally: "on appeal, the Court applies a clearly erroneous standard to the Bankruptcy Court's findings of fact." *In re Global Tissue, L.L.C.*, 302 B.R. 808, 811 (D. Del. 2003), *aff'd,* 106 F. App'x 99 (3d Cir. 2004). "Under the clearly erroneous standard of review, '[i]t is the responsibility of an appellate court to accept the ultimate factual determination of the fact-finder unless that determination either (1) is completely devoid of minimum evidentiary support

48

displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data.'" *Id.* at 812, quoting *DiFederico v. Rolm Co.,* 201 F.3d 200, 208 (3d Cir.2000).

The Appellants attempt to chip away at various entries in a balance sheet or tax return, and hope that some of it sticks. But they did not offer any forensic accounting expert as a witness; the almost random darts that their counsel is throwing at the testimony simply cannot hit their mark on appeal. Mainly, the Appellants are attacking the credibility of Mr. Balasiano and Mr. Sarrao, and as the Third Circuit wrote in a case where the appellant was attempting to challenge a witness's credibility on appeal, that is a "nonstarter":

> The Company argues that the District Court should not have credited Kairys's testimony that Bob Gallagher told him to "lay low" following his surgery, because Bob and Pat testified to the contrary. This argument is a nonstarter because such credibility determinations are for the trier of fact, not the appellate court. We give "great[ ] deference" to the District Court's factual findings that rest on credibility because that Court is in a "superior[ ] ... position to make" such determinations.

*Kairys v. S. Pines Trucking, Inc.*, 75 F.4th 153, 163 (3d Cir. 2023) (emphasis added).

*See also In re NNN 400 Capitol Ctr. 16 LLC*, 632 B.R. 243, 259 (D. Del. 2021), *aff'd,* 2022 WL 17831445 (3d Cir. Dec. 21, 2022) ("Findings 'based on determinations regarding the credibility of witnesses' are afforded 'even greater deference,' and 'can virtually never be clear error.'").

It was the Bankruptcy Court's task to judge the credibility of the witnesses

and weigh the evidence. Based on the testimony, the Bankruptcy Court found the evidence of the non-viability of the potential action to void the 2019 Sunrise REH Transfer to be sufficient; that finding is entitled to great deference on appeal.

### D. Appellants Ask this Court to Assume Viable Breach of Fiduciary Duty Claims Exist, Though No Evidence of Them Was Produced in Bankruptcy Court

Appellants' argument on this issue [Appellants' Br. at 50] is somewhat surprising: they complain that the Bankruptcy Court should not have "accept[ed]" Mr. Balasiano's testimony on the absence of  "viable causes of action" against the Debtors' Insiders – without specifying what they might be. Perhaps they mean "breach of fiduciary duty" claims, since Appellants asserted that below, and the Bankruptcy Court discussed that at length in the Confirmation Ruling. JA2005-JA-2009. But in this appeal, apart from the 2019 Sunrise REH Transfer, they have not pointed to any other transfer or transaction as a basis for asserting a breach of fiduciary duty claim, and accordingly, it must be deemed waived.

Now, they contend that the Bankruptcy Court erred by "accepting Mr. Balasiano's conclusion that there were no viable causes of action against its insiders." *Id*.   In other words, this again is in the manner of challenging Mr. Balasiano's credibility on appeal – and doing so without even having countered by introducing evidence of their own. *See* Argument II.C., *supra*.  As such, it too is a "nonstarter." *Id.*

50

### E.    Appellants' Contention that the Bankruptcy Court Misapplied the Factors for Approval of a Settlement Lacks Merit

For their final argument, Appellants revisit the standards (or some of them) applicable in deciding whether to approve a settlement that has been incorporated into a plan of reorganization. Appellants' Br. at 55-56. *Cf.* Argument II. A., *supra*. They contend that the Bankruptcy Court misapplied the "factors." *Id*.

At the outset of its analysis, one of the standards that the Bankruptcy Court expressly cited was this:

> When determining whether to approve a settlement, the bankruptcy court should consider: (1) the probability of success in the litigation; (2) the complexity, expense, and delay of the litigation involved; (3) the possible difficulties in collection; and (4) the paramount interests of creditors."

JA2003.

Appellants write: "Having erroneously concluded there was not a probability of success for the fraudulent conveyance claim, the Bankruptcy Court then failed to consider the other factors including the cost of the litigation, the likelihood of collection and the paramount interest of the creditors." Appellants' Br. at 56.

However, as the District Court pointed out – but Appellants evidently missed – the Bankruptcy Court *did* in fact address these factors:

> Not only did the Bankruptcy Court explain its findings in detail, it applied the *Martin* factors and the Third Circuit's *Zenith* test as well. Regarding the *Martin* factors the Bankruptcy Court held:
>
> > Under the *Martin* factors, the claims have very little

51

probability of success on the merits, if any. Absent the settlement, the debtor would face increased expense, inconvenience and delay attending to litigation. These are complex claims that could cause delay in distribution of assets to the creditors. Additionally, the creditors will receive the Settlement Consideration as part of the disposable income of the debtor. There was no evidence regarding the possibility of collection on any judgment, so this factor is neutral. The other three *Martin* factors weigh in favor of approving the settlement.

Mem.Op. at 29-30.

Finally, even if, *arguendo*, there were some thought that some greater explanation by the Bankruptcy Court of its reasoning would be of interest, the Court should consider the case of *In re Summit Metals, Inc.*, 477 F. App'x 18, 21 (3d Cir. 2012). (rejecting creditor's appeal from bankruptcy court's approval of settlement, where remand would be futile). In *Summit Metals,* the appellant claimed the Bankruptcy Court's decision was "perfunctory" and that it "failed to properly consider the factors enunciated by this Court in *In re Martin* for evaluating a settlement between an estate and an adverse party." 477 F. App'x at 20. On appeal, the Third Circuit wrote:

> While we realize that Appellant may have desired a more thorough discussion of the *Martin* factors …, the fact remains that the Bankruptcy Court addressed each of the factors . . . [W]e find that to remand the case to the Bankruptcy Court would prove needlessly futile and would result in a waste of judicial resources …. While a remand might cause the Bankruptcy Court to more

explicitly tailor its analysis to the *Martin* factors, we are
confident that the outcome would remain unchanged.
*Id*. at 21-22.

## CONCLUSION

Based on the foregoing, Appellants request this Court affirm the rulings of the

District Court and the Bankruptcy Court from which appeal was taken, deny the

Appellants the relief they requested or any other relief, and dismiss their appeals.


Respectfully submitted,

Dated: November 21, 2025    **MORRIS JAMES LLP**

/s/ *Douglas N. Candeub*
Carl N. Kunz, III (DE Bar No. 3201)
Jeffrey R. Waxman (DE Bar No. 4159)
Douglas N. Candeub (DE Bar No. 4211)
**MORRIS JAMES LLP**
3205 Avenue North Blvd., Suite 100
Wilmington, DE 19803
Telephone: (302) 888-6800
Email:      ckunz@morrisjames.com
            jwaxman@morrisjames.com
            dcandeub@morrisjames.com

*Attorneys for Appellee,*
*Alecto Healthcare Services LLC*

# <u>COMBINED CERTIFICATIONS</u>

I, Douglas N. Candeub, hereby certify:

1. I, the undersigned counsel, am admitted to the bar of the United States Court of Appeals.

2. Pursuant to L.A.R. 31.1(c), the text of the PDF version of Appellee's Brief, as is being electronically filed, is identical to the text of the paper copies to be submitted to the Court.

3. Pursuant to L.A.R. 31.1(c), prior to filing, a virus check was performed on the PDF copy of Appellee's Brief, using CrowdStrike Falcon software, version 7.29.20108.0.

4. This document complies with the type-volume limit of Fed. R. Bankr. P. 8015(a)(7)(B) and  Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. Bankr. P. 8015(g) or Fed. R. App. P. 32(f):

   ■   this document contains  12,922   words.

5. This document complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5) and Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. Bankr. P. 8015(a)(6) or Fed. R. App. P. 32(a)(6) because:

   ■   this document has been prepared in a proportionally spaced typeface using *Microsoft Word*  in 14 point, Times New Roman font.


Dated: November 21, 2025           (s) *Douglas N. Candeub*
                                   Douglas N. Candeub (DE Bar No. 4211)

                                   Attorney for *Appellee,*
                                   *Alecto Healthcare Services LLC*

1

17643769/2

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 21st of November, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

<u>*/s/Douglas N. Candeub*</u>
Douglas N. Candeub

1