No. 25-1853

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

### IN RE: ALECTO HEALTHCARE SERVICES, LLC

*Debtor*,

### THE REED ACTION JUDGMENT CREDITORS,

*Appellants*,

v.

### ALECTO HEALTHCARE SERVICES, LLC,

*Appellee*.

On Appeal from the United States District Court for the District of Delaware,
Cause No. 1:24-cv-00494-GBW (lead) and 1:23-cv-1442-GBW (consolidated)
Judge: Honorable Gregory B. Williams

### APPELLANTS' REPLY BRIEF

Bren J. Pomponio, Esquire
Colten L. Fleu, Esquire
**Mountain State Justice, Inc.**
1217 Quarrier Street
Charleston, WV 25301
Tel.: (304) 326-0188
Email: colten@msjlaw.org
        bren@msjlaw.org


And

William D. Sullivan, Esq. (No. 2820)
William A. Hazeltine, Esq. (No. 3294)
**SULLIVAN NIMEROFF BROWN HILL LLC**
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel.: (302) 428-8191
Email: bsullivan@sha-llc.com
        whazeltine@sha-llc.com

i

Maureen Davidson-Welling, Esquire
PA ID No. 206751
John Stember, Esquire
PA ID No. 23643
**Stember Cohn &**
      **Davidson-Welling, LLC**
The Hartley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA 15219
Tel.: (412) 338-1445
Email: mdw@stembercohn.com
      jstember@stembercohn.com

*Attorneys for Appellants the Reed Action Judgment Creditors*

# Table of Contents

TABLE OF AUTHORITIES ................................................................. i

INTRODUCTION ............................................................................1

STATEMENT OF THE CASE ............................................................3

   **I.**   **LHP'S CLAIM** ..................................................................3

   **II.**  **ALECTO'S INSOLVENCY AT TIME OF 2019 SUNRISE
TRANSFER.** .............................................................................4

ARGUMENT ..................................................................................9

   **I.**   **THE LHP CLAIM WAS NOT UNLIQUIDATED NOR
CONTINGENT.** ........................................................................9

      **A.**  **The LHP Claim Was Not Contingent.** .....................................9

      **B.**  **The LHP Claim Was Liquidated** .............................................12

   **II.**  **THE BANKRUPTCY COURT AND DISTRICT COURT IGNORED
EVIDENCE DEMONSTRATING ALECTO WAS INSOLVENT AT THE
TIME OF THE 2019 SUNRISE TRANSFER AND ERRED IN
APPROVING THE SETTLEMENT AND RELEASES.** ...............................17

CONCLUSION ..............................................................................22

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Bessemer City*, 470 U.S. 564 (1985)....................................................22

*Barcal v. Laughline (In re Barcal)*, 213 B.R. 1008 (B.A.P. 8th Cir. 1997) 15, 16, 17

*Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030 (5th Cir. 1987).............10

*Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024) ......................................17

*In re Fostvedt*, 823 F.2d 305 (9th Cir. 1987) ....................................................... 13, 14

*In re Fountain*, 612 B.R. 743 (9th Cir. BAP 2020) ..................................................13

*In re Fradkov*, No. 20-18987-JKS, 2020 Bankr. LEXIS 3182 (Bankr. D.N.J. Nov. 12, 2020)..............................................................................................................12

*In re Hall*, 650 B.R. 595 (Bankr. M.D. Fla. 2023) ....................................... 14, 15, 16

*In re Jordan*, 166 B.R. 201 (Bankr. D. Me. 1994) ...................................................13

*In re Mazzeo*, 131 F.3d 295 (2d Cir. 1997)...............................................................13

*In re McKenzie Contracting, LLC*, Case No. 8:24-bk-01255-RCT, 2024 Bankr. LEXIS 1712 (Bankr. M.D. Fla. 2024).....................................................................14

*In re Mitchell*, 255 B.R. 246 (Bankr. D. Mass 2000) ...............................................13

*In re Pennypacker*, 115 B.R. 504 (Bankr. E.D. Pa. 1990).......................................12

*In re Pulliam*, 90 B.R. 241 (Bankr. N.D. Tex. 1988) ...............................................11

*In re Sullivan*, 245 B.R. 416 (N.D. Fla. 1999).........................................................14

*In re Rosenberg* 414 B.R. 826 (Bankr. S.D. Fla. 2009)............................................10

*In re Taylor*, No. 08-00526-JDP, 2008 Bankr. LEXIS 2313 (Bankr. D. Idaho July 25, 2008).............................................................................................................11

*In re Wilson*, 9 B.R. 723 (Bankr. E.D.N.Y. 1981)....................................................11

*In re Zhang Medical P.C.*, 655 B.R. 403 (Bankr. S.D.N.Y. 2023) ..........................14

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635 (3d Cir. 1991)............17

*Myers v. Martin (In re Martin)*, 91 F.3d 389 (3d Cir. 1996)...................................18

*Nicholes v. Johnny Appleseed (In re Nicholes),* 184 B.R. 82 (B.A.P. 9th Cir. 1995) ....................................................................................................................................16

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968)..........................................................................18

*Stanziale v. U.S. Risk Ins. Grp., Inc. (In re NovaPro Holdings, LLC)*, 815 F. App'x 655 (3d Cir. 2020) .................................................................................................18

*United States v. May*, 211 B.R. 991 (M.D. Fla. 1997) .............................................15

*United States v. United States Gypsum Co.*, 333 U.S. 364 (1948)..........................22

*Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98 (3rd Cir. 1981)........17

*Welch & Forbes, Inc. v. Cendant Corp*, 233 F.3d 188 (3d Cir. 2000)....................12

*Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639 (3d Cir. 2006) ...............17

i

*Treatise*

2 L. King *Collier on Bankruptcy* ¶ 109.06[2][c] (15th ed. rev. 1997) ............ 13, 15

# INTRODUCTION

Through this appeal, Appellants, the Reed Action Judgment Creditors ("Reed Creditors"), seek to recover the wages they lost when Appellee, Alecto Healthcare Services, LLC ("Alecto"), closed its Wheeling, West Virginia hospital in violation of the federal Workers Adjustment, Retraining and Notification Act ("WARN"). The Reed Creditors prevailed on their WARN claims in U.S. district court in 2022, but Alecto's principals have dodged and sought to shield themselves from the judgment for years, culminating in Alecto's filing and confirmation of a bankruptcy plan under the advantageous protections of Subchapter V of Chapter 11 of the bankruptcy code, though Alecto was ineligible to be a Subchapter V debtor.

Alecto now disingenuously claims that the Reed Creditors characterize Subchapter V as nefarious. Appellee's Br. at 7. Not so. The Reed Creditors simply point out that Subchapter V has reduced creditor protections and provided more generous debtor provisions. By filing under Subchapter V despite its ineligibility, Alecto was able to cramdown over $42,000,000 in debt while its members retain their equity interests. Alecto could not have done this under general Chapter 11 bankruptcy code provisions. Likewise, Alecto's managers were able to secure a release of a cause of action worth millions in exchange for just $25,000. Meanwhile,

under the Plan, the Reed Creditors have received distribution payments representing just over two-tenths of a percent (.212%) of the amount of their judgment.[1]

Turning to the assignments of error on appeal, it remains evident that the Bankruptcy Court erred in overruling the Reed Creditor's objections to the designation of the case under Subchapter V ("Designation Order") because Alecto had too much liquidated, non-contingent debt. The Bankruptcy Court unequivocally erred as a matter of law when it concluded that the Settlement Agreement between Alecto and LHP was contingent upon a demand of payment by LHP and therefore the debt was unliquidated. The Settlement Agreement plainly states that a demand from LHP was only a procedure for payment—the demand requirement did not make LHP's debt contingent until LHP made a demand for payment. The District Court likewise erred when it affirmed the Bankruptcy Court's Designation Order and disregarded the unambiguous language of the Settlement Agreement.

In confirming Alecto's Subchapter V bankruptcy plan over Reed Creditors' objections ("Confirmation Order"), the Bankruptcy Court also clearly erred when it concluded that the $25,000 settlement payment by Alecto's managers was reasonable despite the viability of a multi-million dollar claim Alecto had against its members. Importantly, the Bankruptcy Court ignored substantial evidence that contradicted the unqualified, uninformed, conflicted testimony of Alecto's director,

---

[1] See Distribution Spreadsheet attached as Exhibit A.

Steve Balasiano, that in 2019 at the time of the Sunrise Transfer, Alecto was solvent. Again, the District Court erred in affirming the Bankruptcy Court's approval of this unreasonable settlement.

As is more fully set forth below and in Appellants' Opening Brief, the Reed Creditors respectfully request that this Court reverse the decisions of the lower courts and remand for further proceedings.

## STATEMENT OF THE CASE

### I.   LHP'S CLAIM.

The determinative facts regarding the claim of LHP Hospital Group, Inc. ("LHP Claim") are largely undisputed. The determination of whether the LHP claim was contingent or unliquidated is primarily based on the Guaranty Agreement and the subsequent Settlement Agreement. The plain language of the Settlement Agreement reveals that the Parties did not intend to terminate the Guaranty. *See* JA0622–0630. Rather, the Settlement Agreement provided Alecto could not dispute the guaranty or its liability for payment in future litigation; it could only dispute computational errors in rent/interest calculations. *Id.* The settlement agreement was not signed by the Health System (Seller), *see* JA0630, as would have been required to modify the guarantee. JA0806.

After the Settlement Agreement was executed, Sherman/Grayson again defaulted on rents due under the original Guaranty and the Settlement Agreement. It

3

is undisputed Alecto knew of the default. *See* JA2034; JA2041; JA2047; JA1468 (reflecting Sarrao was EVP for both entities. As a result, on June 28, 2022, LHP wrote to Alecto Sherman demanding payment of overdue amounts of $3,708,475.62. JA0648. Alecto listed the LHP claim as "contingent," "unliquidated," and "disputed" in its Schedules filed two days later. JA0708.

The following evidence was presented to the Bankruptcy Court regarding the LHP Claim:

- On January 20, 2021, LHP sued Alecto Sherman (as indemnitor) and Alecto (as guarantor) for unpaid obligations of Sherman/Grayson under the Lease Agreements which it had paid to the Landlord under its guarantee. *See* JA1114–1121 (LHP Complaint ¶¶ 1, 15, 21).

- From March 1, 2022, through June 1, 2023, LHP made 16 monthly payments to the Landlord in the amount specified by the Lease Agreements (the 'Payment Confirmations"). *See* JA1113.

- On June 28, 2023, LHP made a demand on Alecto Sherman, a non-Debtor entity, for payment of the $3,708,475.62. JA0648.

- The amount asserted in LHP's claim, filed on August 14, 2023, which includes interest, is $3,739,635.77, an amount $31,160.15 higher than the amount sought in the June 28, 2023, Demand Letter. *See* JA0721–0722 (LHP Claim).

## II.   ALECTO'S INSOLVENCY AT TIME OF 2019 SUNRISE TRANSFER.

Alecto fails to rebut the followings facts, which are determinative of the reasonableness of the settlement with Alecto's managers, with any contrary evidence

other than self-serving statements and unsupported, unqualified and uninformed testimony.

Alecto reported $49,100,099 in losses on its 2019 federal tax return, JA1582, and its 2019 balance sheet reflected that Alecto had virtually no assets other than purported "other receivables" arising from intercompany transfers to Alecto subsidiaries that Alecto knew would never be repaid. JA1622, JA2761–2762. Alecto closed two hospitals in 2019 and one in March 2020, JA1452, and later shuttered a fourth. Alecto did not pay subsidiaries' debts (sometimes despite Alecto guarantees), *see, e.g.*, JA1450–1451 (¶19); JA1115 (¶3), and the LHP transaction; and Alecto left behind a trail of lawsuits by unpaid creditors. *See* JA1451–1452 (listing six lawsuits pending against Alecto in 2022 alone).

Although fraudulent transfer claims require proof of insolvency, Alecto did not ask GCS to provide any opinion on insolvency, and GSC's report does not contain a solvency analysis. JA1766 (93:11-13). Instead, Balasiano – who was "not a financial expert," (JA1765) – relied on nominal information and documents curated by Sarrao to determine solvency and whether to pursue claims against Alecto's members (owners) or officers and directors (D&O claims), including Sarrao. Among other things, Balasiano testified:

- He spoke with his own counsel, Sarrao (debtor's general counsel), Jeff Waxman (debtor's outside counsel), and Leanne Gould of GCS in investigating claims. JA1748–1749 (75:23–77:9).

- He "knew" Alecto was solvent in 2019 because "because it was represented to me when we knew that we had a bad transaction... I said, hey, guys, were we solvent at this time, because that's the next question you would ask if you're a practicing lawyer in a bankruptcy context.... So that was the question I said, were we solvent? The answer was, yes, we were solvent." JA1762 (89:11-21).

- He could not say for sure if he'd looked at Alecto's balance sheets before deciding there was no fraudulent transfer claim and the original plan with that conclusion being filed on October 16, 2023. *See* JA1762 (89:21-24).

- Balasiano had his own counsel, yet relied on a purportedly "privileged" memo prepared by debtor's counsel applying law to facts and analyzing whether Alecto had fraudulent transfer or breach of fiduciary duty claims. JA1779.[2]

Sarrao's heavy involvement tainted the decision-making process. Sarrao was a member/owner of Alecto, a corporate officer, and one of the two Managers (directors) on Alecto's Board of Managers. Sarrao was highly conflicted in giving any advice to Balasiano related to whether he (Sarrao) or the trust holding his money should be sued by Alecto.[3]

---

[2] *See* JA1779 ("Q:..And with respect to the questions about breach of fiduciary duty, I'm going to read to you from page 55 of your deposition. And you say, "Again, that counsel, debtor's counsel did a thorough analysis and review, and issued a report and findings to me in determining that there was no breach of fiduciary duty or loyalty. And I can't discuss more than that without breaching attorney client privilege." Do you recall that testimony? A: Yes."

[3] The Bankruptcy Court denied production of the Debtor's memo purporting to provide legal advice to Balasiano as privileged. *See* JA1779–1791.

Balasiano relied on his discussions with Sarrao, and decided Alecto had no claims worth pursuing. Both the original plan filed on October 16, 2024, and the Plan filed on December 19, 2024, report Balasiano's tainted conclusions, stating that GCS presented its report to Mr. Balasiano and "[a]t the conclusion of the conference, Mr. Balasiano determined that the estate does not have any valid claims against the Insiders for avoidable transfers." JA0134.

Nevertheless, the Bankruptcy Court heard Sarrao admit that the $18.6 million in Alecto's equity on 2019's Schedule L (the balance sheet in Alecto's 2019 tax return) depended on a $25.5 million intercompany receivable, and if that receivable had no value, Alecto's equity would be negative. JA1937–1938 (138:13–139:19). Sarrao also admitted that the 2019–2021 balance sheets included receivables that may have been uncollectible, JA1895 (96:4–96:20), and did not include Alecto's liabilities for any subsidiaries which Alecto had guaranteed. JA1899 (100:4–10); JA1908 (109:22–110:8).

The Reed Creditors introduced evidence of substantial liabilities paid by, guaranteed by, or asserted against Alecto that were not included in the balance sheets, fully undermining the perfunctory solvency determination asserted by Alecto and accepted by the Bankruptcy and District Courts, which were exclusively based on the balance sheets. For example, in January 2021, Alecto paid $9.4 million in unpaid federal and state payroll taxes that its Olympia subsidiary and other affiliates

had accrued, JA1637, and in August 2021, it paid an additional $10.5 million in federal and state payroll obligations its affiliates had accrued. JA1639. Alecto also received a demand in September 2020 from its union pension fund for $10.8 million in withdrawal liability relating to obligations of Alecto Healthcare Services Fairmont for former employees of the Fairmont General Hospital. JA1639. These obligations were being paid quarterly with funding from Alecto. *See* JA1899–1900 (100:15–101:22); JA1639 (reflecting payment of $707,803 booked to Alecto re Alecto Ohio Valley Pension Plan). Alecto was also sued by the Centers for Medicare & Medicaid Services ("CMS"), of the U.S. Department of Health and Human Services, for reimbursement of more than $12 million in Medicare advance payments made to its Olympia affiliate. JA1897–1899 (98:20–100:3). Alecto did not book obligations that originated from an affiliate or subsidiary, despite the fact that it regularly paid them or that there was a guaranty agreement imposing the liability by operation of contract and/or law. JA1899 (100:4-10); JA1906 (107:8-25).

As for intercompany accounting, all intercompany advances were booked through Alecto. JA1908 (109:4-17). Intercompany transactions  tracked on the balance sheets related to five different Alecto affiliates that operated hospitals. Alecto financially supported Sherman/Grayson since 2014, which amounts Sherman/Grayson was unable to repay, resulting in unpaid advances of over $60 million when Alecto filed bankruptcy. JA1476 (¶ 27). Three other hospitals are

designated on some of the balance sheets as discontinued entities, having been closed in 2019 (Alecto Ohio Wheeling and Alecto Martins Ferry), JA1452 ¶25, and March 2020 (Alecto Fairmont). JA1900 (101:14-15).

## **ARGUMENT**

### I.    THE LHP CLAIM WAS NOT UNLIQUIDATED NOR CONTINGENT.

A review of the Settlement Agreement reveals the LHP Claim for $3,739,653.77 was non-contingent and liquidated. Therefore, the filed and scheduled claims against Alecto totaled $7,890,536.14, *see* JA721-808, and Alecto was not eligible to proceed under Subchapter V.

### A.    The LHP Claim Was Not Contingent.

The Bankruptcy Court and the District Court erred when they accepted Alecto's argument that the Settlement Agreement altered the original Guaranty because it imposed a contingent demand for payment. In fact, the Settlement Agreement did not eliminate or otherwise modify the underlying guaranty. First, it is illogical that the Parties would have intended that the Settlement Agreement would result in a less enforceable agreement by imposing a new contingency. This is supported by the plain language of the Settlement Agreement, which stated the demand was merely a procedure for payment of the debt:

> Accordingly, the Alecto Defendants agree to the following *procedure for payment* of Future Expenses.

9

> A. LHP shall make written demand upon the Alecto Defendants for a
> specified amount in accordance with the forbearance schedule set forth
> in Paragraph 8….

JA624 (emphasis added). *See Braniff Airways, Inc. v. Exxon Co., U.S.A.,* 814 F.2d

1030, 1036 (5th Cir. 1987) ("The debt owed…does not have to be calculated prior to

the filing of the bankruptcy petition[.]…The debt was absolutely owed; it just was

not due until a calculation of the amount…was made.").

Alecto and the lower courts cite to one case in support of the notion that the

procedure for payment of the debt creates contingent liability. However, that case is

distinguishable from the facts here. In *In re Rosenberg*, the underlying agreement

specifically conditioned the debtor's obligation on a demand for payment and an

opportunity to dispute: "[A] demand for payment must be made upon Rosenberg

before any liability matures under the Limited Guaranty." 414 B.R. 826, 844 (Bankr.

S.D. Fla. 2009).[4] The LHP Settlement Agreement expressly eliminated Alecto's

right to dispute the obligation so long as LHP made the payments it sought to

recover, and the Settlement Agreement provided a right of judgment by confession

if the Debtor did not pay the amounts specified. JA624 (¶ 6).

---

[4] *Rosenberg* is further distinguishable from the case at bar because, in *Rosenberg*,
the limited guaranty also required an opportunity to cure. *Rosenberg*, 414 B.R. at
844.

A review of the Settlement Agreement reveals that the Parties agreed to a subsequent guaranty incorporating the first guaranty, which created the claim at the time of default by Sherman Grayson:

> The guarantor's liability attaches upon the primary obligor's default even if the guarantor is not given notice of the default. *United States v. Little Joe Trawlers, Inc.*, 776 F.2d 1249, 1253 (5th Cir. 1985). "[The] demand [for payment] serves solely as a request for payment as opposed to the creation of liability." *In re Wilson*, 9 Bankr. 723, 725 (Bankr. E.D.N.Y. 1981). An absolute guaranty ceases to be contingent upon the principal obligor's default

*In re Pulliam*, 90 B.R. 241, 243 (Bankr. N.D. Tex. 1988); *see also In re Taylor*, No. 08-00526-JDP, 2008 Bankr. LEXIS 2313, at *10 (Bankr. D. Idaho July 25, 2008) ("An absolute guaranty is an 'unconditional undertaking on the part of the guarantor that he will pay the debt or perform the obligation immediately upon the debtor's default....'"). Therefore, the default of Sherman/Grayson, which is undisputed and which Alecto had full knowledge of, created the liability for the claim, not any demand for payment. *Id.* at *12 ("[A] demand for payment is not essential to the existence of liability for a guaranteed debt."); *see also, e.g.*, *In re Wilson*, 9 B.R. 723, 725 (Bankr. E.D.N.Y. 1981) ("The demand serves solely as a request for payment as opposed to the creation of liability."). Alecto's suggestion that the timing of payment is determinative of when a debt is owed, Br. of Appellee at 28-29, is at odds with the countless authorities stating liability arising from a guaranty attaches at the moment the principal defaults not when a demand for payment is made.

Moreover, the District Court erroneously concluded that whether the Settlement Agreement was a guaranty was of no moment because a guaranty is a classic example of contingent liability. JA59. Alecto does not even seek to defend this inapplicable statement of the law. That's because a guarantor's liability is contingent only until such time as there is a default by the principal. *See In re Pennypacker*, 115 B.R. 504, 507 (Bankr. E.D. Pa. 1990) ("The classic example of a contingent debt is a guaranty because the guarantor has no liability unless and until the principal defaults."); *In re Fradkov*, No. 20-18987-JKS, 2020 Bankr. LEXIS 3182, at *3 (Bankr. D.N.J. Nov. 12, 2020) ("In a guaranty situation, the liability of the guarantor is contingent upon the default of the principal."). After default, the liability of a guarantor is no longer contingent. And in this case, Sherman/Grayson defaulted before the Petition Date. As a result, the LHP Claim was not contingent.

The conclusion that the Settlement Agreement was contingent because it provided for a written demand for payment is an error in contract interpretation. The Bankruptcy Court's incorrect construction of the Settlement Agreement is not entitled to deference on appeal. *See, e.g., Welch & Forbes, Inc. v. Cendant Corp*, 233 F.3d 188, 193 (3d Cir. 2000) ("[C]ontract construction, that is, the legal operation of the contract, is a question of law mandating plenary review.").

**B.     The LHP Claim Was Liquidated.**

As numerous cases recognize, whether a claim is liquidated depends on whether it can be readily determined and is precisely calculable. *In re Fostvedt*, 823 F.2d 305, 306 (9th Cir. 1987) ("[T]he question whether a debt is liquidated turns on whether it is subject to 'ready determination and precision in computation of the amount due.'") (citation omitted); *In re Fountain*, 612 B.R. 743, 749 (9th Cir. BAP 2020) ("A debt is liquidated if it is capable of 'ready determination and precision in computation of the amount due.'") (citation omitted); *In re Mazzeo*, 131 F.3d 295, 304 (2d Cir. 1997) ("[C]ourts have generally held that a debt is 'liquidated' ... where the claim is determinable by reference to an agreement or by a simple computation."") (quoting 2 L. King *Collier on Bankruptcy* ¶ 109.06[2][c] (15th ed. rev. 1997)); *In re Mitchell*, 255 B.R. 345, 360 (Bankr. D. Mass. 2000); *In re Jordan*, 166 B.R. 201, 202 (Bankr. D. Me. 1994) ("A claim is liquidated 'if the amount due can be readily ascertained either by reference to an agreement or by simple mathematics.'") (citation omitted). Here the LHP Claim satisfies these tests.

Alecto's Response continues to confuse ascertainability with the actual knowledge of Alecto's Vice President and General Counsel, Michael Sarrao. Alecto and the lower courts do not cite to any authority that defines ascertainability based on the debtor's knowledge. Nor could they. A rule that bases the characterization of a claim as liquidated on the knowledge of the debtor would allow a debtor to control whether a claim was liquidated by feigning ignorance. The standard is whether the

amount is readily ascertainable, not whether Alecto knew how much is due. *See, e.g.*

*Fostvedt*, 823 F.2d at 406. It is well settled that eligibility under Subchapter V is

determined by what the debtors owe on the Petition Date, not by what the debtors

think they owe. *In re Hall*, 650 B.R. 595, 601 (Bankr. M.D. Fla. 2023) ("Eligibility

should be determined by what the Debtors owe on the petition date, not by what the

Debtors think they owe."); *see also In re Sullivan*, 245 B.R. 416, 418 (N.D. Fla.

1999) (holding that eligibility for Chapter 13 relief is determined based on the total

amount of unsecured debt that debtor owes on petition date, not on what a debtor in

good faith thinks he owes on the petition date, and there is nothing to prevent the

bankruptcy court from looking past a debtor's schedules to other evidence of the

correct amount of such debt as of the petition date); *In re Zhang Med. P.C.*, 655 B.R.

403, 409 (Bankr. S.D.N.Y. 2023) (in determining a debtor's total noncontingent

liquidated debt, the court may look both to the debtor's schedules and to creditors'

proofs of claim); *In re McKenzie Contracting, LLC*, Case No. 8:24-bk-01255-RCT,

2024 Bankr. LEXIS 1712, at *4 (Bankr. M.D. Fla. 2024) (same).

In any event, Alecto did know of the ongoing basis for the LHP Claim because

LHP sued Alecto for the rent obligations to the Landlord for which Alecto had an

obligation to reimburse LHP. Based on the Lease Agreements assigned to

Sherman/Grayson for premises adjacent to a hospital it acquired in 2014, Alecto was

able to ascertain the amounts asserted against it by LHP simply by reviewing the

monthly rent and other financial obligations specified in the leases it guaranteed. *See Hall*, 650 B.R. at 599 ("[C]ourts have generally held that a debt is liquidated if its amount is readily and precisely determinable, where the claim is determinable by reference to an agreement.") (quoting *United States v. May*, 211 B.R. 991, 996 (M.D. Fla. 1997) (citing Collier on Bankruptcy, 15th Ed. at 1109.06[2][c] (March 1997))). A breach of contract claim is liquidated even if adjudication of the debt requires "submission of evidence at trial." *Barcal v. Laughline (In re Barcal)*, 213 B.R. 1008, 1014 (B.A.P. 8th Cir. 1997).

Moreover, the procedure for the payment of pro-rata operating expenses associated with the common areas does not render the amount due under the lease unliquidated. Written notice of the amount due annually for pro-rata operating expenses is provided under the terms of each Lease, and the Lease Agreements required that that specific amount be paid in monthly increments (one-twelfth of the total) at the same time as base rent is paid. To the extent that pro-rata operating expenses are revised through the reconciliation process, they result in an additional amount due or credit towards future rent due, and do not affect the prior payments made.[5] The reconciliation requirement does not mean that the monthly increments

---

[5] The applicable lease provisions provide:

- Tenant agrees to pay Landlord each month, at the same time the Base Rent Payments are due, an amount equal to one-twelfth (1/12th) of the estimated

are not due according to the Leases. Accordingly, there is nothing unliquidated about the monthly payment obligations under the lease. Again, Michael Serrao's purported lack of knowledge of the estimated operating expenses is not relevant where the amount can be ascertained by reference to the Lease Agreements and simple mathematics. Moreover, the failure to pay the pro rata share of operating expenses when due constitutes a default under the Lease Agreements. Accordingly, the operating expenses are not unliquidated because, pursuant to the Leases, they are due and payable on or before the first day of each month, when the base rent is due.

Even assuming Alecto retained a right to object to the computation of amounts due to LHP under the 2022 Settlement Agreement, disputed debts are not excluded from the Subchapter V debt threshold. *Hall*, 650 B.R. at 599.

> [T]he key factor in distinguishing liquidated from unliquidated claims is not the extent of the dispute nor the amount of evidence required to establish the claim, but whether the process for determining the claim is fixed, certain, or otherwise determined by a specific standard.

---

annual Pro Rata Share of Operating Expenses due. Leases § 3.2(1)). (emphasis supplied). Ex. 10., JA385.

- However, if Tenant has paid more than its Pro Rata Share of the actual Operating Expenses, Landlord shall either pay the amount of such excess to Tenant within ten (10) days after delivery of the aforementioned statement, or, at Landlord's option, apply such excess to any sums due or to become due from Tenant to Landlord. Leases § 3.2(3)). Id. Ex. 10, JA385.

*In re Barcal,* 213 B.R. at 1014; *see also Nicholes v. Johnny Appleseed (In re Nicholes),* 184 B.R. 82, 91 (B.A.P. 9th Cir. 1995) ("So long as a debt is subject to computation of the amount due, then it is considered liquidated and included for eligibility purposes under § 109(e), regardless of any dispute.").

The Bankruptcy Court's conclusion that the LHP Claim was unliquidated because Michael Sarrao testified he lacked knowledge of the precise amount of the claim was an error in the application of law, which is not entitled to deference on appeal. *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991) ("We accept the trial court's finding of historical or narrative facts unless clearly erroneous, but exercise 'plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'") (quoting *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101-02 (3rd Cir. 1981)).

## II.  THE BANKRUPTCY COURT AND DISTRICT COURT IGNORED EVIDENCE DEMONSTRATING ALECTO WAS INSOLVENT AT THE TIME OF THE 2019 SUNRISE TRANSFER AND ERRED IN APPROVING THE SETTLEMENT AND RELEASES.

"[T]he unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them." *Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006). Careful examination is particularly appropriate where the debtor seeks to provide releases – for a nominal payment that does not benefit the creditors in any meaningful way – to non-debtor

17

third-party insiders. *See generally Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 216 - 19 (2024) (rejecting a release for company insiders as part of a Chapter 11 reorganization to the extent that it released third party non-debtor claims). Bankruptcy courts have a duty to make an informed, independent judgment that a compromise is fair and equitable before approving it. *See Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). In making such a determination, a bankruptcy court must consider, "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *In re Martin*, 91 F.3d at 393; *see also TMT Trailer Ferry*, 390 U.S. at 424–25 ("There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated.").

Alecto claims that the Bankruptcy Court should be careful not to engage in a mini-trial, relying on a case where the settlement resulted in hundreds of thousands of dollars in benefit to the estate, and resulted in creditors receiving a 10% distribution. *See Stanziale v. U.S. Risk Ins. Grp., Inc. (In re NovaPro Holdings,*

*LLC)*, 815 F. App'x 655, 657 (3d Cir. 2020). Additionally, in *In re NovaPro*, the Trustee recommended the settlement, hired a financial advisor and engaged that advisor to conduct a solvency analysis, and the Parties conducted a mediation resulting in the settlement. None of those factors are present here. Alecto's selective authority does nothing to dimmish the well-established standard for reviewing settlements incorporated into Bankruptcy Plans.

Rather, than consider all of the factors set forth in *In re Martin*, the Bankruptcy Court focused primarily on the likelihood of success on the merits. To be sure, the paramount interest of the estate was clearly not considered. And the lynchpin of the Bankruptcy Court's determination that the meager settlement with insiders was reasonable was the determination that no fraudulent transfer claims against Alecto's managers existed because Alecto was solvent at the time of the Sunrise Transfer in 2019. Specifically, the Bankruptcy Court relied on the testimony of Steven Balasiano – who admitted he based his testimony exclusively on information provided to him by Michael Sarrao, himself a beneficiary of the Plan Releases – on Alecto's solvency, finding his testimony to be "credible." Neither Mr. Balasiano nor Mr. Sarrao is a financial expert nor qualified to render an opinion on solvency. *See* JA1765 3/4/24 Tr. 3:19-21. In particular, no testimony was presented that either Balasiano or Sarrao considered anything other than the facial numbers on the Alecto's balance sheets.

19

As set forth in more detail in their Opening Brief, Appellant's Opening Br. at 51-55, Alecto failed to demonstrate that it was solvent – and therefore that $25,000 was a reasonable settlement of the fraudulent transfer claim – when its members transferred assets for less than equivalent value ($22 million less) in the 2019 Sunrise Transfer. Most importantly, the Bankruptcy Court did not consider the Reed Judgment Creditors' evidence that (i) Alecto was hemorrhaging money in 2019 (with reported tax return losses of over $48M); (ii) Alecto's financial situation was so bad that Alecto had to close two hospitals that year; (iii) Alecto artificially inflated its equity by not booking millions of dollars of liabilities that Alecto was on the hook for and was paying; and (iv) Alecto treated intercompany receivables as assets when many were uncollectable, which also resulted in overstating Alecto's equity. *See* JA1996-2013. Nor did the Bankruptcy Court address the conflicts raised by the Reed Creditors. *See id.*

Lacking a solvency expert, Alecto relied on a simplistic solvency analysis based on the positive equity values shown on its balance sheets and tax returns. JA2004. A more than superficial review of the evidence presented would have considered liabilities of Alecto not included in its balance sheets, and the reduction of the value of intercompany receivables, which provided the positive equity value noted on the face of the balance sheets. *See* Appellant's Opening Br. at 53-55 (citing JA1476; JA1639; JA1681-1682 (l. 62:21-63:24); JA1931 (132:11-16); JA1898

(99:7-18); JA1838 (3/5/24 Tr. 39:13–40:4); JA1899 (3/5/2024 Tr. 100:4-10);

JA1906 (107:8-25); JA1937-38 (3/5/24 Tr. 138:16–139:19); JA2279-2280 (¶¶ 12-

15); JA2662-2884). The evidence presented by the Reed Creditors – and ignored by

the Bankruptcy court – established that the substantial sums loaned to Alecto's

affiliates' operating hospitals will never be repaid, rendering these intercompany

receivables worthless. Had it considered all this evidence, rather than simply relying

on unqualified testimony of Balasaino and Sarrao, the Bankruptcy Court should not

have concluded – and the District Court should not have affirmed – that the

settlement was within the range reasonableness. *See* Appellant's Opening Br. at 50-

51 (citing JA1175; JA1761; JA2004-2005).

Alecto does nothing to address this glaring omission by the Bankruptcy Court

or identify reasonable inferences that may arise from conflicting evidence. Rather,

Alecto rests on the standard of review, arguing essentially that the Bankruptcy

Court's determination that Balasaino was credible ends the analysis. But the

Bankruptcy Court ignored abundant, relevant evidence of insolvency and simply

relied on Balasaino's and Sarrao's unqualified, uninformed testimony. Appellate

courts have recognized that an attempt to insulate a lower court's factual findings by

calling it a credibility determination, as Alecto has done here, can be rejected as clear

error if the court ignores substantial conflicting evidence:

> This is not to suggest that the trial judge may insulate his findings from
> review by denominating them credibility determinations, for factors

other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination.

*Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985); *see also United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948) ("A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."). Here, the Bankruptcy Court's finding that Alecto was solvent at the time of the 2019 Sunrise Transfer – and therefore that the settlement was reasonable – was clearly erroneous.

## <u>CONCLUSION</u>

WHEREFORE, the Reed Judgment Creditors respectfully request that this Court reverse the Designation Order and the Confirmation Order and remand this matter to the Bankruptcy Court with instructions that the Bankruptcy Court conduct further proceedings consistent with this Court's ruling.

Dated: January 12, 2026           Respectfully submitted,

*/s/Bren J. Pomponio*
Bren J. Pomponio (WVSB # 7774)
Colten L. Fleu (WVSB # 12079)
**Mountain State Justice, Inc.**
1217 Quarrier Street
Charleston, WV 25301
Tel.: (304) 326-0188
Email: colten@msjlaw.org
       bren@msjlaw.org

William D. Sullivan, Esq. (No. 2820)
William A. Hazeltine, Esq. (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel.: (302) 428-8191
Email: bsullivan@sha-llc.com
       whazeltine@sha-llc.com
and

Maureen Davidson-Welling, Esquire
PA ID No. 206751
John Stember, Esquire
PA ID No. 23643
**Stember Cohn &**
      **Davidson-Welling, LLC**
The Hartley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA  15219
Tel.: (412) 338-1445
Email: mdw@stembercohn.com
      jstember@stembercohn.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this date, a copy of the foregoing

**APPELLANTS' BRIEF** was filed electronically with the Clerk of Court using the

ECF system which will send notification to the parties of record.  In addition, seven

(7) paper copies of this brief will be delivered to the Clerk within five (5) days of

the electronic mailing:

Respectfully submitted,

Dated: January 12, 2026

*/s/Bren J. Pomponio*
Bren J. Pomponio
**Mountain State Justice, Inc.**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

| | |
|---|---|
| The Reed Action Judgment Creditors, | No. 25-1853 |
| *Appellants*, | |
| v. | |
| Alecto Healthcare Services, LLC, | |
| *Appellee*. | |

## <u>COMBINED CERTIFICATIONS</u>

I hereby certify that:

1.      Undersigned counsel is admitted to the bar of the United States Court of Appeals for the Third Circuit.

2.      The text of the PDF version of the Appellants' Reply Brief, as electronically filed, is identical in every respect to the hard copies of Appellants' Reply Brief that will be sent to the Court.

3.      A virus check was performed on the PDF copy of Appellants' Reply Brief and Exhibit A using Microsoft Defender.

4.      Pursuant to Federal Rules of Appellate Procedure 32(a)(7)(B), Appellants' Reply Brief contains 5,239 words.

Date: January 12, 2026

*/s/Bren J. Pomponio*
Bren J. Pomponio
*Attorney for Appellants*