**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 25-1853

_____

In re: ALECTO HEALTHCARE SERVICES LLC, A
DELAWARE LIMITED LIABILITY COMPANY,
Debtor

_____

THE REED ACTION JUDGMENT CREDITORS,
Appellant

v.

ALECTO HEALTHCARE SERVICES, LLC

_____

Appeal from the United States District Court
for the District of Delaware
(Nos. 1:23-cv-01442 and 1:24-cv-00494)
District Court Judge: Gregory B. Williams

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
May 12, 2026

_____

Before: SHWARTZ, MASCOTT, and McKEE, Circuit

Judges.

(Filed: July 28, 2026)

_____

Douglas N. Candeub
Carl N. Kunz
Jeffrey R. Waxman
Morris James
3205 Avenue North Boulevard
Suite 100
Wilmington, DE 19803

Brya M. Keilson
Robinson & Cole
1201 N Market Street
Suite 1406
Wilmington, DE 19801

Counsel for Appellee

Maureen Davidson-Welling
John E. Stember
Stember Cohn & Davidson-Welling
425 First Avenue, 7th Floor
The Hartley Rose Building
Pittsburgh, PA 15219

William A. Hazeltine
William D. Sullivan
Sullivan Nimeroff Brown Hill
919 N Market Street
Suite 420

Wilmington, DE 19801

Bren J. Pomponio
Mountain State Justice
1217 Quarrier Street
Charleston, WV 25301

<u>Counsel for Appellants</u>

_____

OPINION

_____

SHWARTZ, <u>Circuit Judge</u>.

This appeal arises out of the bankruptcy of Alecto Healthcare Services, LLC ("Alecto"). Because this case is neither constitutionally nor equitably moot, and the Bankruptcy Court properly permitted Alecto to proceed under Subchapter V of Chapter 11 (the "Designation Order") and correctly overruled the Reed Creditors' objections to the reorganization plan (the "Confirmation Plan"), which provided for the settlement and release of potential fraudulent transfer claims against Alecto's insiders (the "Confirmation Order"), we will deny Alecto's motion to dismiss the appeal and affirm.

I

A

Alecto is a holding company for healthcare-related entities. It formed different subsidiaries to acquire acute care hospitals and to provide management services to non-Alecto

acute care hospitals. During the COVID-19 pandemic, Alecto's subsidiaries became insolvent due to reduced government funding and increased costs. These financial hardships led to a lawsuit in which the Reed Creditors—former employees of a West Virginia acute care hospital owned by one of Alecto's subsidiaries—obtained a judgment (the "Reed Judgment") against Alecto for wages owed after Alecto unexpectedly closed the hospital and laid off hundreds of workers. See Reed v. Alecto Healthcare Servs., LLC, No. 5:19-CV-263, 2022 WL 4119367, at *1 (N.D.W. Va. Aug. 2, 2022).

Two weeks after the Reed Judgment was issued, Alecto filed a Subchapter V bankruptcy petition. To proceed under Subchapter V, Alecto was required to have less than $7.5 million in liquidated, noncontingent debt as of the Petition Date.[1] See 11 U.S.C. § 1182(1)(A) (2022). Alecto's Schedule of Assets and Liabilities listed liquidated, noncontingent claims totaling $3,445,535.47.[2]

Alecto listed LHP Hospital Group, Inc. ("LHP") as one of its unsecured creditors and described it as having an unliquidated, contingent claim. This claim arose from a 2014 transaction in which LHP sold to Alecto and one of Alecto's

---

[1] "Subchapter V, which became effective February 19, 2020, is a part of the Small Business Reorganization Act of 2019 ('SBRA'), Pub. L. No. 116-54, and provides a special pathway for small business debtors to reorganize their debts." In re Reis, No. 24-4201, 2025 WL 618363, at *1 (9th Cir. Feb. 26, 2025) (not precedential).

[2] Alecto listed the Reed Creditors as having a liquidated, noncontingent debt.

4

affiliates, Alecto Healthcare Services Sherman LLC ("Alecto Sherman"), membership interests in a Texas medical facility. In their 2014 agreement, Alecto Sherman agreed to pay amounts that LHP would come to owe to a landlord for leased space in a medical office building, and Alecto guaranteed Alecto Sherman's obligations.  Under the leases, the amount due fluctuated monthly because non-base rent charges varied and were only estimated before the end of the year.  After Alecto Sherman failed to pay LHP under the lease agreements, and Alecto failed to pay under its guaranty, LHP sued Alecto and Alecto Sherman in state court in 2021 for breach of contract.  Prior to the Petition Date, the parties entered the LHP Settlement Agreement, pursuant to which the parties agreed, with respect to payments that "may continue to accrue" under the leases: (1) "LHP shall make written demand upon the Alecto Defendants for a specified amount," and (2) "[t]he Alecto Defendants shall make payment of the specific amount within fifteen (15) days of such demand." App. 624.  The LHP Settlement Agreement also included a merger clause that provided it "fully supersede[d] any and all prior agreements or understandings, written or oral, between the parties."  App. 628.  LHP subsequently filed a proof of claim for $3,739,635.77 (the "LHP Debt") in the bankruptcy after the Petition Date but it made no demands for payment before Alecto filed for bankruptcy.

Based on the LHP Debt, the Reed Creditors filed a motion challenging Alecto's Subchapter V election, asserting that the LHP Debt was noncontingent and liquidated.  The Bankruptcy Court found that the LHP Debt was contingent and not liquidated, because Alecto did not receive a demand for payment before the Petition Date and thus had no way of

calculating its debt. Thus, the amount of the debt did not affect Alecto's ability to proceed under Subchapter V.

B

Alecto thereafter filed a Small Business Debtor's Plan of Reorganization (the "Plan"). Steven Balasiano, an independent director of Alecto's subsidiary Sherman/Grayson Hospital, LLC ("Sherman/Grayson"), was appointed to investigate, bring, and settle claims against Sherman/Grayson and Alecto's affiliates and insiders and address disputes between Alecto and certain creditors. After he completed his investigation, Balasiano approved a settlement of the claims against the insiders (the "Settlement") that provided for the release of claims against Alecto's insiders in exchange for $25,000, paid by these insiders.

The Reed Creditors objected to the Plan's confirmation on the ground that the Settlement would release Alecto's potential avoidance claim against Alecto's insiders arising

6

from a transaction known as the "Sunrise Transfer."[3]   At a hearing, Balasiano testified that there were no viable avoidance claims against Alecto's insiders.  He reached this conclusion based on a report from Gould Consulting Services (the "GCS Report").   GCS conducted a forensic analysis of cash transactions into and out of Alecto's bank accounts to identify potentially voidable transfers.  The author of the GCS Report testified that, based on her independent investigation, she had concluded that the Sunrise Transfer was made for less than

---

[3] In the Sunrise Transfer, Alecto transferred ownership of its subsidiary, Sunrise Real Estate Holdings, LLC ("Sunrise REH"), to holders of membership interests in Alecto (the "Alecto Members")—who formed a new entity, Sunrise MOB Holdings, LLC ("Sunrise MOB")—for around $28.4 million in 2019.  Sunrise REH owned a medical office building appraised at $50,700,000.  The Sunrise REH assets were transferred back to Alecto by the Alecto Members by assignment in 2021 for no consideration, and Alecto thereafter sold the Sunrise REH assets for over $58,000,000.  The Reed Creditors argued that Alecto received less than reasonably equivalent value for this transaction.  If Alecto received less than reasonably equivalent value for the Sunrise Transfer, it could avoid the transfer as fraudulent under the applicable California law if Alecto "[i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."   Cal. Civ. Code § 3439.04(a)(2)(B).  California law would apply to a potential avoidance claim because the Plan states that California law "shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan."  App. 155.

reasonably equivalent value.  Notwithstanding that conclusion, Balasiano determined that: (1) the Sunrise Transfer was not avoidable because Alecto's documents show that it was solvent at the time of the transaction,[4] and (2) suing Alecto's insiders would be costly and reduce the funds Alecto would receive under the Plan to satisfy creditors.  Based on these considerations and others, Balasiano concurred with the $25,000 Settlement.[5]

The Bankruptcy Court overruled the Reed Creditors' objections and confirmed the Plan, concluding that "Balasiano's determination that there is 'no . . . cause of action that could be brought' for fraudulent conveyance" was a reasonable basis for the Settlement, as the likelihood of success in litigation was low, litigation would be expensive and inconvenient, and the creditors would be interested in the estate receiving the $25,000 Settlement.  In re Alecto Healthcare Servs., LLC ("Alecto I"), No. 23-10787, 2024 WL 1208355, at *8, 12 (Bankr. D. Del. Mar. 20, 2024), aff'd, No. 23-10787 (JKS), 2025 WL 961482 (D. Del. Mar. 31, 2025).

The District Court agreed and affirmed both the Designation and Confirmation Orders.  It held that: (1) the LHP Debt was contingent and unliquidated because no demand for payment was received before the Petition date and the amount

---

[4] The Reed Creditors offered no evidence demonstrating that Alecto was insolvent at the time of the Sunrise Transfer.

[5] The Bankruptcy Court also heard testimony from Alecto's General Counsel and Executive Vice President, Michael Sarrao, about Alecto's finances.  Sarrao testified that, based on his review of Alecto's balance sheets, Alecto was solvent at the time of the Sunrise Transfer in 2019.

due was not precisely calculable, and (2) the settlement with the Alecto's insiders was appropriate because the Reed Creditors "failed to demonstrate that the [S]ettlement and releases embodied in the Plan fell below 'the lowest point in the range of reasonableness.'" In re Alecto Healthcare Servs., LLC ("Alecto II"), No. 23-10787 (JKS), 2025 WL 961482, at *16 (D. Del. Mar. 31, 2025).

The Reed Creditors appeal. [6]

---

[6] Alecto's motion to dismiss this appeal as both constitutionally and equitably moot lacks merit.

First, "an appeal is moot in the constitutional sense only if events have taken place during the pendency of the appeal that make it impossible for the court to grant any effectual relief whatsoever." In re World Imports Ltd., 820 F.3d 576, 582 (3d Cir. 2016) (quoting In re Cont'l Airlines, 91 F.3d 553, 558 (3d Cir. 1996) (en banc)). Alecto argues that the appeal is constitutionally moot because, even if this Court determined that the Settlement should not have been approved, we could not grant the relief the Reed Creditors seek because the statute of limitations has expired on any potential avoidance claims that Alecto could have brought. This argument fails to recognize that the statute of limitations on a fraudulent transfer claim under California law (which the parties agree applies) may be tolled "while the defendants are in a position to conceal their wrongdoing and prevent the corporation from seeking redress." In re HVI Cat Canyon, Inc., 658 B.R. 558, 573 (Bankr. C.D. Cal. 2024) (discussing California's "adverse domination" doctrine). Because the Reed Creditors maintain that Alecto intentionally hid evidence that it was insolvent, it

II[7]

is possible that the statute of limitations on the avoidance claims may be tolled. Accordingly, we cannot say that it is "impossible for the court to grant any effectual relief whatsoever," In re World Imports, 820 F.3d at 582, so the appeal is not constitutionally moot.

Second, equitable mootness is "only available in complex bankruptc[ies] where the reorganization involves intricate transactions." In re Boy Scouts of Am., 137 F.4th 126, 160 (3d Cir. 2025) (internal quotation marks and citations omitted). Subchapter V is less complicated by design, see In re Ellingsworth Residential Cmty. Ass'n, Inc., 125 F.4th 1365, 1378 (11th Cir. 2025) ("[S]ubchapter V removes many of the complex requirements that made bankruptcy unapproachable for small businesses."), and the Confirmed Plan here involves "a single integrated transaction," Mot. to Dismiss, dkt. no. 30, at 9. Because this bankruptcy lacks the complexity to which equitable mootness has been applied, the appeal here will not be deemed equitably moot.

[7] The Bankruptcy Court had jurisdiction under 28 U.S.C. §§ 1334(b) and 157(a). The District Court had jurisdiction under 28 U.S.C. § 158(a)(1). We have jurisdiction under 28 U.S.C. § 158(d)(2). On appeal of orders from the Bankruptcy Court to the District Court, "we stand in the shoes of the District Court and apply the same standard of review" that it was bound to apply, meaning "[w]e review the bankruptcy court's legal determinations de novo, its factual findings for clear error, and its discretionary decisions for abuse of discretion." In re Somerset Reg'l Water Res., LLC, 949 F.3d 837, 844 (3d Cir. 2020) (internal quotation marks omitted).

A

To proceed under Subchapter V, Alecto was required to have less than $7.5 million in liquidated, noncontingent debt as of the Petition Date. 11 U.S.C. § 1182(1)(A) (2022). Thus, we must decide whether the LHP Debt was noncontingent and liquidated as of the Petition Date because if it is, then Alecto would be ineligible for Subchapter V relief.[8] The Bankruptcy Court correctly concluded that the LHP debt was contingent and unliquidated and thus properly rejected the Reed Creditors' objection to Alecto's Subchapter V petition.

First, the LHP Debt was contingent on the Petition Date. A claim is contingent when the debtor's obligation to pay does not come into being until some future event occurs, even if the parties could have predicted the event when their relationship began. See In re Mallinckrodt PLC, 99 F.4th 617, 620 (3d Cir. 2024); 2 Collier on Bankruptcy ¶ 303.10 ("[W]hen the duty to

---

[8] The terms "noncontingent" and "liquidated" are used elsewhere in the Bankruptcy Code, so based on "the normal rule of statutory interpretation that identical words used in different parts of the same statute are generally presumed to have the same meaning," IBP, Inc. v. Alvarez, 546 U.S. 21, 34 (2005), we will consider how those words were used and interpreted in other sections. See, e.g., In re Zhang Med. P.C., 655 B.R. 403, 408 n.5 (Bankr. S.D.N.Y. 2023) ("The Court is aware of no reason why the Second Circuit's construction of the terms 'noncontingent' and 'liquidated' as used in § 109(e) should be any less applicable to those terms as used in § 1182(1)(A).").

pay does not rest upon a future event, the claim is not contingent."). Here, the plain terms of the LHP Settlement Agreement require LHP to "make written demand upon" Alecto before any payment was due. App. 624. There is no dispute that LHP did not make any written demand until after Alecto filed its bankruptcy petition. Because a future event—the written demand—had not occurred as of the Petition Date, the LHP Debt was contingent.[9] See In re Rosenberg, 414 B.R. 826, 844 (Bankr. S.D. Fla. 2009) (explaining that claim was contingent where "demand for payment must be made" before liability matures, and "no demand for payment was formally made" pre-petition), aff'd, 472 F. App'x 890 (11th Cir. 2012) (not precedential).

Second, the LHP Debt was not liquidated as of the Petition Date. "The term liquidated is not defined in the Bankruptcy Code, but courts have generally held that a debt is liquidated if its amount is readily and precisely determinable."

---

[9] The Reed Creditors' arguments to the contrary fail. First, the argument that the Settlement Agreement included only a procedure for payment rather than a condition precedent for payment ignores the plain language of the LHP Settlement Agreement (which is governed by Delaware law). Thompson St. Cap. Partners IV, L.P. v. Sonova United States Hearing Instruments, LLC, 340 A.3d 1151, 1175 (Del. 2025) (explaining that "shall" is unambiguous language that imposes a condition precedent). Second, the argument that the Settlement Agreement did not modify the 2014 Agreement ignores the merger clause, which unequivocally stated that it "set forth the entire agreement between the [p]arties and fully supersede[s] any and all prior agreements or understandings, written or oral, between the [p]arties." App. 628.

In re Burdock & Assocs., Inc., 662 B.R. 16, 20 (Bankr. M.D. Fla. 2024) (quotation marks omitted).  Here, the LHP Debt was not readily and precisely determinable because Alecto had not received any invoices, and the monthly amount due under the leases fluctuated based on several factors.  In other words, Alecto had no way of knowing how much it owed LHP prior to receiving a written demand for payment.[10]  Accordingly, the Bankruptcy Court correctly determined that the LHP debt was unliquidated as of the Petition Date.

Because the LHP Debt was contingent and unliquidated, Alecto properly proceeded under Subchapter V.

---

[10] The Reed Creditors' insistence that Alecto could have precisely calculated the amount due based on the underlying lease documents ignores the plain language of the LHP Settlement Agreement, which (1) supersedes the 2014 Agreement per the merger clause and (2) stated only that Alecto "may continue to accrue expenses in connection" with the lease agreements, without explaining how such expenses could be calculated prior to LHP making a "written demand . . . for a specified amount."  App. 624.  Moreover, there is no evidence suggesting that the debt amount was readily determinable prior to the Petition Date.  Even if the 2014 Agreement was still in effect, there was evidence that the LHP Debt would not be precisely ascertainable because, under the lease agreements, the amount due varied month-to-month.

B[11]

The Bankruptcy Court acted within its discretion in approving the Settlement. Under Federal Rule of Bankruptcy Procedure 9019, a bankruptcy court has the authority to "approve a compromise or settlement" of a claim "after notice [to the debtor, trustee and creditors] and a hearing" on the compromise. Fed. R. Bankr. P. 9019(a). The bankruptcy court must then decide whether the settlement is "fair and equitable." In re Nutraquest, Inc., 434 F.3d 639, 644 (3d Cir. 2006) (quoting Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968)). This involves "assess[ing] and balanc[ing] the value of the claim that is being compromised against the value to the estate of . . . accept[ing] . . . the compromise" by considering: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it;

---

[11] We review the approval of a settlement for an abuse of discretion. In re Nutraquest, Inc., 434 F.3d 639, 644 (3d Cir. 2006). Under this standard,

> [w]e do not disturb an exercise of discretion unless there is a definite and firm conviction that the court . . . committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors. Put another way, for us to find an abuse of discretion the District Court's decision must rest on a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact.

Id. at 645 (internal citation and quotation marks omitted) (alteration in original).

and (4) the paramount interest of the creditors." In re Martin, 91 F.3d 389, 393 (3d Cir. 1996).  In applying these so-called "Martin factors," "[t]he court need not decide the numerous questions of law or fact raised by litigation but rather should canvas the issues to determine whether the settlement falls above the lowest point in the range of reasonableness." In re Capmark Fin. Grp. Inc., 438 B.R. 471, 515 (Bankr. D. Del. 2010).

The Bankruptcy Court properly assessed the Martin factors and provided explanations tethered to the record for its conclusion that "the proposed settlement falls within a reasonable range of litigation possibility." Alecto I, 2024 WL 1208355, at *12.  As to the first factor, the Bankruptcy Court determined that "the claims have very little probability of success on the merits, if any" based on unrebutted testimony and evidence presented at the hearing regarding Alecto's solvency at the time of the Sunrise Transfer.[12]  Id.  The

---

[12] The Reed Creditors' arguments that the Bankruptcy Court abused its discretion in its assessment of the first Martin factor are meritless.

First, the Bankruptcy Court did not improperly place the burden on the Reed Creditors to show that Alecto was insolvent when it made the Sunrise Transfer.  Because the "objecting parties bear the burden of producing evidence to support their objections," In re Exide Techs., 303 B.R. 48, 58 (Bankr. D. Del. 2003), the Reed Creditors were required to show that Alecto was insolvent at the time of the Sunrise Transfer under California law, Cal. Civ. Code § 3439.04(b)(9). Accordingly, the Bankruptcy Court did not abuse its discretion

Bankruptcy Court concluded the second factor was "neutral" because "[t]here was no evidence regarding the possibility of collection on any judgment." Id.  Third, the Bankruptcy Court determined, based on Balasiano's testimony, that any litigation "[a]bsent the settlement" would be complicated because Alecto "would face increased expense, inconvenience and delay attending to litigation [as] [t]hese are complex [avoidance] claims that could cause delay in the distribution of any assets to the creditors." Id.  As to the fourth factor, the Bankruptcy

---

by relying on Alecto's evidence of solvency and requiring the Reed Creditors to offer rebuttal evidence to support their objection.

Second, contrary to the Reed Creditors' urging, Alecto was not required to present testimony from a solvency expert to obtain settlement approval.  Aetna Cas. & Surety Co. v. Jasmine, Ltd. (In re Jasmine, Ltd.), 258 B.R. 119, 123 (D.N.J. 2000) (explaining that the bankruptcy court need not conduct a "'mini-trial' on the merits" when deciding whether to approve a proposed compromise in a bankruptcy but should "canvass the issues"); see also In re Martin, 212 B.R. 316, 319 (B.A.P. 8th Cir. 1997) (explaining it is "not necessary for a bankruptcy court to conclusively determine claims subject to a compromise, nor must the court have all of the information necessary to resolve the factual dispute, for by so doing, there would be no need of settlement").

Third, the Bankruptcy Court acted within its discretion in relying on internal documents that GCS and Balasiano each reviewed, and which supported the unrebutted conclusion that Alecto was solvent at the relevant time.

Thus, the Bankruptcy Court's assessment of the first Martin factor did not rest on "a clearly erroneous finding of fact." In re Nutraquest, 434 F.3d at 645.

Court suggested that the Settlement would benefit the creditors, who will receive distributions from Alecto, which will include funds from the Settlement. Id. The Bankruptcy Court appropriately considered these factors and thus did not abuse its discretion in approving the Settlement.

## III

For the foregoing reasons, we will affirm the Designation and Confirmation Orders and deny Alecto's motion to dismiss the appeal.